**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

JACKSON WOMEN'S HEALTH
ORGANIZATION, on behalf of itself and its
patients,

SACHEEN CARR-ELLIS, on behalf of
herself and her patients,

                Plaintiffs,

v.

MARY CURRIER, M.D., M.P.H., in her
official capacity as State Health Officer of the
Mississippi Department of Health,

MISSISSIPPI STATE BOARD OF
MEDICAL LICENSURE,

KENNETH CLEVELAND, M.D., in his
official capacity as Executive Director of the
Mississippi State Board of Medical Licensure,

ROBERT SHULER SMITH, in his official
capacity as District Attorney for Hinds
County, Mississippi,

GERALD A. MUMFORD, in his official
capacity as County Attorney for Hinds
County, Mississippi,

and

WENDY WILSON-WHITE, in her official
capacity as City Prosecutor for the City of
Jackson, Mississippi,

                Defendants.

Case No. 3:18-cv-00171-CWR-FKB

**<u>AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE ............................................................................... 6

PARTIES ................................................................................................................... 7

    A.    Plaintiffs ........................................................................................... 7

    B.    Defendants ........................................................................................ 7

FACTUAL ALLEGATIONS ................................................................................... 8

I.    Mississippi Women Are Being Denied Their Constitutional Right to Access Abortion ...................................................................................................... 8

    A.    Mississippi Lags the Rest of the Nation in Access to Abortion .......................... 9

    B.    Mississippi's Laws and Regulations Create a Significant Burden on Women's Access to Abortion in Mississippi ........................................ 10

II.    Mississippi Has Intentionally Targeted Providers of Abortion Care and Tried to Eliminate Women's Ability to Exercise Their Constitutional Rights ............................ 13

III.    Mississippi's Laws and Regulations Target Women's Access to Abortion Care with No Corresponding Benefit ............................................................................ 17

    A.    Abortion Is Safe .............................................................................. 19

    B.    Mississippi's Abortion Licensing Scheme Targets Providers of Abortion Care .......................................................................... 22

            1.    Mississippi's TRAP Scheme Creates Substantial Obstacles to Abortion Access with No Medical Benefit ............................... 23

            2.    The TRAP Licensing Scheme Creates Unjustified Barriers to New Facilities ......................................................................... 30

    C.    Mississippi Has Created Unconstitutional Legal Barriers to Women's Access to Abortion ....................................................................... 34

            1.    Mandatory Delay and Two Trip Requirement .......................... 34

            2.    Physician Only Requirement ................................................. 40

            3.    Telemedicine Ban ............................................................... 43

    D.    The Challenged Laws and Regulations Cumulatively Impose an Undue Burden on Women's Access to Abortion in Mississippi ....................................... 47

IV.    The 15 Week Ban Unconstitutionally Deprives Women of the Right to an Abortion Before Viability .......................................................................................... 48

CLAIMS FOR RELIEF ....................................................................................... 51

    COUNT I  SUBSTANTIVE DUE PROCESS—15 WEEK BAN ................................... 51

    COUNT II  SUBSTANTIVE DUE PROCESS—CUMULATIVE BURDEN ............... 52

COUNT III  SUBSTANTIVE DUE PROCESS—INDIVIDUAL LAWS ...................... 52

COUNT IV  SUBSTANTIVE DUE PROCESS—ARBITRARY DEPRIVATION
OF LIBERTY .................................................................................... 53

COUNT V  EQUAL PROTECTION ............................................................. 53

COUNT VI  FIRST AMENDMENT .............................................................. 54

PRAYER FOR RELIEF ............................................................................... 54

Plaintiffs Jackson Women's Health Organization ("JWHO" or the "Clinic"), on behalf of itself and its patients, and Dr. Sacheen Carr-Ellis, on behalf of herself and her patients (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

### PRELIMINARY STATEMENT

1.      Three weeks ago, Mississippi Governor Phil Bryant signed the latest in a long series of unconstitutional laws and regulations designed to restrict access to abortion within state borders.  This new law—a ban on abortions after 15 weeks—is only the most recent salvo in what has been a 25-year legislative campaign to eliminate women's constitutional right to access abortion in Mississippi.  The tactics and focus in this campaign have shifted over the past two decades, but the goal has always been clear: as stated by Governor Bryant, it is "ending abortion in Mississippi."

2.      Mississippi has not been able to achieve its goal directly through an outright ban on abortion.  The U.S. Supreme Court has prevented that by repeatedly re-affirming that women have a constitutional right "to choose to have an abortion before viability and to obtain it without undue interference from the State."  *Planned Parenthood of Se. Pa.* v. *Casey*, 505 U.S. 833, 846 (1992).  Instead, Mississippi has attempted to circumvent the Supreme Court's rulings by passing a series of targeted laws and regulations designed to choke off access to abortion in the state, primarily by decreasing the number of providers of abortion care, while at the same time delaying and misinforming women who manage to reach these providers.

3.      The impact of these targeted laws and regulations on access to abortion in Mississippi is clear.  In the early 1980s, there were several providers of abortion care operating in Mississippi, providing women access to legal and safe abortion.  By 2004, there was only

one—Plaintiff Jackson Women's Health Organization.  Today, 81 out of Mississippi's 82 counties have no provider of abortion care and 91% of women in Mississippi live in a county without a provider.  The number of abortions provided annually in Mississippi has declined by almost two-thirds from 1991 to 2014.  Nationally, women obtain abortions at almost four times the rate of Mississippi women.

4.     While the decline in access to abortion care in Mississippi is stark, the state's legislative and regulatory efforts are not unique.  Other states like Texas, Louisiana, Oklahoma, and Kansas—to name just a few—have also passed similar legislation and regulations aimed directly at providers of abortion care and their patients.  None of these actions make abortions safer or improve women's health; instead, they are part of a national "step-by-step" legislative strategy by anti-abortion groups and their partners in state legislatures to eliminate abortion through a series of "accumulated" legislative victories—achieving incrementally what the Constitution prohibits states from doing outright.  As one of the key anti-abortion groups in this effort has stated: "[t]hese legislative efforts are at the very heart of our work, and they are one of the keys to ending abortion in the United States."  *The State of Abortion in the United States*, NATIONAL RIGHT TO LIFE COMMITTEE 4 (Jan. 2018), https://www.nrlc.org/communications/stateofabortion/.

5.     These efforts to undermine women's constitutional rights have not gone unnoticed or unchallenged.  In 2016, the U.S. Supreme Court struck down a set of laws in Texas similar to Mississippi's anti-abortion regime challenged here.  In *Whole Woman's Health* v. *Hellerstedt*, the Supreme Court explained that Texas's anti-abortion laws were unconstitutional because the burdens they imposed on abortion access outweighed the meager benefits, if any, they conferred.  136 S. Ct. 2292, 2309–10 (2016).  The district court in fact described the Texas

laws as "a brutally effective system of abortion regulation that reduces access to abortion clinics thereby creating a statewide burden for substantial numbers of . . . women." *Whole Woman's Health* v. *Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014), *aff'd*, 136 S. Ct. 2292 (2016).

6.       Despite decades of Supreme Court precedent, including most recently *Whole Woman's Health*, Mississippi's efforts to eliminate access to abortion have proceeded largely unabated.  For example, the State has imposed a byzantine series of unnecessary regulations on providers of abortion care.  These regulations—also known as Targeted Regulation of Abortion Providers or "TRAP"—are unnecessary because they have nothing to do with women's health or providing safer abortion care.  Without them, providers of abortion care would still be subject to the rules that govern office-based medical procedures in Mississippi that ensure such procedures are performed safely and in the patients' best interests.  Instead, this TRAP regime is clearly designed to place substantial obstacles in the way of women seeking abortions.  It also obstructs abortion access by imposing a cumulative regulatory burden on providers of abortion care that is simply not imposed on other medical practitioners who perform procedures with equal or higher complication rates.

7.       Mississippi has also passed a series of laws that impermissibly burden women's access to abortion care by delaying, demeaning, and misinforming women who seek such care.  Providers of abortion care are then forced to comply with these laws under threat of criminal penalty.  Like the TRAP regime, these laws are not supported by any credible medical evidence that they benefit women's health; in fact, many are inconsistent with the standard of care recognized by the American Medical Association, the American College of Obstetricians and Gynecologists (or "ACOG"), and the American Academy of Family Physicians, among others.

8.      Mississippi's latest legislative effort to restrict abortion access is House

Bill 1510 ("H.B. 1510" or the "15 Week Ban").  This law includes a provision banning abortion

after 15 weeks (with narrow exceptions), which is at least eight weeks before viability.  Yet

under decades of Supreme Court precedent, Mississippi cannot ban abortion prior to viability,

regardless of what exceptions are provided to the ban.  There is no question that the 15 Week

Ban is unconstitutional under Supreme Court precedent.

9.      The overall burden created by Mississippi's abortion regime is evident in

the lack of Mississippi abortion providers and the statistics on access in the state.  Hidden behind

those numbers is the impact Mississippi's abortion laws have on individual women and families

affected by the lack of access to abortion care.  For example, Mississippi's arbitrary requirement

that a woman must visit a clinic twice to obtain an abortion, when for any other comparable care

she would have to go only once, means that many women must take additional time off from

work, often forcing them to forego wages or perhaps even putting their employment at risk.

And, because the only abortion clinic left in the state is in Jackson, a woman who wants to obtain

abortion care in Mississippi may be forced to travel a significant distance to her two required

appointments, trips that are particularly difficult for someone who does not own a car.  The time

these trips take may also necessitate additional childcare expenses and require explanations to a

husband, partner, or other family member that put women at risk of domestic violence or worse.

These burdens are considerable and real to many women who seek or would seek an abortion in

Mississippi and, individually and collectively, they create a substantial obstacle to women who

seek to exercise their constitutional right to access abortion care.

10.     In 2016, in *Whole Woman's Health,* the Supreme Court found that the

Texas abortion regime challenged in that case was unconstitutional because it created a

substantial obstacle to women seeking access to abortion care in the state.  Mississippi's abortion

laws and regulations are no different, and (like the Texas regime) have created a "brutally

effective" system of abortion regulations that unduly burdens women and singles out providers

of abortion care for arbitrary treatment in order to eliminate access to abortion in the state.

Accordingly, Plaintiffs bring this action pursuant to both the Due Process and Equal Protection

Clauses of the Fourteenth Amendment, seeking a declaration that the following Mississippi laws

and regulations targeting providers of abortion care and their patients are unconstitutional, and

seeking an injunction to prevent these unconstitutional laws from being enforced:

- The licensing scheme that subjects providers of abortion care to more burdensome regulations than healthcare providers who perform office-based procedures that have a similar or greater risk of complications, *see* Miss. Code Ann. § 41-75-1 *et seq.*; Miss. Admin. Code § 15-16-1:44.1.1 *et seq.* (the "TRAP Licensing Scheme");

- The requirement that women make two trips to a provider of abortion care that are separated by at least 24 hours in order to have an abortion, *see* Miss. Code Ann. § 41-41-33 (the "Mandatory Delay and Two Trip Requirement");

- The requirement that providers of abortion care recite false, misleading, and medically irrelevant information to their patients, or face criminal prosecution, *see* Miss. Code Ann. § 41-41-33 (the "Biased Counseling Law");

- The prohibition on qualified advanced practice clinicians ("APCs") providing abortion care, *see* Miss. Code Ann. § 41-75-1(f) (the "Physician Only Requirement"); and

5

- The prohibition on the practice of telemedicine that applies only in the context of providing abortion care, *see* Miss. Code Ann. §§ 41-41-33, 41-41-107 (the "Telemedicine Ban").

11.     These laws and regulations lack any legitimate justification, medical or otherwise, and, individually and collectively, have the purpose or effect of placing substantial obstacles in the way of women seeking abortion care in Mississippi.

12.     Plaintiffs also seek a declaration and injunction against H.B. 1510 because it bans abortion prior to viability, in violation of the liberty rights of Plaintiffs' patients, as guaranteed by the Fourteenth Amendment, and against Mississippi's Biased Counseling Law, which forces Dr. Carr-Ellis to recite to her patients a state-mandated message that falls outside accepted ethical standards and practices for informed consent practices in violation of her rights under the First Amendment.  *See* Miss. Code Ann. § 41-41-33.

## JURISDICTION AND VENUE

13.     This action arises under the Constitution of the United States and the laws of the United States, including 42 U.S.C. § 1983.  Thus, this Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because it arises under federal law, and pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation of rights, privileges, and immunities secured by the Constitution of the United States.

14.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

15.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

### A.    Plaintiffs

16.    Jackson Women's Health Organization is a health care facility in Jackson, Mississippi that has been providing pregnancy testing, contraception counseling, and abortion care to women since 1996.  Upon information and belief, it has been the sole licensed "Abortion Facility*," see* infra ¶ 58, in the State of Mississippi for more than a decade.  The Clinic is a member of the National Abortion Federation, the professional association of abortion providers, and has been continuously licensed as an abortion facility by the Mississippi Department of Health (the "MDH") since it opened.  The Clinic sues on its own behalf and on behalf of its patients.

17.    Plaintiff Sacheen Carr-Ellis, M.D., M.P.H., is a board-certified obstetrician-gynecologist licensed to practice medicine in Mississippi, Alabama, Maryland, and Massachusetts.  Dr. Carr-Ellis graduated with an M.D. from Albany Medical College and a master's in public health from Boston University.  She completed her residency in obstetrics and gynecology at Boston University School of Medicine.  Dr. Carr-Ellis has been providing reproductive health care since 1999.  She has provided reproductive health care at the Clinic since 2014 and has been the Clinic's medical director since 2015.  Dr. Carr-Ellis sues on behalf of herself and her patients.

### B.    Defendants

18.    Defendant Mary Currier, M.D., M.P.H., is the State Health Officer of the Mississippi Department of Health.  Among other things, Defendant Currier is responsible for supervising and directing all activities of the Department of Health, pursuant to Miss. Code Ann. §§ 41-3-5.1, 41-3-15(1)(c).  Defendant Currier also has the authority to adopt and enforce regulations and standards with respect to abortion facilities, pursuant to Miss. Code Ann.

§ 41-75-13, and to revoke, suspend, or deny a license for violation of this or any law, pursuant to Miss. Admin. Code § 15-16-1:44.3.8.  She is sued in her official capacity.

19.     Defendant Mississippi State Board of Medical Licensure has the authority to suspend or revoke a physician's license to practice medicine in the State of Mississippi if the physician violates the 15 Week Ban, pursuant to H.B. 1510 § 1.6.

20.     Defendant Kenneth Cleveland, M.D., is the Executive Director of the Mississippi State Board of Medical Licensure.  He is responsible for the day-to-day operations of the Board, pursuant to Code Miss. R. 30-17-2645:1.2(F).  He is sued in his official capacity.

21.     Defendant Robert Shuler Smith is the District Attorney for Hinds County, Mississippi, which includes the City of Jackson.  Defendant Smith has criminal enforcement authority for violations of the licensing scheme for abortion facilities, pursuant to Miss. Code Ann. § 41-75-26(1).  He is sued in his official capacity.

22.     Defendant Gerald A. Mumford is the County Attorney for Hinds County, Mississippi.  Among other things, Defendant Mumford is responsible for prosecuting misdemeanors, pursuant to Miss. Code Ann. § 19-23-11(4).  He is sued in his official capacity.

23.     Defendant Wendy Wilson-White is the City Prosecutor for the City of Jackson, Mississippi.  Defendant Wilson-White has the authority to prosecute misdemeanor offenses committed in the City of Jackson, pursuant to Miss. Code Ann. § 21-13-19.  She is sued in her official capacity.

**FACTUAL ALLEGATIONS**

## I.   Mississippi Women Are Being Denied Their Constitutional Right to Access Abortion

24.     In the half-century since it decided *Roe* v. *Wade*, 410 U.S. 113 (1973), the Supreme Court has, time and again, "reaffirm[ed] . . . the right of the woman to choose to have

an abortion before viability and to obtain it without undue interference from the State." *Casey*, 505 U.S. at 846.  The Supreme Court has also repeatedly explained that both the right and the access it protects must be practical, not merely theoretical.  As the Supreme Court recently reiterated, laws that "have the *purpose or effect* of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right."  *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 878) (emphasis added).  Thus, *even* where a statute serves a "valid state interest," if it also "has the effect of placing a substantial obstacle in the path of a woman's choice[, it] cannot be considered a permissible means of serving its legitimate ends" and is thus unconstitutional.  *Id.* (quoting *Casey*, 505 U.S. at 877).

25.     The Supreme Court has also repeatedly reaffirmed the importance of safe and legal abortion access, including its vital role in facilitating "[t]he ability of women to participate equally in the economic and social life of the Nation." *Casey*, 505 U.S. at 856.  The availability of abortion enables women to decide whether to forego educational and economic opportunities due to unplanned pregnancy, whether to raise children with an absent or unwilling partner, and whether to accept the risk of carrying medically compromised pregnancies to term.

### A.     Mississippi Lags the Rest of the Nation in Access to Abortion

26.     In 2014, there were 14.6 abortions per 1,000 women of reproductive age nationally, compared to 8.5 abortions per 1,000 women of reproductive age living in Mississippi. According to data collected by the Centers for Disease Control and Prevention ("CDC"), for those women living in Mississippi who did have an abortion, more than half obtained abortion care outside the state.  Tara C. Jatlaoui *et al.*, *Abortion Surveillance—United States, 2014*, 66 Morbidity and Mortality Weekly Report 20 (CDC Nov. 24, 2017), https://www.cdc.gov/mmwr/volumes/66/ss/pdfs/ss6624-H.PDF.

27.     The lower abortion rate in Mississippi is not the result of fewer pregnancies overall or fewer unplanned pregnancies in the state.  On the contrary, according to the CDC, approximately 62% of all pregnancies in Mississippi were unintended in 2010, compared to 45% nationally in 2011.[1]  Of the unintended pregnancies, 22% resulted in abortion in Mississippi in 2010, whereas 42% resulted in abortion nationwide in 2011.  Mississippi also has the highest or second-highest teen pregnancy rate in the country (depending on the year) – a rate almost double the national average.

28.     The explanation for the substantially reduced rate of abortion in Mississippi lies in the legislature's concerted efforts over the past two-plus decades to limit access to abortion by regulating abortion and providers of abortion care out of existence.  As a result of these efforts, Jackson Women's Health Organization is now the only clinic providing abortion care in the whole state, meaning that 81 out of Mississippi's 82 counties are without an abortion provider and 91% of Mississippi women live in a county where they cannot obtain an abortion.  If the Clinic were to close, Mississippi women's constitutional right to access abortion care would be effectively eliminated within state borders.

**B.     Mississippi's Laws and Regulations Create a Significant Burden on Women's Access to Abortion in Mississippi**

29.     Mississippi's abortion laws and regulations create an undue burden on women who seek abortions in the state.  For example, under Mississippi law, JWHO's clinicians are required to provide state-mandated biased information "orally and in person" to a patient seeking an abortion, after which the patient must wait 24 hours before returning to the Clinic a second time to obtain the abortion.  Because this law forces women to make two trips to the

---

[1]    The most recent year for which Mississippi data is available is 2010; nationally aggregated data is not available for 2011.

Clinic for an abortion some Mississippi women are forced to undertake the time and expense to travel over 600 miles or 10 hours to access abortion care at the Clinic.  *See infra* ¶¶ 94–96.  And the ban on telemedicine that only applies to medical care related to abortion means that women must make an unnecessary trip to Jackson to receive medical services that, for other health care, would be available through telemedicine.  *See infra* ¶¶ 116–27.  With access to telemedicine, the clinician could at least provide the state-mandated information to many of these patients over a monitor so the patients would not need to make two trips to the Clinic.

30.     Mississippi's mandated burdens of delay and two separate trips to the Clinic are magnified for low-income women who, in the United States, make up 75% of the women who have abortions.  For these women, travel of even short distances—30 to 50 miles, for example—can present significant obstacles as they must find or save money for the cost of transportation and other travel-related expenses and potentially take time off from work.  Many must also find child care—not once but twice because of the Two Trip Requirement—as approximately two-thirds of the women who have an abortion at the Clinic already have at least one child.

31.     These burdens are particularly acute in Mississippi, where almost a quarter of all working-age women (between the ages of 18 and 64) live below the poverty line—the highest percentage of women living below the poverty line in the nation—and many more qualify as low income.  This means that many Mississippi women do not earn enough to cover their monthly expenses and do not have enough money at the end of each month to buy food and pay their bills.  In fact, Mississippi is the most food-insecure state in the nation—more than one in five households do not consistently have the resources to put food on the table.

32.     For women struggling just to feed their families, *any* additional costs created by Mississippi's abortion regime can make abortion care prohibitively expensive.  And while the medical profession recognizes that abortion is an important component of women's health and reproductive health care, many women in Mississippi do not have insurance that covers abortion care.  Health insurance purchased through the state exchange is prohibited from covering abortion care.  *See* Miss. Code Ann. § 41-41-99(1).  Public funds may not be used to pay for abortion, except when a woman's life is in danger or when she has reported being a victim of rape or incest both to law enforcement and to a physician who has certified the report.  Thus, the majority of women must pay for abortion care out of pocket.

33.     Mississippi's abortion laws and regulations also create a significant burden on women by delaying or preventing their access to abortion care.  For example, due to the Mandatory Delay and Two Trip Requirement, some women must delay care in order to make the necessary logistical and transportation arrangements.  Financial need may also create delays; indeed one of the most frequently cited reasons for delay is raising money for abortion care.  These financial issues are linked not only to the lack of insurance coverage for abortion care, but also to the increased costs associated with travel and child care necessitated by Mississippi's abortion laws.

34.     The burdens created by these delays are not only financial.  Delay also increases health risks for women.  For example, the risks of pregnancy, as well as the attendant physical and psychological burdens, increase the longer a pregnancy continues.  The comparative risks associated with abortion procedures (while still very small) also increase as pregnancy advances.  Finally, because some of the challenged laws work to delay access and others limit when a woman may seek care—most notably the 15 Week Ban—some Mississippi women are

delayed out of their ability to have the procedure at all and must carry a pregnancy to full term, with attendant psychological and physical risks.  Others are forced to leave the state to access care while some resort to self-help methods, which can be unsafe or ineffective.

35.     Mississippi's abortion regime also creates undue burdens on women by devaluing their opinions, autonomy, and decision-making power.  Pregnant women are capable of deciding whether and when to end a pregnancy, taking into account all relevant factors. Forcing women to delay their access to abortion does not respect women's rights to make decisions about their own health; indeed, studies have shown that the majority of women seeking abortions would have preferred to obtain their abortions earlier than they did.  Forcing women to carry a pregnancy to term promotes the stereotyped notions that motherhood is the preferred, natural, and proper state for women.  It also suggests that women are not capable of making decisions about the timing, number, and spacing of children, but rather must be protected from the consequences of making decisions that others see as wrong.

## II.     Mississippi Has Intentionally Targeted Providers of Abortion Care and Tried to Eliminate Women's Ability to Exercise Their Constitutional Rights

36.     The obstacles Mississippi has erected to women's access to abortion in the state are the result of a coordinated legislative strategy by Mississippi politicians and various anti-abortion groups dedicated to eliminating access to abortion throughout the country.  The stated goal of this strategy is to eliminate abortion in the state altogether, including by forcing providers of abortion care to close, regardless of women's constitutional rights and regardless of the impact on women's health, women's autonomy to pursue their own goals and values, or women's ability to pursue educational and economic opportunities.

37.     Mississippi has not yet been able to ban abortion outright, due to decades of U.S. Supreme Court precedent.  But it has made clear that its intent is to recriminalize

13

abortion as soon as possible, and in 2007, Mississippi passed legislation imposing a criminal ban on all abortions and punishing clinicians with up to 10 years imprisonment for performing them, to be enforced if *Roe* v. *Wade* is ever reversed.  *See* Miss. Code Ann. § 41-41-45.

38.   In the meantime, Mississippi has enacted a web of laws and regulations that have undermined women's constitutional rights by choking off access to abortion in the state.  This effect on access was not incidental.  Over the years, Mississippi's legislators, including both the current and former Governor, have made clear statements that the purpose of these laws and regulations is to end legal abortion in Mississippi:

- "Rest assured that I am as committed as ever to ending abortion in Mississippi."  Governor Bryant, speaking on the 42nd Anniversary of *Roe* v. *Wade* (Jan. 22, 2015), http://www.governorbryant.ms.gov/Pages/_Governor-Phil-Bryant-Comments-on-42nd-Anniversary-of-Roe-v-Wade.aspx.

- "Please rest assured that I also have not abandoned my hope of making Mississippi abortion free."  Governor Bryant, Mississippi State of the State Address 2012 (Jan. 24, 2012), http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2012/01/24/mississippi-state-of-the-state-address-2012.

- "We are very close to ending abortion in Mississippi, and I support all the pro-life bills that will do just that."  Lieutenant Governor Tate Reeves, *quoted in* Elizabeth Waibel, *Reeves: "Very Close to Ending Abortion in Miss.," JACKSON FREE PRESS* (Mar. 28, 2012, 4:53 p.m.), http://www.jacksonfreepress.com/news/2012/mar/28/reeves-very-close-to-ending-abortion-in-miss/.

- "I would love for Mississippi to become the first state in the nation to completely ban [abortions]."  Senate Public Health Committee Chairman Alan Nunnelee, *quoted in* Holbrook Mohr, *Lawmakers Hope to Link Sonograms With Abortion; Believe Women Would Reconsider*, THE COMMERCIAL APPEAL (Jan. 21, 2007).

- "We've reduced those [abortion] numbers by over 60 percent adding various constitutionally allowable requirements on these (abortion) clinics. So our strategy is being successful."  Senate Public Health Committee Chairman Nunnelee, *quoted in* Holbrook Mohr, *Abortion Ban Bill Heads; for Barbour's Signature*, THE COMMERCIAL DISPATCH (Mar. 9, 2007) (discussing S.B. 2391).

14

- "I said during my campaign that if we're ever going to end the tragedy of abortion, we have to start by changing hearts and minds one at a time.  I think this is a good start."  Governor Haley Barbour, Statement, *Governor Haley Barbour Caps Successful Pro-Life Agenda; Signs Four Bills* (May 6, 2004) (describing the slate of laws Governor Barbour signed, including a requirement that abortions after the first trimester could only be performed at hospitals and ambulatory surgical facilities that was later deemed unconstitutional).

39.    This overriding intent was clearly articulated by Mississippi legislators in connection with H.B. 1390—the 2012 bill that, among other things, required all physicians who provided abortion care in Mississippi to have admitting privileges at a local hospital and that was deemed unconstitutional based on the Supreme Court's ruling in *Whole Woman's Health*—was signed into law.  *See* Miss. Code Ann. § 41-75-1(f) (codification of H.B. 1390).  For example:

- H.B. 1390 was part of "a movement . . . to try and end abortion in Mississippi."  Governor Bryant, *quoted in* Roslyn Anderson, *Gov. Bryant Signs Abortion Bill*, MISS. NEWS NOW (2012), http://www.msnewsnow.com/story/17461039/gov-bryant-to-sign-abortion-bill.

- H.B. 1390 "should effectively close the only abortion clinic [Plaintiff JWHO] in Mississippi."  Lieutenant Governor Reeves, *quoted in* Elizabeth Waibel, *Reeves: "Very Close to Ending Abortion in Miss."* JACKSON FREE PRESS (Mar. 28, 2012, 4:53 PM), http://www.jacksonfreepress.com/news/2012/mar/28/reeves-very-close-to-ending-abortion-in-miss/.

- "Our goal needs to be to end all abortions in Mississippi.  I believe the admitting privileges bill gives us the best chance to do that."  Lieutenant Governor Reeves, *quoted in* Faith Eischen, *Mississippi's Last Abortion Clinic to Remain Open, For Now*, IVN (July 11, 2012), https://ivn.us/2012/07/11/mississippi-last-abortion-clinic-to-stay-open/.

- "I think if this legislation causes there to be fewer abortions in Mississippi that is a positive result."  House Public Health Committee Chairman Sam Mims V, who authored H.B. 1390, *quoted in* Ellen Ciurczak, *Abortion Debate Lives On*, HATTIESBURG AMERICAN (Mar. 25, 2012).

- "There's only one abortion clinic in Mississippi [JWHO].  I hope this measure shuts that down."  State Senator Merle Flowers, *quoted in Mississippi Sole Abortion Clinic Sues Over New Law Aimed to Close Its Doors*, RTT NEWS (June 29, 2012, 1:28 PM),

http://www.rttnews.com/1915003/mississippi-sole-abortion-clinic-sues-over-new-law-aimed-to-close-its-doors.aspx.

- "We have literally stopped abortion in the state of Mississippi."  State Representative Bubba Carpenter after passage of H.B. 1390, *quoted in* Karen McVeigh, *Mississippi Abortion Clinic's Forced Closure Challenged in Federal Court*, THE GUARDIAN (June 27, 2012, 5:46 PM), https://www.theguardian.com/world/2012/jun/27/mississippi-abortion-clinic-closure-challenged.

40.     Many of Mississippi's efforts have been applauded—if not directed—by national anti-abortion groups that seek to eliminate abortion throughout the United States. Americans United for Life ("AUL"), the architects of much of the legislation challenged here, has praised Mississippi as an "excellent example of the cumulative effectiveness of the step-by-step enactment of" laws targeted at abortion.  *Defending Life 2013*, AMERICANS UNITED FOR LIFE 55 (2013), http://aul.org/featured-images/AUL-1301_DL13%20Book_FINAL.pdf.  In 2013, AUL noted that "[o]ver the past two decades, Mississippi has adopted more than a dozen [abortion-restricting] laws.  As a result, abortions in the state have decreased by nearly 60 percent and six out of seven abortion clinics have closed."  *Id*.  The Mississippi affiliate of National Right to Life similarly boasted: "Working with elected officials at all levels of government, [Mississippi Right to Life] has been able to support the enactment of many pro-life statutes."  *About Us*, MISSISSIPPI RIGHT TO LIFE, http://www.msrtl.org/about-us.html (last visited Apr. 4, 2018).

41.     As with past laws and regulations, the intent behind Mississippi's most recent effort to limit access—the 15 Week Ban—is clear.  In fact, a number of the same individuals who have previously expressed their support for ending abortion in Mississippi were also supporters of the 15 Week Ban.  The Ban itself was the result of lobbying efforts by the Alliance Defending Freedom ("ADF"), a national advocacy group that is attempting to "put an end to the abortion industry," which not only drafted the bill, but specifically chose Mississippi

16

to enact it.  Denise Burke, senior counsel at ADF, recently explained that the purpose of the 15

Week Ban is to end abortion outright by "baiting" a challenge to its constitutionality that would

ultimately reach the Supreme Court and result *Roe* v. *Wade* being overturned.  Arielle Dreher,

*Reversing "*Roe*"; Outside Group Uses Mississippi as "Bait" to End Abortion*, JACKSON FREE

PRESS (Mar. 14, 2018, 10:06 a.m.),

http://www.jacksonfreepress.com/news/2018/mar/14/reversing-roe-using-mississippi-bait-end-

abortion/.  ADF deliberately chose Mississippi to be the first state to pass such a ban because, as

Burke explained: "We have very carefully targeted states based on where we think the courts are

the best, where we think the governors, the AGs and the legislatures are going to do the best job

at defending these laws."  ADF's lobbying efforts were so successful that three individual

lawmakers—Representative Becky Currie, Senator Angela Hill, and Senator Joey Fillingane—

introduced competing, *identical* versions, of ADF's work, though only Currie's bill, H.B. 1510,

survived.

III.     **Mississippi's Laws and Regulations Target Women's Access to Abortion Care with
         No Corresponding Benefit**

         42.     In *Whole Woman's Health*, the Supreme Court reiterated that

"[u]nnecessary health regulations that have the purpose or effect of presenting a substantial

obstacle to a woman seeking an abortion impose an undue burden on the right" to choose.  136 S.

Ct. at 2309 (quoting *Casey*, 505 U.S. at 878).  Moreover, "statute[s] which, while furthering [a]

valid state interest, ha[ve] the effect of placing [] substantial obstacle[s] in the path of a woman's

choice cannot be considered [] permissible means of serving [a state's] legitimate ends."  *Id.*

(quoting *Casey*, 505 U.S. at 877).  Because access to abortion is "a constitutionally protected

personal liberty," courts reviewing laws that regulate abortion must "consider the burdens a law

imposes on abortion access together with the benefits those laws confer"—including the "existence or nonexistence of medical benefits." *Id.*

43.     Plaintiffs challenge three categories of Mississippi laws and regulations aimed at both providers of abortion care and women seeking abortions.  The first is the separate TRAP Licensing Scheme for "Abortion Facilities," codified in part at Miss. Code Ann. § 41-75-1 *et seq*.  The TRAP Licensing Scheme requires providers of abortion care to obtain and renew a particular health care facility license and to meet separate (albeit in some instances overlapping) sets of requirements established by both the Mississippi legislature and MDH via its implementing regulations in order to obtain or keep that license.  *See* Miss. Admin. Code § 15-16-1:44.1.1 *et seq.* ("Minimum Standards of Operation for Abortion Facilities"); Miss. Admin. Code § 15-16-1:42.1.1 *et seq.* ("Minimum Standards of Operation for Ambulatory Surgical Facilities").  These laws and regulations are imposed on facilities providing abortion care but not on medical facilities offering similar—and in many cases much riskier—care and procedures. Together, the laws and regulations that make up this licensing system constitute Mississippi's TRAP Licensing Scheme.

44.     The second category of laws Plaintiffs challenge are laws intended to delay, demean, and misinform women seeking abortion care.  These laws, including the Mandatory Delay and Two Trip Requirement, Biased Counseling Law, and Telemedicine Ban, dictate the type of medical care providers can offer, and thus patients can receive, without regard to the standard of care or the patients' best interests.  *See* Miss. Code Ann. § 41-41-31 *et seq.*

45.     Third, the ban on abortions after 15 weeks from a woman's last menstrual period unlawfully strips women of their constitutional right to choose an abortion before viability.

A.     **Abortion Is Safe**

46.     Legal abortion is among the safest, most common medical procedures American women undergo.  In fact, nearly one in four women in the United States (23.7%) will have had an abortion by the time she is 45 years old.  Complication rates for abortion, including after 15 weeks from a woman's last menstrual period, are similar to or lower than for other outpatient procedures.

47.     As the Supreme Court has recognized, abortion is a safe procedure with low risk of complications.  *See Whole Woman's Health*, 136 S. Ct. at 2315–16.  The leading medical authorities, including the American College of Obstetricians and Gynecologists, the American Medical Association, the American Academy of Family Physicians, the American Academy of Pediatrics, and the American Osteopathic Association have all concluded not just that abortion is an extremely safe medical procedure, but that it is actually one of the safest medical procedures performed in the United States.

48.     In one of the most comprehensive studies to date, published in *Obstetrics & Gynecology*, the medical journal of ACOG, researchers found that major complications (defined as requiring hospital admission, surgery, or blood transfusion) from abortions occurred in less than one-quarter of one percent (0.23%) of cases.

49.     Indeed, abortion is far safer than the alternative of carrying a pregnancy to term, particularly in Mississippi.  Every year, 2% to 10% of pregnant women in the United States suffer from gestational diabetes mellitus, and approximately half of these women will go on to develop type two diabetes after pregnancy—a seven-fold increase in risk.  According to the CDC, 144 in 10,000 women who gave birth in a hospital in the United States in 2014 experienced unexpected outcomes of labor and delivery that resulted in significant short- or

long-term consequences; such "severe maternal morbidity" disproportionately affects minority women.

50.     The risk of death associated with childbirth is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions.  This is especially true for women in Mississippi, which has the second-highest maternal mortality rate in the country.  In Mississippi, the maternal mortality rate is more than *twice* the national average, at 39.7 pregnancy-related deaths per 100,000 live births between 2010 and 2012, the most recent data available.  For African-American women in Mississippi, the maternal mortality rate is even worse: there were 54.7 deaths per 100,000 live births from 2011 to 2012.  *Pregnancy-Related Maternal Mortality, 2011–2012*, MISSISSIPPI STATE DEPARTMENT OF HEALTH, http://msdh.ms.gov/msdhsite/_static/resources/5631.pdf (last visited Apr. 4, 2018).  By contrast, according to the CDC, there were only 0.62 deaths per 100,000 legally induced abortions in the period 2008 through 2013, a fatality rate of 0.0006%.  It is thus roughly 64 times more dangerous for a woman to give birth in Mississippi than it is for her to undergo a legal abortion.

51.     Jackson Women's Health Organization performs abortions up to 16 weeks, 0 days as measured from the first day of a woman's last menstrual period.  The two abortion techniques used at the Clinic are non-surgical—medication abortion and a procedure called vacuum aspiration ("aspiration").  Both are safe and effective.

52.     Medication abortion is available up through 10 weeks from a woman's last menstrual period.  Medication abortion is administered by oral consumption of two pills.  Typically, a patient takes the first medication, mifepristone (distributed as Mifeprex), at the health facility, and then a second medication, misoprostol (distributed as Cytotec), up to 48 hours

20

later at home or another location of her choosing, where she passes the pregnancy in a process similar to a miscarriage.

53.    Aspiration abortion, also referred to as "suction curettage" or "dilatation and curettage" ("D&C") is a straightforward outpatient procedure.  It is sometimes referred to as "surgical" abortion, although no incision is made.  Typically, the clinician uses a speculum—the same instrument used in a routine "pap" smear—and dilates the patient's cervix before inserting a thin tube through the cervix into the uterus, which is evacuated with gentle suction.  The entire procedure typically takes about five to ten minutes.  This procedure is identical in the contexts of abortion and miscarriage (spontaneous abortion).

54.    Because there is no incision and instruments are introduced through a body cavity, aspiration abortion does not need to be performed in a sterile operating room.  Nor does an aspiration procedure require general anesthesia.  And while some clinicians may use a local anesthetic and/or minimal sedation that carry their own risks, JWHO only dispenses over-the-counter medications.

55.    Complications associated with either medication or aspiration abortion are rare.  Abortion is as safe as, if not safer than, many common outpatient procedures regularly performed in clinicians' offices, such as diagnostic hysteroscopy (to visualize the inside of the uterus), endometrial biopsy (to take a small tissue sample from the uterine lining), and *any* surgical or dental procedure requiring general anesthesia.  A recent large study found that the prevalence of complications arising from first trimester aspiration abortion performed by a physician was 0.87%, and most are so mild that patients do not need hospital treatment.  Ushma D. Upadhyay, PhD, MPH, *et al.*, *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (Jan. 2015).  The prevalence of major

complications requiring treatment at a hospital was only 0.16% in first trimester aspiration performed by a physician. *Id.* A separate peer reviewed study designed to examine the impact on patient safety if aspiration abortions were performed by certified nurse practitioners, certified nurse midwives, and physician assistants found that the number of complications from abortions by these providers were "clinically equivalent" to abortions performed by physicians. Tracy A. Weitz, PhD, *et al.*, *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Pub. Health 454 (Mar. 2013). By comparison, vasectomy, another minor procedure frequently performed in a physician's office, has a prevalence of complications of 2%, more than double that of abortion, and a prevalence of major complications requiring hospitalization of 0.2% to 0.8%, up to five times higher than that of abortion.

56.     Abortion is also much safer than the numerous other medical procedures performed in outpatient surgical facilities subject to significantly fewer regulations under Mississippi's laws and regulations than those imposed on facilities that provide abortion-care under Mississippi's TRAP Licensing Scheme. For example, abortion is lower risk and less complex than skin cancer removal, removal of pre-cancerous cells on the cervix through a Loop Electrosurgical Excision Procedure ("LEEP"), proctoscopy (scoping of the rectum, anus, or sigmoid colon), colonoscopy, surgical hernia repair, and large joint dislocations—all of which are routinely performed in an office-based, outpatient setting subject to significantly less regulation than the Clinic.

**B.     Mississippi's Abortion Licensing Scheme Targets Providers of Abortion Care**

57.     Mississippi has a set of regulations applicable to office-based surgical procedures, but abortion has been purposefully removed from this scheme and instead subjected to a separate set of unique and more burdensome regulations. This separate licensing scheme for

Abortion Facilities places arbitrary and unnecessary requirements on providers of abortion care that are not imposed on medical facilities that offer similar—and often more complex and riskier—care and procedures.

58.     Mississippi first singled out "Abortion Facilities" as requiring special licensure and regulation by the Department of Health in 1991.  *See* 1991 Miss. Laws Ch. 301 (S.B. 2884), *codified at* Miss. Code Ann. § 41-75-1 *et seq*.  The new law defined "Abortion Facilities" as "a facility primarily organized or established for the purpose of performing abortions for outpatients," which "include[d] physicians' offices which [were] used primarily to perform elective abortions."  Miss. Code Ann. § 41-75-1(f).  The law exempts healthcare providers from licensing requirements if they perform less than 10 abortion procedures per month or 100 procedures per year, or if they are not a "separate identifiable legal entity from any other health care facility."  *Id.*  It is a criminal offense to operate an "Abortion Facility" without a license or with a suspended license in Mississippi.  Miss. Code Ann. § 41-75-26(a).

59.     Mississippi's abortion licensing scheme governs virtually every aspect of a clinic's operations, from its provision of medical care and counseling to its physical plant, administration, staffing, and recordkeeping.  The licensing scheme imposes numerous arbitrary, onerous, and costly requirements that have no medical benefit, and/or that are not imposed on outpatient facilities performing procedures with a greater risk of complication.

### 1. Mississippi's TRAP Scheme Creates Substantial Obstacles to Abortion Access with No Medical Benefit

60.     Mississippi's efforts to eliminate access to abortion in the State through medically unnecessary and burdensome regulations began in earnest in 2004.  In 2004, Mississippi mandated that abortions performed at or beyond the first trimester could only be performed at a licensed Ambulatory Surgical Facility ("ASF") or hospital, a license JWHO could

not obtain for reasons unrelated to any interest in women's health, despite the fact that the Clinic had been safely performing abortions up to 16 weeks from a woman's last menstrual period for the eight years prior.  That law was struck down as unconstitutional.  *Jackson Women's Health Org.* v. *Amy*, No. CIV.A. 3:04CV495LN, 2005 WL 1412125, at *2 (S.D. Miss. June 14, 2005).

61.     Undeterred, the next year Mississippi created the framework that exists today: all facilities providing abortion care must be licensed as either a Level I or Level II Abortion Facility, subject to all corresponding regulations, including the burdensome "Minimum Standards of Operation for Abortion Facilities."  Miss. Code Ann. § 41-75-1(e), (h).  When this law was passed, JWHO was the only abortion clinic in Mississippi, and thus the only clinic subject to these onerous regulations.

62.     Under this licensing system, all facilities performing abortions after the first trimester are classified as Level I Abortion Facilities.  In order to maintain a Level I Abortion Facility license, Level I facilities must satisfy the Abortion Facility requirements and must *also* satisfy the regulations applicable to Ambulatory Surgical Facilities, including the "Minimum Standards of Operation for Ambulatory Surgical Facilities."  Miss. Code Ann. § 41-75-1(h).  Other outpatient facilities performing procedures with equal or greater risk of complications are not subject to similar onerous requirements.

63.     JWHO is licensed as a Level I Abortion Facility.  JWHO is thus subject to all generally applicable health care regulations, all Abortion Facility laws and regulations— including the Minimum Standards of Operation for Abortion Facilities—*and* the Minimum Standards of Operation for Ambulatory Surgical Facilities.  There are no Level II Abortion Facilities licensed in Mississippi.

64.     Neither abortion by medication nor by aspiration is comparable to the many types of surgical procedures that can be performed at an Ambulatory Surgical Facility—which are broadly classified as procedures that are "more complex than office procedures performed under local anesthesia, but less complex than major procedures requiring prolonged postoperative monitoring and hospital care to ensure safe recovery and desirable results.  General anesthesia is used in most cases."  Miss. Code Ann. § 41-75-1(d).  By contrast, the procedures performed by JWHO require *no* anesthesia and *no* incisions.

65.     Physicians are allowed to perform procedures similar to those performed in Ambulatory Surgical Facilities, including procedures that require general anesthesia, in private physicians' offices classified as Level III Office Surgery facilities.  *See* Miss. Admin. Code § 30-17-2635:2.6(A)(1).  The requirements these facilities must satisfy are much less onerous than either Ambulatory Surgical Facilities or Level I or Level II Abortion Facilities, despite performing riskier procedures.  *See* Miss. Admin. Code § 30-17-2635:1 *et seq.*

66.     Abortion by medication or by aspiration is even safer than many Level I Office Surgery procedures, the least regulated of the outpatient procedure classifications.  Level I Office Surgery includes procedures that may use local anesthesia, for example, hysteroscopies, proctoscopies, LEEP, laser cone of cervix, and paracentesis.  Miss. Admin. Code § 30-17-2635:2.5.

67.     Tellingly, the Mississippi regulations explicitly define dilation and curettage—the same procedure used to perform aspiration abortions, *see supra* ¶ 53—as a Level II Office Surgery procedure.  Miss. Admin. Code § 30-17-2635:2.5.  Yet, while JWHO, as a Level I Abortion Facility, is subjected to the burdens of both the Abortion Facility requirements and the Ambulatory Surgical Facility requirements, other physicians' offices that perform the

exact same procedure for purposes other than abortion (including in connection with miscarriages) are not.

68.     In short, under the TRAP Licensing Scheme, providers of abortion care—in contrast to other clinics and medical providers performing substantially more risky procedures—are subject to licensing requirement which in turn subjects them to scores of medically unnecessary and burdensome regulations, the sole purpose of which is to regulate abortion access out of existence.

69.     The chart below provides a stark illustration of examples of the unequal and burdensome requirements that Mississippi imposes on Level I Abortion Facilities that are not imposed on facilities that perform Level I or Level II Office Surgery:

|  | Level I Abortion Facility | Level I Office Surgery | Level II Office Surgery |
|---|---|---|---|
| **License & Fee** | License required subject to annual renewals to confirm compliance with licensing regulations and payment of $3,000 annual fee. Miss. Admin. Code §§ 15-16-1:44.3.1-3. | None | No fee.  One-time registration with the Mississippi State Board of Medical Licensure. Miss. Admin. Code § 30-2635:2.2. |
| **Inspection & Investigation Authority** | "The licensing agency shall make or cause to be made such inspections and investigations as it deems necessary." Miss. Code Ann. § 41-75-17. | None | None |
| **Reporting** | Required to file monthly reports with MDH for each patient that include: <ul><li>Address;</li><li>Marital status;</li><li>Race;</li><li>Education;</li><li>Number of prior pregnancies;</li><li>Number of previous live births;</li><li>Prior pregnancy outcomes;</li><li>Estimate of gestation;</li><li>Date of last menstrual period;</li><li>Type of procedure; and</li><li>Additional procedures used.</li></ul> *See* Miss. Admin. Code § 15-16-1:44.5.1. | None | Only required to report potentially harmful or life-threatening episodes. Miss. Admin. Code §§ 30-2635:2.2-3. |
| **Enforcement** | Facility is subject to revocation of its license for any violation of the | None | None |

| | Level I Abortion Facility | Level I Office Surgery | Level II Office Surgery |
|---|---|---|---|
| | TRAP laws or rules and regulations thereunder.  All violations, including by "careless, negligent or incautious disregard," are misdemeanors punishable by $1,000 fine/day. Miss. Code Ann. § 41-75-26. | | |
| **Medical Staff Organization & Personnel Requirements** | Required to have: <ul><li>A physician medical director who is a certified OB/GYN responsible for all medical aspects of faculty programs;</li><li>At least one registered nurse ("RN") per six patients, in addition to the director of nursing; and</li><li>At least one physician and nurse present at all times when procedures are being performed.</li><li>Employees must have an annual health examination to ascertain communicable diseases, a record of which must be maintained in his or her personnel file that is subject to inspection by MDH.</li></ul> Miss. Admin. Code § 15-16-1:44.11.2; Miss. Admin. Code § 15-16-1:44.10; Miss. Admin. Code 15-16-1:42.9; Miss. Code Ann. § 41-75-1. | None | Physician must be board certified or board eligible in the procedures performed in the office. Miss. Admin. Code § 30-2635:2.5. |
| **Patient Transfer Agreement** | Must have a written agreement with one or more physicians purportedly to ensure patients who have complications will be transferred to the physician's care. The physician must: <ul><li>Have full admitting privileges with an acute general hospital located within 30 minutes travel time of the abortion facility, and full credentials with the hospital; and</li><li>Maintain his or her primary office location within 30 minutes' travel time of the abortion facility.</li></ul> Miss. Admin. Code § 15-16-1:44.12.1. | None | The surgeon must have a written transfer agreement from a licensed hospital within reasonable proximity.  The agreement must include physician coverage of transferred patients if the physician does not have privileges at the hospital. Miss. Admin. Code § 30-2635:2.5. |
| **Requirements for Medical Records** | Must have a designated room or area at the facility for medical records.  Patients' records must include: | Required to maintain "complete" records of each surgical procedure. | Required to maintain "complete" records of each surgical procedure and a log that includes a confidential |

|  | Level I Abortion Facility | Level I Office Surgery | Level II Office Surgery |
|---|---|---|---|
|  | <ul><li>Identification, including full name, sex, address, date of birth, next of kin, and patient number;</li><li>Admitting diagnosis;</li><li>Preoperative history and physical examination pertaining to the procedure to be performed;</li><li>Anesthesia reports;</li><li>Procedure report;</li><li>Laboratory and pathology reports and tests for RH Negative factor;</li><li>Preoperative and postoperative orders;</li><li>Discharge note and discharge diagnosis;</li><li>Informed consent; and</li><li>Nurses' notes.</li></ul>Miss. Admin. Code § 15-16-1:44.19.1, 2, 4. | Miss. Admin. Code § 30-2635:2.3. | patient identifier, the type of procedure, the type of anesthesia used, the duration of the procedure, the type of post-operative care, and any potentially harmful or life-threatening events.  Must also maintain written informed consent from the patient reflecting the patient's knowledge of identified risks, consent to the procedure, and anesthesia provider. Miss. Admin. Code § 30-2635:2.3. |
| Prescriptions | All prescriptions must be signed by hand by the prescribing physician. Miss. Admin. Code §§ 15-16-1:44.25.1, 6. | Electronic prescriptions are permitted. Miss. Code Ann. § 41-127-1. | Electronic prescriptions are permitted. Miss. Code Ann. § 41-127-1. |
| Miscellaneous Authority | All other conditions are enforced in accordance with the best practices as interpreted by MDH.  MDH reserves the right to review any and all records and reports of any Abortion Facility, as deemed necessary to determine compliance with these minimum standards of operation. Miss. Admin. Code § 15-16-1:44.32.1. | None | None |

70.     In addition to what is in the chart above, the regulations outlined in the Minimum Standards of Operation for Abortion Facilities impose regulations that are merely superfluous restatements of the basic standard of care and practice.  Examples include mandating that Abortion Facilities have "adequate" linens or "sanitary" instruments, disposal of garbage and waste in a manner "designed to prevent the transmission of disease," provide "a safe and sanitary environment" that is "maintained to protect the health and safety of patients," and

maintain a smoke-free environment, all of which JWHO would do as a matter of basic standards of care.  This level of micromanagement and regulation is not imposed on facilities that perform Level I or Level II Office Surgery, nor is there any medical justification for singling out providers of abortion care for such specific regulations given the exceedingly low complication rate of abortion.

71.     Mississippi's TRAP Licensing Scheme is not medically justified nor does it serve to improve the safety of abortion care.  If these requirements were intended to increase safety or improve medical care—in fact, if they were intended to do anything other than target providers of abortion care for unequal treatment in an effort to eliminate abortion access in Mississippi—similar requirements would also be imposed on other health facilities in Mississippi that perform medical procedures that carry equal or greater risk of complications.

72.     The overall licensing scheme, including the many regulatory requirements it imposes, creates a burden on access to abortion.  For example, the requirement that the Clinic have at least one registered nurse per six patients, forces the Clinic to hire RNs to perform tasks that do not require a nursing certificate, such as monitoring blood pressure or checking in patients, simply to maintain the arbitrary nurse-to-patient ratio mandated by the regulation.  After the RN requirement took effect, the Clinic had to hire two additional RNs for roles that were previously fulfilled by medical assistants or licensed practical nurses to ensure the continuation of patient care.  Due to the difficulty of hiring nurses, this requirement also creates scheduling issues which can limit access to abortion care.  For example, the Clinic is forced to cancel patient appointments in order to comply with the nurse-to-patient ratio on days when one of JWHO's nurses is sick or unable to work.  Likewise, the numerous recordkeeping requirements occupy

physicians and other medical staff with unnecessary and medically unjustified paperwork, instead of providing medical services to patients.

73.     Similarly, because JWHO must satisfy the operating standards of an Ambulatory Surgical Facility, it is required to comply with regulations with no medical or safety rationale in the context of providing abortion care, and which are not required for Level I or Level II Office Surgery.  For example, to satisfy the Ambulatory Surgical Facility standards, the Clinic is required to have a backup generator "to make life sustaining equipment operable in case of power failure," Miss. Admin. Code § 15-16-1:42.30.14, even though JWHO does not need or use any "life sustaining equipment," and there is no circumstance when this generator would be needed for this purpose.

74.     The TRAP Licensing Scheme also creates a burden on access to abortion by limiting the number of abortions the Clinic can provide, for example due to the required registered nurse-to-patient ratios.

### 2.   The TRAP Licensing Scheme Creates Unjustified Barriers to New Facilities

75.     The TRAP Licensing Scheme also imposes significant costs and regulatory hurdles on prospective Level I or Level II Abortion Facilities that are not imposed on facilities that perform Level I or Level II Office Surgery.  These additional burdens not only unlawfully target providers of abortion care, they also create a substantial obstacle to women's access to abortion in Mississippi by preventing any new clinics from opening, leaving JWHO as the sole provider.  In fact, it has been more than 20 years since a new clinic has opened in Mississippi.

76.     As an initial matter, any prospective provider of abortion care would be subject to the legal and regulatory provisions applicable to Level I and Level II Abortion

Facilities outlined in paragraphs 61 through 74, and their corresponding financial and administrative burdens.  These alone present a significant barrier to any new clinic opening.

       77.     In addition, any new provider would be subject to an additional set of laws and regulations that govern the location, planning, and construction of any new facility willing to provide abortion care.

       78.     The chart below provides a comparison of just some of the regulations applicable to any prospective Abortion Facility, none of which are imposed on new facilities that perform Level I or Level II Office Surgery:

| | Level I and Level II Abortion Facilities | Level I Office Surgery | Level II Office Surgery |
|---|---|---|---|
| **Location Restrictions** | Cannot be within 1500 feet of a church, school, or kindergarten. Must be within 30 minutes (Level II) or 15 minutes (Level I) of a hospital with an emergency room. MDH must approve the site before construction begins. Miss. Admin. Code § 15-16-1:44.31.1; Miss. Admin. Code § 15-16-1:42.30.1. | None | None |
| **First Stage Submission— Preliminary Plans** | Preliminary plans must be approved by MDH, and must include:<br>• Plot plans showing size and shape of entire site, location of proposed building and any existing structures, adjacent streets, highways, sidewalks, railroad, etc., all properly designated; size, characteristics, and location of all existing public utilities.<br>• Floor plans showing overall dimensions of buildings; location, size and purpose of all rooms; location and size of all doors, windows, and other openings with swing of doors properly indicated; and location of stairs, elevators, dumbwaiters, vertical shafts, and chimneys.<br>• Outline specifications listing the kind and type of materials.<br>Miss. Admin. Code § 15-16-1:44.30.4. | None | None |
| **Final Stage Submission— Working Drawings and Specifications** | Final stage or working drawings and specifications must be approved by MDH prior to construction, and must include: (a) architectural drawings; (b) structural drawings; (c) mechanical drawings to include plumbing, heating, and air conditioning; (d) electrical drawings; and (e) detailed specifications. | None | None |

31

| | Level I and Level II Abortion Facilities | Level I Office Surgery | Level II Office Surgery |
|---|---|---|---|
| | The preparation of drawings and specifications must be executed by or under the immediate supervision of an architect registered in the State of Mississippi. Miss. Admin. Code §§ 15-16-1:44.30.5, 6. | | |
| **Structural Requirements** | Corridors used by patients must be at least 5 (Level II) or 6 (Level I) feet wide. Exit doors must be no less than 36 (Level II) or 44 (Level I) inches wide. Minimum ceiling height must be 7 feet 8 inches. Miss. Admin. Code §§ 15-16-1:44.31.11, 16; Miss. Admin. Code §§ 15-16-1:42.30.10, 16. | None | None |
| **Occupancy Restrictions** | No part of an abortion facility may be rented, leased, or used for any commercial purpose, or for any purpose not necessary or in conjunction with the operation of the facility. Miss. Admin. Code § 15-16-1:44.31.12. | None | None |
| **Emergency Equipment** | Must have an emergency lighting system that will "adequately light corridors, operating rooms, exit signs, stairways, and lights on each exit sign at each exit in case of electrical power failure," Miss. Admin. Code § 15-16-1:44.31.14, and Level I facilities must have an emergency power generator to "make life sustaining equipment operable in case of power failure." Miss. Admin. Code § 15-16-1:42.30.14. | None | None |
| **Materials Requirements** | All draperies and cubicle curtains must be flame retardant. Miss. Admin. Code § 15-16-1:44.31.21. Carpet must have a flame spread rating of 75 or less and smoke density rating of 450 or less, or conform with paragraph 6-5, N.F.P.A. 101, Life Safety Code, 1981. Miss. Admin. Code § 15-16-1:44.31.20. Materials on walls and ceiling in corridors and rooms occupied by four or more persons must have a flame spread rating of 25 or less and a smoke density rating of 450 or less, and rooms occupied by less than four persons must have a flame spread rating of 75 or less and a smoke density rating of 450 or less. Miss. Admin. Code § 15-16-1:44.31.18. | None | None |

79.     The aspects of Mississippi's TRAP Licensing Scheme that are imposed on prospective abortion facilities are not medically justified nor do they serve to improve the safety of abortion care.  If these requirements were intended to increase safety or improve medical care—in fact, if they were intended to do anything other than target prospective abortion providers for unequal treatment in an effort to eliminate abortion access in Mississippi—similar

32

requirements would be imposed on other prospective health facilities in Mississippi that provide medical care carrying equal or greater risk of complications, such as Level I or Level II Office Surgery facilities.

80.     Many of these regulations impose significant financial burdens that prospective facilities performing Level I and Level II Office Surgery do not have to bear when planning and building clinics.  For example, a prospective provider of abortion care would have to hire professionals to prepare mandatory, detailed architectural and engineering plans that he or she must submit to MDH.  On information and belief, architects charge between $125 and $250 per hour to prepare the sort of detailed architectural and engineering plans required by the regulations.

81.     A potential provider of abortion care must also build a facility that far exceeds the justifiable medical and operational needs of such care at great additional costs.  For example, a Level I Abortion Facility would be required to build hallways that are six feet wide, and doorways 44 inches wide.  On information and belief, this requirement would significantly increase costs for a prospective clinic.

82.     Other requirements that, on information and belief, would significantly and unnecessarily increase construction costs include the requirement to install an emergency lighting system and the requirements to use specific flame retardant materials for curtains, wall coverings, and carpets.

83.     Not a single one of these burdens or expenses is required to open a facility that performs Level I or Level II Office Surgery, despite the fact that it could perform riskier procedures than a Level I or Level II Abortion Facility.

84.     Individually and collectively, these regulations create significant unnecessary barriers to the opening of additional clinics to provide abortion care.  As a result, JWHO remains the only provider of abortion care in the state, which creates a substantial obstacle to Mississippi women's access to abortion.

### C.     Mississippi Has Created Unconstitutional Legal Barriers to Women's Access to Abortion

#### 1.   Mandatory Delay and Two Trip Requirement

85.     Mississippi law requires that, unlike for other comparable medical procedures in the state, a woman has to make a second, unnecessary trip to her clinician's office in order to exercise her constitutional right to an abortion.  In 1991, Mississippi passed H.B. 982, requiring a woman to delay her abortion by 24 hours after receiving "certain information regarding abortion and alternatives to abortion to be provided to the woman . . . [and] to provide penalties for violations."  1991 Miss. Laws Ch. 439 (H.B. 982).  The law required a physician providing the abortion care, under threat of criminal penalty, to inform the patient at least 24 hours in advance of, among other things, "the probable gestational age of the unborn child," and to offer the patient materials that "describe the unborn child and list agencies that offer alternatives to abortion."  *Id*.

86.     A prior version of the law that similarly mandated a 24-hour delay period and required that physicians provide women with information on abortion alternatives and risks associated with abortion was rejected in 1990 by the Mississippi House Judiciary Subcommittee for its "very serious constitutional problems."

87.     When H.B. 982 passed the House and Senate in 1991, it was vetoed by then-Governor Ray Mabus for constitutional concerns.  However, the legislature overrode the Governor's veto the next day and the bill became law.

88.     As written, the 1991 bill was ambiguous as to how and where the counseling had to take place.  It was thus unclear whether a woman seeking an abortion would be forced to make two trips to a facility, at least 24 hours apart, or whether the prescribed information could be conveyed by phone.

89.     In 1995, Mississippi's then-Attorney General issued an opinion that the statutorily prescribed "informed consent" material could be provided telephonically under the law.  Office of the Att'y Gen., Opinion Letter, No. 95-0318, 1995 WL 328978 (May 5, 1995). This meant that women had to travel to a clinic only once, for the procedure itself, and could receive all other information by phone.

90.     In direct response, the legislature passed S.B. 2817 in 1996, which, among other things, explicitly required the patient to travel to a clinic on two separate occasions, first, to receive the prescribed information "orally and in person" by the physician who was to perform the abortion and, at least 24 hours later, to obtain the abortion.  *See* 1996 Miss. Laws Ch. 442 (S.B. 2817), *codified at* Miss. Code Ann. § 41-41-33.  This law is still in effect, and a physician who fails to comply with this requirement is subject to criminal penalties of six months imprisonment, a $1,000 fine, or both.  Miss. Code Ann. § 41-41-39.  The combination of the 1991 and 1996 laws together created the "Mandatory Delay and Two Trip Requirement."

91.     Under the auspices of "informed consent," the Mandatory Delay and Two Trip Requirement compels providers of abortion care, under threat of criminal prosecution, to tell their patients orally and in person, a state-mandated message that is outside accepted medical standards and practices for informed consent, and that they would not otherwise tell patients.  It further compels patients to receive this false, misleading, and medically irrelevant information. Miss. Code Ann. § 41-41-33.  For example, Dr. Carr-Ellis is compelled to tell her patients that

breast cancer is a risk associated with abortion, despite the fact that it is simply not true.  *See id.*

§ 33(1)(a); *The Safety and Quality of Abortion Care in the United States*, A Consensus Study

Report of the National Academies of Sciences, Engineering, and Medicine at 5-2 (The National

Academies Press 2018), http://nap.edu/24950 (hereinafter "National Academies Consensus

Report") (concluding that, based on a rigorous study of published research on potential long-term

risks of abortion, "having an abortion does not increase a woman's risk of . . . breast cancer").

This state-mandated information is designed to obstruct and obscure the woman's decisional

process and undermine her ability to make a factually informed decision.  What is more, the

Mandatory Delay and Two Trip Requirement is based on the notion that the woman needs to sit

with this biased information for no less than 24 hours in order to make an "informed" decision.

92.     This law also requires providers of abortion care to obtain patients' written

confirmation that they have received this information prior to obtaining an abortion and maintain

this documentation in patients' medical records.  MDH is authorized to, and does, enforce this

requirement by reviewing patients' unredacted medical records during unannounced inspections

that are conducted at least annually.  *Id.* §§ 41-41-33(1)(c), (2).

93.     The State has not imposed similar two-trip or mandatory biased

counseling requirements on any other comparable medical procedure in Mississippi in order for a

patient to consent to that procedure.  For example, although vasectomy includes both an incision

and a higher risk of complication, no lag time is required in Mississippi for providers of

vasectomy to obtain informed consent.  Instead, whether a patient's medical decisions are

sufficiently informed is entrusted to the reasonable judgment of the patient and physician.

94.     The Mandatory Delay and Two Trip Requirement creates several

substantial obstacles to a woman's right to access abortion care in Mississippi, particularly for

women who are poor or living in rural communities.  In particular, the law imposes undue burdens of additional travel time, cost, and delays that create substantial obstacles to accessing abortion care.

95.     Because the Clinic is the only provider of abortion care left in Mississippi, any woman who is seeking an abortion in the state must travel to the Clinic in Jackson not once, but twice.  Many of the women who seek abortion care at the Clinic travel more than a hundred miles and several hours.  The Mandatory Delay and Two Trip Requirement forces them to do so twice, doubling the time and expense of transportation, food, and potentially lodging.  The logistical difficulty and expense of travelling twice is compounded for women who do not own a car since the State has so little public transit infrastructure that it ranks last in the nation for public transit usage.  Of course, even women who do own cars have to incur gas and other expenses and contend with a long journey.

96.     The Mandatory Delay and Two Trip Requirement also imposes other unnecessary costs and obstacles for patients, such as obtaining childcare twice for the two-thirds of the Clinic's patients with at least one child, and forcing women to take time off from work twice—not just losing those days' pay, but potentially jeopardizing their employment.  The Mandatory Delay and Two Trip Requirement also forces women to twice explain their absence to husbands, partners, and employers, which could put some women at risk of physical, psychological, or economic harm.  Collectively, these burdens of cost and travel time create a substantial obstacle to women seeking to access abortion care.

97.     The Mandatory Delay and Two Trip Requirement also creates a substantial obstacle in terms of delay in accessing abortion care, which can increase health risks for women, reduce options for care or even prevent women from getting an abortion altogether.

37

98.     By forcing women to come to the Clinic on two separate occasions, the Mandatory Delay and Two Trip Requirement creates a burdensome delay for a significant percentage of women who seek or would seek services from the Clinic.  Some of the delay is caused by the reality of many women's situations when they cannot make two appointments on consecutive days or even in the same week due to employment or family concerns, for example.

99.     Delay is exacerbated by the limited schedule for abortion care the Clinic is able to offer due to the cumulative effect of other of the challenged laws.  *See infra* ¶¶ 114–15.  At present, the Clinic is only able to see patients for abortion care approximately two to three days a week.  This means that women who cannot make two appointments in the same week within this narrow window have to wait another week to have an abortion.  And those who cannot fit a second appointment into the scheduling window during the next week may have to wait two weeks or more.

100.     The delay created by the Mandatory Delay and Two Trip Requirement— and, in many cases by the interplay between the Mandatory Delay and Two Trip Requirement and the limited schedule forced on the Clinic by the TRAP regime as a whole—can prevent women from accessing a medication abortion.  Medication abortion is available only through 10 weeks after a woman's last menstrual period.  The delay created by the Mandatory Delay and Two Trip Requirement means that some women who seek a medication abortion in the ninth or even eighth week can no longer access a medication abortion because they are unable to return to the Clinic to obtain the abortion until after 10 weeks.

101.     Likewise, because the Clinic only provides aspiration abortions through 16 weeks, 0 days from a woman's last menstrual period, women who make the first required trip to the Clinic in the 14th or 15th week may be forced by the Mandatory Delay and Two Trip

Requirement to leave the state to access abortion, or forego an abortion altogether.  If the 15 Week Ban is allowed to go into effect, the window available to access an abortion in Mississippi will be narrowed further still, increasing the practical impact of the Mandatory Delay and Two Trip Requirement on limiting access to abortion.

102.   This delay not only prevents some women seeking abortion from choosing the best method for her, or to have an abortion at all, it also increases the health risks for women who do obtain an abortion because abortion carries comparatively greater risk as pregnancy advances.  *See supra* ¶ 34.

103.   The Mandatory Delay and Two Trip Requirement also prevents the Clinic's physicians from appropriately allocating their time to providing the requested abortion care.  Because the abortion regime requires Dr. Carr-Ellis to provide state-mandated biased counseling "orally and in person," she must do the first visit consultations during the two to three days per week she is at the Clinic.  Currently, these consultations consume approximately one-third of the time Dr. Carr-Ellis is physically present in the Clinic – time that is then not available to provide abortion care to Clinic patients.  If Dr. Carr-Ellis were consulting with patients for any other type of medical care in Mississippi, she could do so by telemedicine.  *See* Miss. Code Ann. § 41-127-1.

104.   Thus, if the Mandatory Delay and Two Trip Requirement did not exist, and there was no abortion-only exception to the state's highly permissive laws on the practice of telemedicine, *see infra* ¶¶ 116–20, Dr. Carr-Ellis could give women any required information outside of her limited Clinic hours and devote her time in the Clinic to providing women traveling to the state's sole remaining clinic with their constitutionally protected right to abortion care.

105.     There are no countervailing benefits to the Mandatory Delay and Two Trip Requirement.  It does not improve women's health nor is there any medical reason for it.  In fact, abortion is the only medical care that is specifically targeted by Mississippi to require patients to travel to the medical provider's office not only once, but twice.  Further, even if there was some benefit to a separate initial consultation, in every medical context other than abortion, Mississippi allows physicians to treat patients via "telemedicine" so that patients can access medical care, particularly specialized medical care that is not available in remote areas, without traveling great distances.  *See infra* ¶ 116.  Thus, even if the mandated 24-hour delay remained in effect, there is no valid reason that telemedicine could not be used for an initial consultation with respect to an abortion.

106.     In short, the Mandatory Delay and Two Trip Requirement impermissibly targets providers of abortion care for more burdensome regulations and individually and collectively with the Telemedicine Ban, the Physician Only Requirement, and the TRAP Licensing Scheme, create an undue burden on women's constitutional right to access abortion in Mississippi.

### 2. Physician Only Requirement

107.     At the same time the legislature passed the Mandatory Delay and Two Trip Requirement, it passed a requirement that "[a]bortions shall only be performed by physicians licensed to practice in the State of Mississippi."  *See* 1996 Miss. Laws Ch. 442 (S.B. 2817), *codified at* Miss. Code Ann. § 41-75-1(f).  The legislature later added a requirement that only physicians may "dispense[], administer[], or otherwise provide[] or prescribe[]" abortion-inducing medication.  The violation of either law constitutes a misdemeanor.  Miss. Code Ann. §§ 41-41-107(1), -111(1); *id.* § 41-75-26.  In addition, other Mississippi laws contemplate that only physicians may provide certain aspects of pre-abortion care, and carry criminal penalties for

40

their violation.  *See, e.g.*, *id.* § 41-41-33 (setting forth information that *the physician* who is to provide the abortion is required to give the patient at least 24 hours before the abortion, which includes the provision of biased counseling discussed *supra* ¶¶ 91–92); *id.* § 41-41-34 (pre-abortion requirements that must be fulfilled by *the physician* who is to provide the abortion, or a qualified person assisting that physician).  Together, these laws form the "Physician Only Requirement."

108.    Medication and aspiration abortions are regularly provided in other states by advanced practice clinicians ("APCs"), such as certified nurse practitioners, certified nurse midwives, and physician assistants.

109.    Studies have found that this abortion care is just as safe when provided by APCs as when it is provided by physicians.  National Academies Consensus Report at 3-7 to 3-9 (medication abortion); Tracy A. Weitz, PhD et al., *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Pub. Health 454, 458–59 (2013) (aspiration abortion).  Both the American College of Obstetricians and Gynecologists and the American Public Health Association, two leading associations of healthcare providers, have also recognized the safety of abortion provided by APCs.  *See* American College of Obstetricians and Gynecologists, *Committee Opinion: Abortion Training and Education*, No. 612 (Nov. 2014), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education; American Public Health Association, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants*, Policy No. 20112 (Nov. 1, 2011), https://www.apha.org/policies-and-

advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants.

110.    Notwithstanding the demonstrated safety of medication and aspiration abortions provided by APCs, because of Mississippi's Physician Only Requirement, APCs are prohibited from providing abortions or certain forms of pre-abortion care in Mississippi.

111.    There is no medical benefit or other reason to prevent APCs from providing this care.  APCs in Mississippi regularly engage in patient care, in collaboration with or under the supervision of a licensed physician, that is comparable to first trimester abortions and that carries similar or greater risks of complications.  For example, subject to approval by the Mississippi Board of Medical Licensure, APCs may be granted prescriptive authority for a full range of medications that, absent the Physician Only Requirement, would include the authority to prescribe medication abortion.  *See* Miss. Code Ann. § 73-15-20 (prescribing authority for advanced practice registered nurses); Miss. Admin. Code § 30-17-2615:1.5 (prescribing authority for physician assistants).  Certified Nurse Practitioners and Certified Nurse Midwives may also provide a wide range of women's health care, including treatment related to pregnancy, childbirth, family planning (including inserting and removing IUDs and other contraceptive implants), sexually transmitted infections, and other gynecological care.

112.    Despite the drastically lower risk of complications associated with abortion as compared to childbirth, *see supra* ¶¶ 49–50, "females engaged solely in the practice of midwifery" *are completely exempt from laws requiring a license to practice medicine.  See* Miss. Code Ann. §§ 75-25-1, -33.

113.    The Physician Only Requirement creates a substantial obstacle to access to abortion care.  Both ACOG and the American Public Health Association have identified a

shortage of abortion providers as a barrier to abortion access.  *See Committee Opinion No. 612:*

*Abortion Training and Education*, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS

(Nov. 2014), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-

for-Underserved-Women/co612.pdf?dmc=1&ts=20170926T2329467312; *Provision of Abortion*

*Care by Advanced Practice Nurses and Physician Assistants Policy No. 20112*, AMERICAN

PUBLIC HEALTH ASSOCIATION (Nov. 1, 2011), https://www.apha.org/policies-and-

advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-

abortion-care-by-advanced-practice-nurses-and-physician-assistants.

   114. Because of the Physician Only Requirement, JWHO is unable to use APCs

to provide abortion care and state-mandated biased counseling, and thus is only able to see

patients for abortion care two to three days per week, when a physician is physically present in

the Clinic.  *See supra* ¶ 99.  As with the Mandatory Delay and Two Trip Requirement, these

scheduling constraints frequently result in patients being forced to wait one or two weeks

between their initial visit to the Clinic and obtaining an abortion—which, in turn, increases the

risk of complications and, in some cases, the cost of obtaining an abortion.  *See supra* ¶¶ 99–102.

In the most extreme cases, some women are forced to forego an abortion in the state altogether.

   115. In short, the Physician Only Requirement impermissibly targets providers

of abortion care for more burdensome regulations and individually and collectively with the

Mandatory Delay and Two Trip Requirement, the Telemedicine Ban, and the TRAP Licensing

Scheme, create an undue burden on women's constitutional right to access abortion in

Mississippi.

### 3. Telemedicine Ban

   116. "Telemedicine" is "the practice of medicine using electronic

communication, information technology, or other means between a physician in one location and

a patient in another location."  Miss. Admin. Code § 30-17-2635:5.1.  In all medical contexts *except* abortion, Mississippi authorizes physicians to use telemedicine to provide consultations and treatment recommendations, including dispensing prescription medications, to patients.  *See* Miss. Code Ann. §§ 41-41-33; 41-41-107(2) and (3); 41-127-1; Miss. Admin. Code § 30-17-2635:5.1.

117.    As Mississippi has recognized, a face-to-face meeting is not necessary, or even important, to establish a physician-patient relationship or to provide "appropriate" medical treatment "if the technology is sufficient to provide the same information to the physician as if the exam had been performed face to face."  *Id.* § 30-17-2635:5.5.  Indeed, except in the provision of abortion care, Mississippi places "treatment recommendations made via electronic means" on equal footing with treatment in "traditional patient-provider settings" and provides that the two "shall be held to the same standards of appropriate practice."  Miss. Code Ann. § 41-127-1.

118.    In fact, telemedicine is routinely and successfully practiced in Mississippi, which has been recognized as a national leader in telemedicine.  As Governor Bryant said, "Mississippi leads the nation in telemedicine and is one of only seven states to receive an 'A' rating from the American Telemedicine Association."  Gov. Phil Bryant, *Governor Sets the Record Straight on Health Care*, Clarion Ledger (Mar. 31, 2017), https://www.clarionledger.com/story/opinion/columnists/2017/03/31/governor-phil-bryant-sets-record-straight-health-care/99868700/.

119.    For example, the University of Mississippi Medical Center uses telemedicine to diagnose potential concussion injuries for student athletes in real time (which may include a physical examination to determine the need for immediate medical attention, a

neurological examination, long- and short-term memory evaluations, and a sensory assessment, all via electronic means) in order to provide a return-to-play recommendation and treatment plan. *See Remote Concussion Evaluation*, UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, CENTER FOR TELEHEALTH (2016), https://www.umc.edu/Healthcare/Telehealth/Files/th-concussion.pdf.  No face-to-face interaction is necessary, even though the consequences of misdiagnosis can be severe and even fatal.  *See* Charles H. Tator M.D., PhD, *Concussions and Their Consequences: Current Diagnosis, Management and Prevention*, 185 CAN. MED. ASSOC. J. 975, 977 (Aug. 6, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3735746/pdf/1850975.pdf.

120.    Yet, at the same time Mississippi passed the law that opened the door to more widespread practice of telemedicine in 2013, it also passed the Telemedicine Ban, which banned the practice of telemedicine *solely* in the context of medication abortion, the intentional violation of which is a misdemeanor.  2013 Miss. Laws Ch. 551 (S.B. 2795), *codified in relevant part at* Miss. Code Ann. §§ 41-41-107, 41-41-111.

121.    There is no medical justification for singling out abortion care and prohibiting the practice of telemedicine in the context of medication abortion.  In fact, a recent consensus study report jointly prepared by the National Academies of Sciences, Engineering, and Medicine found no evidence that taking medication abortion requires the physical presence of a physician, and concluded that telemedicine medication abortion is just as safe as in-person medication abortion.  *See* National Academies Consensus Report at 2-11, 2-27.

122.    Further, medication abortion is extremely safe.  Only one-tenth of one percent of women who used Mifeprex between 2000 and 2017 reported any adverse event.  As a comparison, neurologists at St. Dominic Hospital in Jackson use telemedicine to diagnose stroke patients at hospitals hundreds of miles away based on CT scans or MRIs, and to prescribe

appropriate treatment, including whether to administer medication that is potentially life-saving

for one type of stroke, and potentially fatal for the other.  *See* Eric Wicklund, *Saving Lives With*

*Telestroke Care*, MHEALTH INTELLIGENCE (Feb. 16, 2016),

https://mhealthintelligence.com/news/saving-lives-with-telestroke-care.  To the extent that

complications do arise with medication abortion, because the second pill in the medication

abortion regimen will be consumed outside of the office, almost all possible complications—

however rare—will occur *after* the patients have left the provider's office.

        123.    Providing medication abortion via telemedicine also meets the standard of

care recognized by ACOG and even the FDA label for Mifeprex.  *Practice Bulletin: Medical*

*Management of First-Trimester Abortion*, AMERICAN COLLEGE OF OBSTETRICIANS AND

GYNECOLOGISTS (Mar. 2014), https://www.acog.org/-/media/Practice-Bulletins/Committee-on-

Practice-Bulletins----Gynecology/Public/pb143.pdf?dmc=1&ts=20180405T0157409810.

ACOG also recognizes that medication abortion via telemedicine is of particular benefit to

women who otherwise would have to travel great distances to access reproductive care.  *Id.*  And

yet, the purported "legislative purpose" behind the Telemedicine Ban is to "[e]nsure that

physicians meet the standard of care when giving, selling, dispensing, administering or otherwise

providing or prescribing abortion-inducing drugs."  Miss. Code Ann. § 41-41-103(2).

        124.    The Telemedicine Ban creates undue burdens for women seeking abortion

by: (1) requiring the physician to physically examine the patient prior to administering

medication abortion; (2) prohibiting anyone other than a physician from providing abortion-

inducing drugs to patients; and (3) requiring that the abortion-inducing drug be administered "in

the same room and in the physical presence" of the physician.  Miss. Code Ann. § 41-41-107.

Mississippi law also prohibits clinicians from providing the required pre-abortion biased

counseling via telemedicine, as it requires that such counseling be told to the patient "orally and in-person." Miss. Code Ann. § 41-41-33.

125.     By preventing clinicians from providing care through telemedicine, the Telemedicine Ban forces women to bear the burden and cost of traveling back and forth to the Clinic to receive the pre-abortion biased counselling and/or medication abortion. *See supra* at ¶¶ 94–96. The Ban also leads to delays because women are required to be physically present at the Clinic twice, creating the need for multiple appointments. *See supra* at ¶¶ 98–99.

126.     Further, without the Ban, the Clinic could increase the number of women able to receive care. For example, if Dr. Carr-Ellis could provide the mandatory consultations through telemedicine on days she is not physically present at the Clinic, she could focus on providing abortion care during the days she was physically present in the Clinic.

127.     In short, the Telemedicine Ban impermissibly targets providers of abortion care for more burdensome regulation without conferring any benefit and, individually, and collectively with the Mandatory Delay and Two Trip Requirement, the Physician Only Requirement, and the TRAP Licensing Scheme, creates an undue burden on women's constitutional right to access abortion in Mississippi.

**D.     The Challenged Laws and Regulations Cumulatively Impose an Undue Burden on Women's Access to Abortion in Mississippi**

128.     Together, the challenged laws impose burdens that are exponentially greater than the burdens imposed by any single, individual challenged law operating in isolation. Thus, not only do the individual laws operate to limit access to abortion, but the cumulative impact of the challenged laws and regulations is to severely restrict and threaten ongoing availability of abortion care in Mississippi.

129.    The challenged regime cumulatively imposes on women seeking abortion numerous, unnecessary restrictions that delay their access to care, increase the financial costs women bear to access abortion in the state, and increase health risks associated with otherwise very safe care.

130.    Through demeaning and unnecessary laws, Mississippi's abortion restrictions discriminate against and stigmatize clinicians who offer abortion care, and the Mississippi women who seek it.

131.    Mississippi's abortion restriction scheme threatens the existence of the sole remaining licensed abortion facility in the state by imposing multiple, overlapping restrictions with no benefit, and imposing expensive and time-consuming requirements on both providers and patients, which some patients may not be able to overcome, or may seek to overcome by traveling out of state to exercise their constitutionally protected right to access safe abortion care.

132.    Defendants have the authority to subject Plaintiffs to a $1,000 penalty, six months in prison, or both, for each violation of some or all of the various provisions of Mississippi's abortion regime.  *See* Miss. Code Ann. §§ 41-41-39; 41-41-111; 41-75-26.  In addition, any provider of abortion care may have their license revoked for the violation of any of the laws or regulations outlined above.  *See* Miss. Code Ann. § 41-75-26.

## IV.    The 15 Week Ban Unconstitutionally Deprives Women of the Right to an Abortion Before Viability

133.    On March 19, 2018, Governor Bryant signed the 15 Week Ban into law, with an immediate effective date.  Under the 15 Week Ban, "a person shall not intentionally or knowingly perform, induce, or attempt to perform or induce an abortion," if "the probable gestational age of the unborn human," which the physician is required to determine and

document prior to performing the abortion, is "greater than fifteen (15) weeks." H.B. 1510 § 1.4(b).

134.    The only exceptions to the ban are if the woman is experiencing a medical emergency or in the case of a severe fetal abnormality. *Id.* The 15 Week Ban defines "medical emergency" as a physical condition or illness that makes it necessary to perform an abortion to save a woman's life or to prevent "a serious risk of substantial and irreversible impairment of a major bodily function." *Id.* at § 1.3(j). It defines a "severe fetal abnormality" as "a life-threatening physical condition that, in reasonable medical judgment, regardless of the provision of life-saving medical treatment, is incompatible with life outside the womb." *Id.* at § 1.3(h).

135.    The 15 Week Ban defines "gestational age" or "probable gestational age" as "the age of an unborn human being as calculated from the first day of the last menstrual period," of the pregnant woman. *Id.* at § 1.3(f). Accordingly, the law bans abortions in Mississippi, with very limited exceptions, after 15 weeks from the last day of a woman's menstrual period.

136.    The 15 Week Ban includes severe professional sanctions and civil penalties for violation. *Id.* at § 1.6. It provides that a physician "who intentionally or knowingly" violates the Ban "commits an act of unprofessional conduct and his or her license to practice medicine in the State of Mississippi shall be suspended or revoked pursuant to action by the Mississippi State Board of Medical Licensure." *Id.* at § 1.6(a).

137.    Further, the 15 Week Ban gives enforcement authority to the Attorney General, stating that the "Attorney General shall have authority to bring an action in law or equity to enforce the provisions of this section on behalf of the Director of the Mississippi State Department of Health or the Mississippi State Board of Medical Licensure." *Id.* at § 1.7.

138.    As discussed *supra* ¶¶ 99, 114, the Clinic typically provides abortion care two to three days per week and because of the Mandatory Delay and Two Trip Requirement, each of the Clinic's patients must make two separate visits to the Clinic, at least one full day apart.  Because of patients' work and family commitments combined with the fact that the Clinic does not provide abortions every day of the week, Mississippi's abortion regime delays many patients by several days or more in obtaining an abortion.  Thus, even patients who contact the Clinic and are able to schedule their first visit before 14 weeks, 6 days from their last menstrual period may not be able to return to the Clinic for an abortion before 15 weeks from their last menstrual period, again, as a direct result of the Mandatory Delay and Two Trip Requirement.

139.    In 2017, 78 of the Clinic's patients obtained abortions after 14 weeks, 6 days from their last menstrual period, and who would fall within the 15 Week Ban.

140.    The Clinic's patients seek abortions at this stage of pregnancy for a number of reasons, including difficulties or concerns related to financial, logistical, relationship, or other issues in their lives, family circumstances, and the health of the woman or the fetus.  As is true nationwide, approximately two-thirds of the Clinic's patients already have at least one child.

141.    In a normally progressing pregnancy, viability typically does not occur until at least 23 weeks from a woman's last menstrual period.  Viability is a determination that must be made by a physician, and it will vary from pregnancy to pregnancy, depending on the health of the woman and the fetus.  But there is no question that the 15 Week Ban prohibits abortion at least eight weeks before viability; no fetus is viable after only 15 weeks of pregnancy.

142.    All Mississippi women seeking a pre-viability abortion after 15 weeks, except under the narrow exceptions provided in the 15 Week Ban, will be prohibited from obtaining abortions because of the Ban.

143.    By prohibiting all abortions after 15 weeks from a woman's last menstrual period, except under the narrow exceptions listed, the Ban harms Plaintiffs' patients by denying access to pre-viability abortions and violating their constitutional rights.  The exceptions to the Ban do not cure the constitutional violation.

144.    The Ban presents Plaintiffs with an untenable choice:  to face professional sanctions and civil penalties for continuing to provide abortions after 15 weeks from a woman's last menstrual period, or to stop providing the care their patients seek.  These harms constitute irreparable harm to Plaintiffs and their patients.

145.    Absent injunctive relief from this Court to enjoin the 15 Week Ban, Plaintiffs will be forced to turn away patients seeking pre-viability abortions, as described herein, or face the risk of substantial professional sanctions and civil penalties.

## CLAIMS FOR RELIEF

## COUNT I

## SUBSTANTIVE DUE PROCESS—15 WEEK BAN

146.    Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 145 above.

147.    The 15 Week Ban bans abortion prior to viability, in violation of the liberty rights of Plaintiffs' patients, guaranteed by the Fourteenth Amendment of the United States Constitution.

## COUNT II

### SUBSTANTIVE DUE PROCESS—CUMULATIVE BURDEN

148.     Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 147 above.

149.     Mississippi's TRAP Licensing Scheme, Mandatory Delay and Two Trip Requirement, Biased Counseling Law, Physician Only Requirement, and Telemedicine Ban described above cumulatively violate Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because they impose an undue burden on a woman's right to choose abortion before viability.

## COUNT III

### SUBSTANTIVE DUE PROCESS—INDIVIDUAL LAWS

150.     Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 149 above.

151.     The TRAP Licensing Scheme violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because it imposes an undue burden on a woman's right to choose abortion before viability.

152.     The Mandatory Delay and Two Trip Requirement violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because it imposes an undue burden on a woman's right to choose abortion before viability.

153.     The Biased Counseling Law violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because it imposes an undue burden on a woman's right to choose abortion before viability.

154.     The Physician Only Law violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because it imposes an undue burden on a woman's right to choose abortion before viability.

155.     The Telemedicine Ban violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the United States Constitution because it imposes an undue burden on a woman's right to choose abortion before viability.

## COUNT IV

## SUBSTANTIVE DUE PROCESS—ARBITRARY DEPRIVATION OF LIBERTY

156.     Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 155 above.

157.     Mississippi's TRAP Licensing Scheme, Mandatory Delay and Two Trip Requirement, Biased Counseling Law, Physician Only Requirement, and Telemedicine Ban described above, to the extent they subject Plaintiffs to requirements that only apply to providers of abortion care with no corresponding benefit, medical or otherwise, arbitrarily and irrationally deprive Plaintiffs of their substantive due process rights guaranteed by the Fourteenth Amendment of the United States Constitution.

## COUNT V

## EQUAL PROTECTION

158.     Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 157 above.

159.     Mississippi's TRAP Licensing Scheme, Mandatory Delay and Two Trip Requirement, Biased Counseling Law, Physician Only Requirement, and Telemedicine Ban described above, to the extent they subject Plaintiffs to more burdensome requirements than similarly situated providers of medical services, with no corresponding benefit, medical or

otherwise, arbitrarily and irrationally deprive Plaintiffs of their rights to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution.

## COUNT VI

## FIRST AMENDMENT

160.     Plaintiffs reallege and hereby incorporate by reference paragraphs 1 through 159 above.

161.     The Biased Counseling Law compels Dr. Carr-Ellis to tell her patients, orally and in person, a state-mandated message that falls outside the accepted ethical standards and best practices for informed consent, and that she would not otherwise convey to her patients, violating Dr. Carr-Ellis's First Amendment rights not to speak.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment that H.B. 1510 is unconstitutional as applied to pre-viability abortions under the liberty clause of the Fourteenth Amendment to the United States Constitution and in violation of 42 U.S.C. § 1983;

2.     Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors from enforcing H.B. 1510 as to pre-viability abortions;

3.     Issue an order prohibiting Defendants, their employees, agents, and successors from bringing enforcement actions for pre-viability abortions performed while a Preliminary Injunction is in effect against H.B. 1510;

4.     Issue a declaratory judgment that, individually and cumulatively, the TRAP Licensing Scheme, the Mandatory Delay and Two Trip Requirement, the Biased Counseling Law, the Physician Only Requirement, and the Telemedicine Ban are unconstitutional as applied and enforced by Defendants, under the due process and equal

protection clauses of the Fourteenth Amendment to the United States Constitution and in

violation of 42 U.S.C. § 1983;

     5.    Issue a declaratory judgment that the Biased Counseling Law is

unconstitutional as applied and enforced by Defendants, under the First Amendment to the

United States Constitution and in violation of 42 U.S.C. § 1983;

     6.    Issue permanent injunctive relief restraining Defendants, their employees,

agents, and successors from enforcing the TRAP Licensing Scheme, the Mandatory Delay and

Two Trip Requirement, the Biased Counseling Law, the Physician Only Requirement, and the

Telemedicine Ban;

     7.    Award Plaintiffs their reasonable costs and attorneys' fees pursuant to

42 U.S.C. § 1988; and

     8.    Grant such other or further relief as the Court deems just, proper, and

equitable.

RESPECTFULLY SUBMITTED this 9th day of April, 2018.

 /s/ Hillary Schneller                         /s/ Robert McDuff
Julie Rikelman,* NY Bar # 3011426        Robert B. McDuff, MS Bar # 2532
Christine Parker,* CA Bar # 315529        767 North Congress Street
Hillary Schneller,* NY Bar # 5151154     Jackson, MS 39202
Leah Wiederhorn,** NY Bar # 4502845    (601) 969-0802 (Phone)
Center for Reproductive Rights           (601) 969-0804 (Fax)
199 Water Street, 22nd Floor             rbm@mcdufflaw.com
New York, NY 10038
(917) 637-3777 (Phone)                Beth L. Orlansky, MS Bar # 3938
(917) 637-3666 (Fax)                  Mississippi Center for Justice
jrikelman@reprorights.org              P.O. Box 1023
cparker@reprorights.org                Jackson, MS 39205
hschneller@reprorights.org           (601) 352-2269 (Phone)
lwiederhorn@reprorights.org          borlansky@mscenterforjustice.org
*Pro Hac Vice
**Pro Hac Vice application submitted

55

Roberto J. Gonzalez,** D.C. Bar # 501406
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7316 (Phone)
(202) 204-7344 (Fax)
rgonzalez@paulweiss.com
**Pro Hac Vice application submitted

Claudia Hammerman,* NY Bar # 2574333
Aaron S. Delaney,** NY Bar # 4321642
Alexia D. Korberg,** NY Bar # 5094222
Crystal Johnson,** NY Bar # 5405204
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000 (Phone)
(212) 492-0364 (Fax)
chammerman@paulweiss.com
adelaney@paulweiss.com
akorberg@paulweiss.com
cjohnson@paulweiss.com
*Pro Hac Vice application to be submitted
**Pro Hac Vice application submitted