

_____

No. 3:18-CV-171-CWR-FKB

JACKSON WOMEN'S HEALTH ORGANIZATION,
*On behalf of itself and its patients, et al.,*

*Plaintiffs,*

*v.*

MARY CURRIER,
*In her official capacity as State Health Officer of the Mississippi Department of Health, et al.,*

*Defendants.*

_____

ORDER GRANTING PERMANENT INJUNCTION

_____

Before CARLTON W. REEVES, *District Judge*.

In March 2018, Mississippi enacted House Bill 1510, one of the most restrictive abortion laws in the country. Plaintiffs filed suit to challenge this law.

There is a lone legal question presented: does H.B. 1510 infringe on the Fourteenth Amendment due process rights of women? It does, unequivocally.

## I. Procedural Background

On March 19, 2018, Mississippi enacted H.B. 1510, which is titled "An Act to . . . Prohibit Abortions After 15 Weeks' Gestation." The Act can be summarized by § 1.4(b):

> Except in a medical emergency or in the case of a severe fetal abnormality, a person shall not intentionally or knowingly perform, induce, or attempt to perform or induce an abortion of an unborn human being if the probable gestational age of the unborn human being has been determined to be greater than fifteen (15) weeks.

Gestational age is measured by "the time that has elapsed since the first day of the woman's last menstrual period."[1] The two exceptions are limited to narrow circumstances. A "medical emergency" exists only when necessary to save the woman's life or because the woman is facing "a serious risk of substantial and irreversible impairment of a major bodily function."[2] "Severe fetal abnormality" exists only when the fetus cannot survive outside the womb, no matter the fetus' age.[3] If doctors perform abortions outside of the parameters of the Act, they *shall* have their medical license suspended or

---

[1] H.B. 1510 § 1.3(e). "Last menstrual period" is often abbreviated as "lmp." The State's definition is consistent with standard medical practice. *See Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1222 (N.D. Fla. 2016) ("Physicians measure gestational age from the onset of the last menstrual period, not from the date of conception."). In regulating abortion, other states, however, attempt to measure gestational age based upon conception. *See Jane L. v. Bangerter*, 102 F.3d 1112, 1114 n.3 (10th Cir. 1996) ("20 weeks gestational age" as used in Utah's ban "equates with 22 weeks gestational age as this computation is generally made.").

[2] H.B. 1510 § 1.3(j).

[3] *Id*. § 1.3(h).

2

revoked and may be subject to an additional civil penalty or fine.[4]

On the day the Act was signed into law, Jackson Women's Health Organization ("JWHO"), the sole facility providing abortion services in Mississippi, and one of its board-certified doctors, Dr. Sacheen Carr-Ellis, filed suit challenging the 15-week ban and requesting a temporary restraining order ("TRO"). The plaintiffs named as defendants the officers of the state responsible for overseeing healthcare and healthcare licensing. An abortion was scheduled for the next day. The Court entered the TRO.

Plaintiffs later amended their complaint, dropping the equal protection challenge to the Act and adding five separate challenges to Mississippi's other abortion laws. The Court bifurcated the claims into two parts; Part I deals with the 15-week ban, and Part II deals with the other challenges to Mississippi's abortion regulations. In the interim, the Court extended the TRO a number of times with the final extension due to expire on November 26, 2018.[5]

Plaintiffs filed for summary judgment on Part I on August 24, 2018. That motion is now fully briefed. The familiar standard applies.[6]

---

4 *Id*. § 6 (emphasis added).

5 *See* Docket No. 87.

6 *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact the movant is entitled to judgment as a matter of law.").

## II. Viability is the Controlling Constitutional Precedent

"Liberty finds no refuge in a jurisprudence of doubt."[7] *Roe v. Wade* is controlling law.[8] As the Fifth Circuit said four years ago, it is "important to keep in mind that for more than forty years, it has been settled constitutional law that the Fourteenth Amendment protects a woman's basic right to choose an abortion."[9]

The Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* affirmed the central holding of *Roe*: "Before viability, the State's interests are not strong enough to support

---

[7] *Planned Parenthood of Se. Pennsylvania v. Casey,* 505 U.S. 833, 844 (1992) ("Yet 19 years after our holding that the Constitution protects a woman's right to terminate her pregnancy in its early stages that definition of liberty is still questioned.").

[8] 410 U.S. 113 (1973). Many view *Roe* as the starting point for abortion in America, but abortion in America did not begin in 1973. In Mississippi, when the 1890 constitution was adopted, abortion was legal until "quickening" which was between four and five months after the last menstrual period. *See Pro-Choice Mississippi v. Fordice*, 716 So. 2d 645, 650 (Miss. 1998). During months of research while drafting *Roe*, Justice Blackmun was surprised to learn that abortion was an accepted practice for thousands of years until it was criminalized in the 19th Century. *See* Scott Armstrong & Bob Woodward, *The Brethren* 183 (1979); *see also* Sybil Shainwald, *Reproductive Injustice in the New Millennium*, 20 Wm. & Mary J. Wom. & L. 123, 127 (2013) (explaining that "[i]n England between 1327 and 1803, and in the United States between 1607 and 1830, the common law afforded women the right to have an abortion."). Justice Ginsburg's own critique of *Roe*, prior to her appointment to the Supreme Court, was that the decision undercut progress states were making expanding abortion access. *See* Ruth Bader Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade*, 63 N.C. L. Rev. 375, 381–82 (1985).

[9] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014) (citations omitted).

a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."[10] Courts across the country, including this one, are required to follow *Casey's* holding that "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."[11]

### III. Undisputed Facts

As this Court previously noted in applying *Casey* and limiting the scope of discovery in this case, "[g]iven the Supreme Court's viability framework, the ban's lawfulness hinges on a single question: whether the 15-week mark is before or after viability."[12]

Viability is not the same for every pregnancy. It is a determination that must be made by a trained medical professional on a case-by-case basis.[13] The established medical consensus,

---

10 *Casey*, 505 U.S. at 846.

11 *Id.* at 860; *see Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) ("Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy.") (quoting *Casey*); *Sojourner T. v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) ("a State's interests are not strong enough to support a prohibition of abortion."); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (upholding unconstitutionality of 12-week abortion ban*); Isaacson v. Horne*, 716 F.3d 1213, 1222–23 (9th Cir. 2013) (finding 20-week abortion ban unconstitutional on the premise that viability is the "critical point" of inquiry).

12 Docket No. 41 at 2.

13 *Colautti v. Franklin*, 439 U.S. 379, 388 (1979) ("Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him [or her], there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.").

5

however, is that viability typically begins between 23 to 24 weeks lmp.[14]

The evidence in this case is consistent with the medical consensus. Plaintiffs direct the Court to the affidavits of two board-certified obstetrician/gynecologists who both agree that a fetus is not viable at 15 weeks lmp.[15] In fact, the Mississippi Department of Health's own position has long been that a fetus at 15 weeks lmp has "no chance of survival outside of the womb."[16] The State concedes established medical fact and acknowledges it has been "unable to identify any medical research or data that shows a fetus has reached the 'point of viability' at 15 weeks LMP."[17]

The consequences of the Act are also undisputed. JWHO provides abortion services until 16 weeks lmp. Dr. Carr-Ellis states in her affidavit that the Act presents her with "an impossible choice: to face potential civil penalties and loss of [her] Mississippi medical license for continuing to safely provide abortion care or to stop providing [her] patients the care they seek and deserve."[18] Generally, once per week the clinic provides an abortion to at least one woman after 14 weeks 6 days lmp.[19] If the Act is allowed to take effect, Dr. Carr-Ellis contends, those patients seeking abortions after 14 weeks 6 days lmp "will either be forced to carry their pregnancy to

---

14 *Isaacson*, 716 F.3d at 1224–25.

15 *See* Docket No. 82 at 4.

16 *Id*.

17 Docket No. 85 at 1–2.

18 Docket No. 81-1 ¶ 16.

19 *Id*. ¶ 8.

6

term against their will or have to leave the state to obtain care."[20]

The record is clear: States may not ban abortions prior to viability; 15 weeks lmp is prior to viability; and plaintiffs provide abortion services to Mississippi residents after 15 weeks lmp. As the facts establish, the Act is unlawful.

### IV. The State's Arguments Disregard Controlling Constitutional Precedent

So, why are we here? Because the State of Mississippi contends that every court who ruled on a case such as this "misinterpreted or misapplied prior Supreme Court abortion precedent."[21]

The State argues that because the Act is only a "regulation," which includes exceptions and was passed in furtherance of the State's legitimate interest in protecting the health of

---

20 *Id*. ¶ 10.

21 Docket No. 85 at 7.

women,[22] the Act does not place an undue burden on a woman's right to choose. [23]

---

22 The judiciary "retains an independent constitutional duty to review factual findings [of legislatures] where constitutional rights are at stake." *Gonzales*, 550 U.S. at 165 (citations omitted). In *Shelby County v. Holder*, for example, the Supreme Court found that § 4 of the Voting Rights Act was unconstitutional, despite a 15,000-page legislative record. 570 U.S. 529 (2013). The Court's view of American history led it to conclude that "our country has changed" and Congress's legislative findings failed to "reflect[] current needs." *Id.* at 553, 557.

In that spirit, this Court concludes that the Mississippi Legislature's professed interest in "women's health" is pure gaslighting. In its legislative findings justifying the need for this legislation, the Legislature cites *Casey* yet defies *Casey's* core holding. The State "ranks as the state with the most [medical] challenges for women, infants, and children" but is silent on expanding Medicaid. Ryan Sit, *Mississippi has the Highest Infant Mortality Rate and is Expected to Pass the Nation's Strictest Abortion Bill*, Newsweek, March 19, 2018. Its leaders are proud to challenge *Roe* but choose not to lift a finger to address the tragedies lurking on the other side of the delivery room: our alarming infant and maternal mortality rates. *See, e.g.*, Lynn Evans, *Maternal Deaths Still on the Increase*, The Clarion Ledger, March 31, 2018; Danielle Paquette, *Why Pregnant Women in Mississippi Keep Dying*, Wash. Post, April 24, 2015.

No, legislation like H.B. 1510 is closer to the old Mississippi—the Mississippi bent on controlling women and minorities. The Mississippi that, just a few decades ago, barred women from serving on juries "so they may continue their service as mothers, wives, and homemakers." *State v. Hall*, 187 So. 2d 861, 863 (Miss. 1966). The Mississippi that, in Fannie Lou Hamer's reporting, sterilized six out of ten black women in Sunflower County at the local hospital—against their will. *See* Rickie Solinger, *Wake Up Little Susie* 57 (1992). And the Mississippi that, in the early 1980s, was the last State to ratify the 19th Amendment—the authority guaranteeing women the right to vote. *See* Marjorie Julian Spruill & Jesse Spruill Wheeler, *Mississippi Women and the Woman Suffrage Movement*, Mississippi History Now.

23 *See* Docket No. 85 at 3–5.

8

The State is wrong on the law. The *Casey* court confirmed that the "State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child" and it may *regulate* abortions in pursuit of those legitimate interests.[24] Those *regulations* are constitutional only if they do not place an undue burden on a woman's right to choose an abortion.[25] But "this 'undue burden'/'substantial obstacle' mode of analysis has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the conditions under which such abortions are to be allowed."[26] There is no legitimate state interest strong enough, prior to viability, to justify a ban on abortions.[27]

The State's characterization is also wrong. The Act's full title is "An Act to be Known As the Gestational Age Act; To *Prohibit* Abortions After 15 Weeks' Gestation."[28] "Ban" and "prohibit" are synonyms.[29] This Act is a ban. It is not a regulation.

Given what *Casey* says about pre-viability bans, bans do not fare well in court. In *Edwards v. Beck*, the State of Arkansas,

---

24 *Casey*, 505 U.S. at 846.

25 *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) ("a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.").

26 *Isaacson*, 716 F.3d at 1225 (emphasis in original).

27 *Casey*, 505 U.S. at 846.

28 H.B. 1510 (emphasis added).

29 To the extent there is any doubt, "[t]he title of an act should assist to clarify what was in the mind of the legislature." Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 18:7 at 75–76 (7th Ed. 2009).

attempting to defend a ban on abortions after 12 weeks, made the exact same argument as the State of Mississippi does here.[30] The Eighth Circuit rejected the argument and held that "[w]hether or not exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."[31] As the Fifth Circuit explicitly stated in ruling that Louisiana's ban on abortions, which also included certain exceptions, was unconstitutional: "The [Supreme] Court held that before viability, a State's interests are not strong enough to support a prohibition of abortion. Thus, the [state] statute is clearly unconstitutional under *Casey*."[32]

Pivoting, Mississippi then asks the Court to totally disregard the *Casey* framework. The State argues this Court should unilaterally adopt a new line of reasoning and look to "fetal pain" instead of viability as a justifiable basis for the ban.[33] The State suggests that *Gonzales v. Carhart* allows for the adoption of this new framework.

Wrong again. To be absolutely clear, *Gonzales* does not replace *Casey* with a new standard.[34] *Gonzales* upheld the ban of a particular type of abortion procedure when other avenues for

---

30 *Edwards*, 786 F.3d at 1117.

31 *Id*. (quotations and citations omitted).

32 *Sojourner T.*, 974 F.2d at 30 (citations omitted); *see also Gonzales*, 550 U.S. at 146 ("Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy.").

33 *See* Docket No. 85 at 6–15. There is disagreement over the science of fetal pain. *See, e.g.*, Shainwald, *supra* n.8, at 156–57.

34 *Gonzales*, 550 U.S. at 146; *Isaacson*, 716 F.3d at 1223–24 ("*Gonzales*, preserved the viability line as the limit on prohibitions of abortion, applying *Casey* rather than overturning it. *Gonzales* left in place the earlier rulings

pre-viability abortions still existed.[35] In contrast, after 15 weeks women in Mississippi would be left with no other options.[36]

The State, of course, has the right to pass legislation that represents the interests of its citizens. But the State has already accounted for those desires by passing a "trigger law" that will ban abortions in the event *Roe* is overturned.[37] The Court's frustration, in part, is that other states have already unsuccessfully litigated the same sort of ban that is before this Court and the State is aware that this type of litigation costs the taxpayers a tremendous amount of money.[38]

No, the real reason we are here is simple. The State chose to pass a law it knew was unconstitutional to endorse a decades-

---

that, [b]efore viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy.") (quoting *Gonzales*).

35 *Gonzales*, 550 U.S. at 140.

36 The result would disproportionately impact poor women, and Mississippi has a greater population of poor women than any other state in the country. *See* Rebecca Wind, *Abortion is a Common Experience for U.S. Women*, Guttmacher Institute (Oct. 19, 2017); *Status of Women in the States: 2018*, Institute for Women's Policy Research (March 2018). Poor women are less likely to be able to leave the state to obtain the care they need. *See* Audrey Carlsen, et al., *What It Takes to Get an Abortion in the Most Restrictive U.S. State*, N.Y. Times, July 20, 2018 ("in 2014, the income of about half of women having abortions was less than the federal poverty level, which was $11,670" and in Mississippi abortions are not covered by Medicaid).

37 *See* Miss. Code Ann. § 41-41-45.

38 *See Jackson Women's Health Organization v. Currier*, No. 3:12-CV-436-DPJ-FKB, Docket No. 217 (S.D. Miss. May 29, 2018) (as prevailing party plaintiffs have moved for an award of attorney's fees and costs in excess of $1.2 million in case where State's abortion regulation was ruled facially unconstitutional).

long campaign, fueled by national interest groups, to ask the Supreme Court to overturn *Roe v. Wade*.[39]

This Court follows the commands of the Supreme Court and the dictates of the United States Constitution, rather than the disingenuous calculations of the Mississippi Legislature.[40]

---

[39] *See* Arielle Dreher, *Reversing 'Roe'; Outside Group Uses Mississippi as 'Bait' to End Abortion*, Jackson Free Press, March 14, 2018. Evidence of the campaign against *Roe* is evident in legislation from across the country. In 2011 and 2012, states passed over 130 laws restricting abortions. Yet in 2012 "no new laws were passed . . . to improve access to abortion, family planning services" or other interventions that would reduce unintended pregnancies. Shainwald, *supra* n.8, at 124.

[40] The Mississippi Legislature has a history of disregarding the constitutional rights of its citizens. *See, e.g.*, *Alexander v. Holmes Cty. Bd. of Ed.*, 396 U.S. 19, 20 (1969) (15 years after *Brown v. Board*, Mississippi continued to maintain segregated schools, prompting the Supreme Court to tell the State that it was "the obligation of every school district . . . to terminate dual school systems at once and to operate now and hereafter only unitary schools."); *Campaign for Southern Equality v. Bryant*, 791 F.3d 625, 627 (5th Cir. 2015) (striking down Mississippi's ban on same-sex marriage, explaining that "*Obergefell*, in both its Fourteenth and First Amendment iterations, is the law of the land and, consequently, the law of this circuit"); *ACLU v. Fordice*, 969 F. Supp. 403, 405 (S.D. Miss. 1994) (reciting how State legislature created and funded the Sovereignty Commission "to maintain racial segregation in the South despite orders to the contrary by the United States Supreme Court. As the secret intelligence arm of the State, the Commission engaged in a wide variety of unlawful activity"); *Jackson Women's Health Organization v. Amy*, 330 F. Supp. 2d 820 (S.D. Miss. 2004) (enjoining state statute that eliminated organization's ability to perform abortions early in second trimester); *Campaign for Southern Equality v. Miss. Dep't of Hum. Serv.*, 175 F. Supp. 3d 691, 697 (S. D. Miss. 2016) (striking down Mississippi statute prohibiting adoption by married gay couples); *Stewart v. Waller*, 404 F. Supp. 206 (N.D. Miss. 1975) (striking down at-large alderman election statute as purposeful device conceived to violate the Fourteenth and Fifteenth Amendments in furtherance of racial discrimination).

Summary judgment, therefore, is granted in favor of plaintiffs.

## V. The Ban Must Be Enjoined

Plaintiffs, who have already been granted a TRO, request that this Court enter "permanent injunctive relief restraining Defendants, their employees, agents, and successors from enforcing H.B. 1510 as to pre-viability abortions."[41] The State argues that plaintiffs do not have standing to seek such relief because the JWHO does not provide abortion services after 16 weeks lmp. The State, therefore, says that if the Court were to grant the plaintiffs any relief, it must be limited to a permanent injunction that would end at 16 weeks 0 days lmp. In addition to the time frame of the injunction, the State also suggests that plaintiffs have not established a facial challenge to the Act, so any remedy must be limited by application only to JWHO. Plaintiffs, correctly, respond that the State has conflated the principals of standing and remedies, and the remedy they request is appropriately tailored to the injury they have established.

"The scope of injunctive relief is dictated by the extent of the violation established, and an injunction must be narrowly tailored to remedy the specific action necessitating the injunction."[42] The breadth of the challenge, whether facial or as-applied, guides the appropriate scope of the remedy.[43] In a facial challenge, it is up to the Court to determine "whether the

---

[41] Docket No. 23 at 57.

[42] *Fiber Sys. Int'l., Inc. v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006); *see also* Fed. R. Civ. P. 65(d).

[43] The Fifth Circuit has held that an injunction against the application of a law to parties not involved in the suit "was an overly broad remedy in an as-applied challenge." *Currier*, 760 F.3d at 458.

plaintiffs are correct that the Statute cannot be construed and applied without infringing upon constitutionally protected rights."[44]

There is some confusion, as acknowledged in *Gonzales*, regarding the burden that a plaintiff bears in proving a facial challenge in the abortion context.[45] The Supreme Court has articulated two standards: challengers have to show that either there is no set of circumstances under which the law could be constitutional or that "in a large fraction of cases" the law would be unconstitutional.[46] Here, this distinction matters little because Mississippi's Act is not constitutional under any set of circumstances.

Plaintiffs have met the burden of a facial challenge because, as the State admits, a fetus is not viable at 15 weeks lmp. Therefore, the Act is banning abortions prior to viability. The Act could not be construed or applied without violating precedent.

If plaintiffs' challenge had been an as-applied one, moreover, the immediate practical result of the remedy would be the same since the JWHO is the sole abortion provider in Mississippi.[47]

---

[44] *Sojourner T.*, 974 F.2d at 30 (citations omitted).

[45] *See Gonzales*, 550 U.S. at 167–68.

[46] *Compare Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 514 (1990) *with Casey*, 505 U.S. at 895.

[47] *See generally* Sarah Fowler, *I Had an Abortion*, The Clarion Ledger, Aug. 19, 2018 (noting the drastic reduction in the number of abortion clinics within Mississippi).

Furthermore, the plaintiffs cite two instructive cases where courts did not limit the remedy based upon the services provided by abortion clinics who were plaintiffs.[48]

## VI. Conclusion

In *Whole Woman's Health v. Hellerstedt*, the Supreme Court held that a set of Texas abortion regulations placed an undue burden on a woman's right to choose. One of the dozens of amicus briefs filed in opposition to the restrictions was by a group of over 110 women, all members of the legal community. The women noted that the right to choose represents more than just the ability to make a medical decision; it is about "dignity and autonomy which are central to the liberty protected by the Fourteenth Amendment."[49] Mississippi's law violates Supreme Court precedent, and in doing so it disregards the Fourteenth Amendment guarantee of autonomy for women desiring to control their own reproductive health.

At various times throughout this Order, the Court has asked, "why are we here?" The State concedes that plaintiffs' articulation of the relevant facts is correct, and it cannot provide any

---

48 *See MKB Mgmt. Corp.*, 16 F. Supp. 3d at 1061–62 (permanently enjoining state's ban on abortions after the detection of a fetal heartbeat, remedy was not limited by self-imposed limitations of clinic), *aff'd sub nom. MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015); *Edwards v. Beck*, 8 F. Supp. 3d 1091, 1095 (E.D. Ark. 2014) (permanently enjoining ban on abortions after 12 weeks, without limiting remedy to time period between viability and when clinic stopped offering abortion services), *aff'd,* 786 F.3d 1113 (8th Cir. 2015); *see also Jane L.*, 102 F.3d at 1117–18 (clinic's referral of women out-of-state after gestational age when clinic elected to stop providing abortion services was evidence that state ban created an undue burden on women).

49 Amici Curiae Brief in Support of Petitioners, at 3–4, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (No. 15-274) (citing *Casey*).

controlling law that requires this Court to consider other facts. The only other explanation in its brief is that the State is making a deliberate effort to overturn *Roe* and established constitutional precedent.[50] With the recent changes in the membership of the Supreme Court, it may be that the State believes divine providence covered the Capitol when it passed this legislation. Time will tell. If overturning *Roe* is the State's desired result, the State will have to seek that relief from a higher court.[51] For now, the United States Supreme Court has spoken.

The fact that men, myself included, are determining how women may choose to manage their reproductive health is a sad irony not lost on the Court.[52] As Sarah Weddington argued to the nine men on the Supreme Court in 1971 when representing "Jane Roe," "a pregnancy to a woman is perhaps one of the most determinative aspects of her life."[53] As a man, who cannot get pregnant or seek an abortion, I can only imagine the anxiety and turmoil a woman might experience when she decides whether to terminate her pregnancy

---

[50] *See* Docket No. 85 at 9 n.5 (The State suggests the Supreme Court is waiting for a circuit split as the opportunity to reevaluate the viability standard); *see also* Dreher, *supra* n.39.

[51] *See Bryant*, 791 F.3d at 627 n.1 (explaining that the Fifth Circuit may not be bound by dicta within its own decisions, but "dicta of the Supreme Court are, of course, another matter.").

[52] *See also Sec. & Exch. Comm'n v. Adams*, No. 3:18-CV-252-CWR-FKB, 2018 WL 2465763, at *1–2 (S.D. Miss. June 1, 2018) (women report that "federal courts are 'places of discrimination' . . . where they feel 'invisible' and face 'pain, isolation, and injury' – especially from men cloaked in the robes of justice.").

[53] Josh Gottheimer, *Ripples of Hope: Great American Civil Rights Speeches* 353 (2003) (excerpt from *Roe v. Wade* oral argument).

16

through an abortion. Respecting her autonomy demands that this statute be enjoined.

H.B. 1510 is permanently enjoined because it is a facially unconstitutional ban on abortions prior to viability. The defendants; their officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with them; shall not enforce H.B. 1510 at any point, ever.

SO ORDERED, this the 20th day of November, 2018.

s/ CARLTON W. REEVES
*United States District Judge*