UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


WOMEN'S HEALTH ORGANIZATION
ON BEHALF OF ITSELF AND ITS PATIENTS          PLAINTIFFS

VS.                          CIVIL NO. 3:18-cv-00171-CWR-FKB

M.D., M.P.H., MARY CURRIER, ET AL.          DEFENDANTS




HEARING ON THE MOTION FOR TRO




BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
MARCH 20, 2018
JACKSON, MISSISSIPPI


APPEARANCES:

FOR THE PLAINTIFF VIA TELEPHONE: MR. ROBERT B. MCDUFF
                                 MS. CHRISTINE PARKER
                                 MS. HILLARY SCHNELLER

FOR THE DEFENDANT:          MR. PAUL E. BARNES
                            MR. WILSON E. MINOR


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1        THE CLERK:  Before the court this morning is case

2   styled and numbered *Jackson Woman's Health Organization, et*

3   *al., v. M.D., M.P.H., Mary Currier, et al,* civil action number

4   3:18cv171-CWR-FKB.

5        THE COURT:  Good morning.  I'm having some technical

6   difficulty.  Bear with me for just a second.

7     (Short Pause)

8        THE COURT:  It's my understanding that we have for the

9   plaintiff attorneys Rob McDuff, Hillary Schneller, and

10   Christine Parker.  Is that correct?

11        MR. MCDUFF:  That's correct, Your Honor.

12        THE COURT:  I just wanted to make sure you all can

13   hear me.  Are you having any difficulty hearing me and

14   understanding me?

15        MR. MCDUFF:  I'm not.

16        MS. SCHNELLER:  We can hear you.  Thank you.

17        THE COURT:  Who are you?  I'm sorry.

18        MS. SCHNELLER:  I apologize.  This is Hillary

19   Schneller.

20        THE COURT:  Who will be arguing on behalf of the

21   plaintiff?

22        MR. MCDUFF:  I will, Your Honor.

23        THE COURT:  Okay.  Thank you.  And for the State, I

24   have Mr. Barnes and Mr. Minor.  Is that correct?

25        MR. BARNES:  That's correct, Your Honor.

1          THE COURT:  Are we ready to proceed then, Mr. McDuff?

2          MR. MCDUFF:  We are, Your Honor.

3          THE COURT:  You may proceed.

4          MR. MCDUFF:  Thank you very much, Your Honor, and

5     thank you for accommodating me.  I am not in Jackson this

6     morning and would have a very difficult time getting back there

7     so I appreciate you allowing me to participate by telephone.

8          Yesterday afternoon around 3:30 the governor signed

9     House Bill 1510 that prohibits women who are beyond the

10    15th week -- who are beyond the 15th week of pregnancy from

11    making their own decisions about whether to bear children.

12    Within an hour after the law was signed, we filed this

13    challenge to the constitutionality of that bill, and we filed

14    it on behalf of the Jackson Women's Health Organization and its

15    medical director.

16          Within -- about 7 p.m., we filed a motion for a

17    temporary retraining order seeking an immediate order this

18    morning that would prevent the law from remaining in effect.

19    By its terms, it took effect immediately.  Prior to the filing

20    of the lawsuit, I informed the Attorney General that we were

21    about to file it, and I informed them of the basic points we

22    would be making in our motion for temporary restraining order.

23          This afternoon at 2 p.m., the clinic is seeing a

24    patient who is just beyond the 15th week of pregnancy.  If the

25    temporary restraining order is not issued, they will have to

1    turn her away, and the next opportunity there would be for an

2    appointment for her with a doctor present would be eight days

3    from now at which point she would have entered the 16th week of

4    pregnancy and the clinic does not perform abortions after 16

5    weeks.  So this is her only opportunity to have treatment at

6    the clinic.

7         THE COURT:  Let me -- Mr. McDuff, let me ask this

8    question, and I apologize for interrupting you.  Why does she

9    have to wait another eight days if she's turned around today?

10        MR. MCDUFF:  Because the clinic does not have a doctor

11   present who can perform the procedure until eight days from

12   now.  The schedule is they've got doctors that come in from out

13   of state, and they have only certain days each week in which

14   procedures are performed, and the next date is eight days from

15   now.

16        THE COURT:  Okay.  Thank you.  I'm sorry.  Let me ask

17   you this.  In reading your papers, has that patient fulfilled

18   the initial obligation of having the 24-hour wait period or

19   whatever she has to -- she has to have that first consultation

20   first.  Right?

21        MR. MCDUFF:  Yes, and she has.

22        THE COURT:  Okay.

23        MR. MCDUFF:  Under existing law in Mississippi,

24   abortions are banned after 20 weeks.  Now, that statute we

25   believe is unconstitutional, but because no one in Mississippi

1    is performing abortions past the 20th week, there has been no

2    occasion to challenge it.  But with this particular bill that

3    we are confronting today, the clinic does have standing and

4    does have reason to challenge it because it does perform

5    abortions after 16 weeks.

6          And the Supreme Court has held beginning in 1972 with

7    *Roe v. Wade* and again in 1992 in *Planned Parenthood v. Casey*

8    and again in 2016 in the *Hillerstedt* case from Texas, that a

9    state my not prohibit anyone from making the ultimate decision

10   to terminate her pregnancy before viability.  And viability has

11   been defined as the point at which the fetus could be

12   maintained -- his life could be maintained and nourished

13   outside the woman.

14         The declaration of Dr. Carr-Ellis, who is the clinic's

15   medical director and is one of the plaintiffs, states that

16   fetal viability does not occur at 15 weeks.  It occurs in

17   normal pregnancies at around 23 weeks.  The Supreme Court in

18   the *Planned Parenthood v. Casey* case tells that fetal viability

19   "sometimes" occurs as early as "23 to 24 weeks."

20         The cases that we have cited from the Ninth Circuit,

21   *Isaacson v. Horne*, states that viability occurs well after 20

22   weeks gestation.  The Eighth Circuit in the *MKB Management Corp*

23   case states -- credits the plaintiff's expert declarations that

24   state viability occurs at about 24 weeks.

25         There has been no case in which a law like this

1   setting a ban at some point prior to viability has been upheld

2   on the merits in the face of the constitutional challenge.  We

3   have listed in our brief a number of federal court of appeals

4   and state supreme court decisions in which decisions -- in

5   which the laws banning procedures prior to viability had been

6   struck down and each of them has either been affirmed by the

7   United States Supreme Court or the Supreme Court has denied

8   review.  These include laws struck down that had bans of

9   abortions past 22 weeks, past 20 weeks, past 12 weeks and past

10  six weeks.

11          So it's very clear under the existing law that women

12  have a right to make their own decisions about whether or not

13  to bear children even after 15 weeks of pregnancy and all the

14  way up to viability.  This law is clearly unconstitutional.

15          There's clearly irreparable harm here if a temporary

16  restraining order is not issued, and for those reasons we

17  respectfully request that the court issue a temporary

18  restraining order as soon as possible this morning.  That's all

19  I have, Your Honor.

20          THE COURT:  Thank you.  Any response from the State,

21  Mr. Barnes?  The State has -- I want to make sure the State has

22  not filed any papers yet.  Is that correct?

23          MR. BARNES:  That's correct, Your Honor.

24          THE COURT:  Okay.

25          MR. BARNES:  May it please the court?

```
 1                THE COURT:  You may proceed.

 2                MR. BARNES:  Your Honor, I think it's important to

 3      note from the outset that we are here on the TRO motion only.

 4      The merits of the case only need to be developed to the extent

 5      the court has to consider likelihood of success.  And the

 6      reason we are here right now is because of the one woman who

 7      has got a procedure scheduled this afternoon.

 8                So I'm going to focus my argument on really three

 9      issues.  One is the burden of proof and standing.  Second,

10      possibility of irreparable harm.  And as part of that, I'm

11      going to concentrate on the harms that the law is intended to

12      protect.  And then third, the State's interest in the

13      protection of unborn life.

14                It's the marriage of those two and the interest of

15      protecting maternal health and the State's interest in

16      protecting unborn life that ultimately is underpinning

17      justification for this law.

18                The clinic has said they only perform procedures

19      through 16 weeks.  That's been represented to us in other cases

20      and here today.  So we're not talking about week 17, 18 and 19.

21      They don't do procedures after the 16th week.  So in our view,

22      the court should be looking only at the week -- the 16th week,

23      which is the one week that could affect the clinic's operation.

24                Now, the burden of proof in an abortion case is on the

25      plaintiffs, both legally and factually, and the undue burden
```

1    test has teeth.  As Judge Jordan's ruling last week on the

2    ob-gyn certification issue shows, plaintiffs cannot simply

3    offer rhetoric or general evidence.  They must come forward

4    with substantial evidence to meet their burden.

5            So if we -- if they don't do procedures after 16

6    weeks, there's no reason to delve into the other weeks.  And

7    it's important for the court to know until the passage of this

8    bill under the 20-week law, that was purely a decision of the

9    clinic.  That's their business model.  The clinic chooses not

10   to perform abortions after the 16th week, and the reason they

11   choose not to do it is because abortions after the 16th week

12   are riskier and because they require more personnel.

13           Generally an anesthesiologist is considered necessary

14   in order to -- in case general anesthesia is necessary.  The

15   procedures are more complicated.  So we think the fact that the

16   clinic chooses not to perform abortions or procedures after the

17   16th week is tacit admission of part of our argument.

18           Now, this law has a number of stated purposes, and

19   legislative findings and statements of legislative purpose are

20   entitled to substantial deference.  The Supreme Court has said,

21   however, they're not entitled to dispositive weight, but they

22   can't simply be discarded, and we think that's very important

23   in this case.

24           THE COURT:  Did the legislature have any hearings on

25   this legislation -- any hearings that had been reduced to

1   transcripts or writing of the proceedings?  And I know

2   typically they do not.

3        MR. BARNES:  Not to my knowledge, Your Honor, but I do

4   not know for certain.

5        THE COURT:  Do you know if they had hearings?  Because

6   that was a compound question.

7        MR. BARNES:  I do not know, Your Honor.

8        THE COURT:  Okay.  All right.  So if they didn't have

9   hearings, how much deference should I give anything that

10  they -- any of the justifications that they set out or their

11  findings that they set out in the statute, how much deference

12  should the court give it if they had no hearings?

13       MR. BARNES:  Your Honor, still substantial deference.

14  That goes into the court.  The court does have an independent

15  inquiry obligation under the current law, but even if hearings

16  are not -- are not held, those findings are still entitled to

17  substantial difference.  And in addition to the findings which

18  are described in the bill, which I want to talk through a few

19  of those, there also is one particular peer reviewed article

20  which is cited in the statute itself and which we would also

21  like to make -- first I'd like to make an exhibit a copy of the

22  HB1510 and second -- and then second I would like to make an

23  exhibit the article that is cited --

24       THE COURT:  I know you and Mr. McDuff have talked

25  about these proceedings today.  Do the plaintiffs have -- have

1  you given them a copy of that?

2  MR. BARNES:  I don't know that I have, not overnight

3  Your Honor.  I assume they have a copy, but I'm not going to go

4  into great detail.  I just want to get into the effort --

5  THE COURT:  It's labeled "Risk Factors for Legal

6  Induced Abortion Mortality in the United States," an article by

7  several doctors, Linda Bartlett, Cynthia Berg, et al.  If you

8  don't have it, Mr. McDuff, I imagine the State will get it to

9  you.

10  MR. BARNES:  Absolutely we will, Your Honor.

11  MR. MCDUFF:  Your Honor, we had no objection to you

12  considering it for whatever weight it's worth at this stage.

13  We do not -- this is not a -- however we might object to it in

14  the future depending on the context.  I want to reserve that

15  right if it's introduced at any further hearings.

16  THE COURT: All right.  Thank you.  That objection

17  will be noted.  You may proceed, Mr. Barnes.

18  MR. BARNES:  Thank you, Your Honor.  The reason I want

19  to make this an exhibit is because this article does support a

20  number of the legislative findings that are described in the

21  bill itself, and it's specifically cited on lines 62 through 65

22  of the bill.

23  And one of the things that the plaintiffs and their

24  experts cannot deny is that the risk is -- greater factor of

25  determining a risk in gestational age after the eighth week,

1   the risk related to having an abortion increases approximately

2   38 percent per week.  So, therefore, an abortion being

3   performed at the 12th week, 13th week, the 14th week, the

4   15th week, each of those weeks, the risk goes up.

5        We anticipate that their argument -- and

6   Dr. Carr-Ellis says in her declaration that it's still a safe

7   number.  That's an ultimate issue of fact that the court's

8   going to have to determine in this litigation.  She does not

9   dispute -- her declaration does not dispute that there is

10  increased -- that harm is one.  Harm is what this bill is

11  intended to protect against, excuse me.

12        And some of those findings, Your Honor, that are

13  pertinent here today, 75 percent of the countries in the world

14  do not permit abortion after the first trimester.  The U.S. is

15  in a substantial minority.  Knowledge regarding fetal

16  development is constantly changing.

17        THE COURT:  Does the State typically look and see what

18  other countries are doing in basing its legislative findings

19  on?  I mean, that is a rare circumstance where the State of

20  Mississippi looks to other countries for guidance as opposed to

21  the other 50 -- 49 states.

22        MR. BARNES:  Well, they certainly did in this

23  instance, Your Honor.

24        THE COURT:  Okay.

25        MR. BARNES:  And because knowledge of fetal

1    development is constantly changing, constantly increasing, the

2    state of the technology and medical knowledge now is different

3    than it was at the time of *Roe*, and it's different than it was

4    at the time of *Casey*, different than at the time of *Carhart*,

5    different than last year.

6           And one of the things we know is that the viability

7    line is constantly moving and that has to be -- that is

8    anchored to technology, and that line is constantly going down.

9    The State's interest is constantly, therefore, increasing

10   because as the -- the more developed the fetus is, the stronger

11   the State's interest in protecting unborn life.

12          And the Bartlett study, which we referred to, is the

13   source of the 38 per cent per week increased risk factor.  The

14   risk of second trimester abortions include infection,

15   incomplete abortion, blood clots, heavy bleeding or hemorrhage,

16   laceration or tear of the cervix, punctured uterus, injury to

17   bowel or bladder, emotional and psychological issues.  Also

18   after 15 weeks, there's a greater risk of hysterectomy,

19   transfusion, or need for other reparative surgery.

20          Now, again Dr. Carr-Ellis' declaration simply says

21   this is as safe as a comparable outpatient procedures, does not

22   dispute that gestational age is the single biggest factor in

23   determining risk of abortion procedure, and it does not

24   contradict the fact that the risk increases exponentially from

25   one week to the next.

1          And, Your Honor, we believe that is enough, that is,

2     enough for the court to deny the motion.

3          THE COURT:  Now, you mentioned this article that the

4     legislature relied on.  In the statute itself, does the statute

5     or any of the legislative findings acknowledge the *Casey*

6     decision, acknowledge any other Supreme Court decision where

7     they -- where the U.S. Supreme Court has defined the parameters

8     of when viability begins?  Because it's the viability that

9     matters most with respect to whether this abortion is going to

10    be allowed past 15 weeks or past three or four weeks.  Right?

11         MR. BARNES:  Well, that's certainly one of the

12    considerations the court will have in ultimately deciding the

13    case.  However, we do not believe that it's the most important

14    consideration for today.  We think with regards to the TRO

15    motion, which we're on here now -- and the woman who has a

16    procedure scheduled this afternoon, the issue is does this law

17    protect this woman from increased risk by preventing her from

18    having a post 15-week abortion?

19         The other main consideration is does -- we do know

20    that if a TRO issues, that there is one unborn life that the

21    legislature -- that this law was unable to protect.  And in the

22    State's view, those are the critical issues for today.

23         THE COURT:  Now, in the plaintiff's brief, they cite

24    from the Mississippi Department of Health's own materials as

25    they explain -- that state that at 14 to 16 weeks a fetus has

```
1    "no chance of survival outside of the womb."  Does the State

2    stand by the Department of Health's representation as

3    represented by the -- I have not gone back and pulled that

4    particular document.  I'm going to believe that the plaintiffs

5    have cited that correctly, but the State of Mississippi itself

6    says -- the Department of Heath, "a fetus from 14 to 16 weeks

7    has no chance of survival outside of the womb."  So that ties

8    to the viability argument because the Supreme Court cases

9    suggest that if there is no viability, the State has no real

10   interest in telling a woman what to do with her body.

11        MR. BARNES:  Your Honor, those stats that they cited,

12   it's my understanding those are from 1996.  So they may still

13   be up on the website, but again medical knowledge, technology

14   has changed a lot since 1996.  So --

15        THE COURT:  Maybe not with the Mississippi Department

16   of Health.

17        MR. BARNES:  Yes, Your Honor, but that -- and we're

18   now in litigation, and we will continue to develop the record

19   with current medical information, and we anticipate that we'll

20   be able to develop that information.

21        But, Your Honor, the cases cited -- what the

22   plaintiffs don't say in their brief is that there's only one

23   federal court in recent years that has struck down -- one

24   federal court that has struck down even a 20-week ban.  That's

25   the Ninth Circuit.
```

1        THE COURT:  The Eighth Circuit just struck down --

2   what type of ban did they strike down?

3        MR. BARNES:  That was several years ago, I believe.

4   That was either Arkansas' 12-week ban -- and in that case, the

5   Eighth Circuit severely criticized -- recognized what it was

6   bound, but severely criticized the entire viability framework.

7   And I think that's going to be an issue, something that we're

8   going to go into more and more.  But the bottom line, Your

9   Honor, is the viability line is constantly moving, and it's

10  never moving in favor of providing -- allowing more abortions.

11       THE COURT:  But has the Supreme Court allowed that

12  line to move below 15 weeks or below 16 weeks or below 20

13  weeks?

14       MR. BARNES:  Well, they have prevented -- the Supreme

15  Court in *Gonzales v. Carhart* barred the partial birth abortion

16  procedure at any time.  So the answer to that extent is yes.

17  They have barred one specific procedure even for previability,

18  previability -- excuse me, Your Honor, previability abortions,

19  and the Supreme Court has not considered a case that contains

20  both the woman's right to choose to have an abortion and the

21  State's interest in protecting unborn life since *Carhart*.

22       *Hellerstedt* -- the right of the State to protect

23  unborn life was not directly implicated in *Hellerstedt*.  So

24  this is in a gray area, and that intersection of those two

25  competing interests we believe ultimately are where this case

1   is going to be decided.

2          THE COURT:  And that's the purpose of enacting this

3   statute.  Huh?  I mean --

4          MR. BARNES:  Your Honor --

5          THE COURT:  -- the record will be developed at some

6   point in time, I presume.  But if you don't look to what the

7   State Supreme -- what the U.S. Supreme Court has said about it

8   and you -- the -- you know, outside of the 20-week ban -- well,

9   Mississippi now has a 20-week ban, according to what Mr. --

10  what the plaintiffs have argued, they have a 20-week ban, but

11  they decided to reduce that to 15 weeks.  Do we know why?  From

12  the legislative findings, is it because medicine has changed in

13  the last few years, viability has changed?

14         MR. BARNES:  Well, Your Honor, the legislative

15  findings are the best evidence we have of what the legislative

16  intent was in passing this, and the legislature did refer to

17  *Casey*.  He did recognize that, but also noted that in *Gonzales*

18  *v. Carhart*, the State's interest in protecting unborn life was

19  held to trump the woman's interest in having a particular

20  procedure.

21         So, again, we think that there -- plaintiffs have

22  tried this particular tactic in other states.  They tried this

23  in North Carolina, where North Carolina's 20-week bill is

24  currently in litigation.  And after discovery -- I believe

25  they're not at the summary judgment stage, but that has not

1    been ruled on.

2         Viability is one of the concerns, and the other

3    concern is protection of unborn life and how far has that line

4    moved and how far can the State go?

5         THE COURT:  But where there is no viability, that's

6    ultimately going to be the question.  Where there is no

7    viability, does the State have -- should the State's right to

8    protect something that is not viable, should the State's right

9    to protect that fetus or whatever you want to call it, that

10   unborn matter, whatever it is if it's not viable, does the

11   State have a right to trump the woman's right to have control

12   over her decisions, over her body?  So reduced -- if viability

13   is but one factor, isn't it the most important factor?

14        MR. BARNES:  Your Honor, it's one of the factors, but

15   another consideration here is going to be fetal pain.  That's

16   part of the 20-week analysis.  That's going to be part of the

17   analysis here.  There is substantial evidence that at as low as

18   22 weeks there is substantial viability.  More than 20 or

19   25 percent of fetuses are viable, which implies that at 20

20   weeks some are viable.  So we think that -- we anticipate we

21   will we able to develop proof that shows that at least some of

22   the fetuses protected by this -- by this law are, in fact,

23   viable.

24        THE COURT:  Are there any findings in the legislative

25   record of what the legislature thought the need was to go below

1   16 weeks when the only abortion clinic in the state of

2   Mississippi provided abortions up to 16 weeks?

3          MR. BARNES:  Well, Your Honor, again, we have the

4   legislative findings, and there's -- it's obviously a

5   legislative determination that they feel the balancing point

6   should be 15 weeks.  As you know, I don't make the laws.  I

7   don't pass the laws.  We in the executive branch defend the

8   laws and execute the laws.  So, no, I cannot tell you

9   definitively why they chose 15 weeks in this bill at this time,

10  but we anticipate we will be able to develop substantial

11  evidence to support their conclusion.

12         THE COURT:  Okay.

13         MR. BARNES:  Could I have one moment, Your Honor?

14         THE COURT:  Yes, you may.

15      (Short Pause)

16         MR. BARNES:  In conclusion, Your Honor, we believe

17  that the State's interest in protecting women from the

18  increased risk associated with post 15-week abortions combined

19  with the State's interest in protecting unborn life is

20  sufficient justification for the court to deny the motion for

21  temporary retraining order.  It's the plaintiff's burden of

22  proof both factually and legally.

23         And, again, as far as irreparable harm, at most you're

24  talking about one week that the clinic performs procedures.  I

25  believe they said 70 something procedures in a year is the

1   number affected out of approximately 2600 abortions that this

2   facility performs.  So it is not as if there are thousands of

3   dep– –– thousands of abortions or hundreds of abortions being

4   performed every year that this bill's going to stop.  It's not.

5   The 15th, the 16th week is the only affected part.  And so if

6   we're talking about harm beyond that, then we're beyond the

7   scope of the TRO motion.

8           THE COURT:  Well, let me ask you specifically about

9   the one plaintiff who expects or intends to be on her way to

10  determining her destiny at 2:00 this afternoon.  If the court

11  does not stay or does not enjoin this statute, the plaintiff

12  has argued that if it doesn't go forward today, she has to wait

13  eight days.  She's into the 16th week.  So, therefore, the

14  statute would have served its purpose, that is, that that young

15  woman would not be able to have an abortion in the state of

16  Mississippi at the clinic from the doctors whom she wants to

17  perform that procedure.  Why isn't that irreparable harm to her

18  or substantial harm to her?

19          MR. BARNES:  I think the issue the court has to

20  determine is whether or not the medical benefits, as the

21  statute is intended to provide, are preventing her from

22  undergoing a risky post 15-week procedure is outweighed by what

23  she views as harm.

24          THE COURT:  But what evidence other than this study

25  here do we have that shows that this risky –– that shows this

1    exceptional risk, if courts and other states have struck down

2    statutes that are 20 weeks and -- anywhere between 20 and 15

3    weeks, obviously they base that on some evidence.  And I know

4    we're going to ferret that out in the future, but right here

5    today, should I give the legislature that much deference?  You

6    know, I don't know of any testimony -- if doctors came in and

7    testified during the hearing -- I don't even know if there was

8    a hearing.

9         And if -- a lot of stuff happens over there in the

10   legislature that just should not happen in ways that it should

11   not happen, and I'm not sure if we -- when we get down to

12   whether examining a record if there's going to be a formal

13   record, if there were proceedings, do we know if doctors were

14   brought in to testify about viability, if viability is

15   different in Mississippi because of environmental

16   circumstances, because of the standard of life of people here

17   in Mississippi is so much greater than the lives of people all

18   over the country.  I mean, do we have that?

19        MR. BARNES:  Well, Your Honor, I think that's not the

20   question for today.  We don't have the burden of proof.  The

21   legislature doesn't have the burden of proof.  The defendants

22   don't have the burden of proof.  On this TRO here today, the

23   plaintiffs clearly do.  So the question -- we believe the

24   appropriate question is have the plaintiffs provided enough

25   specific evidence to overturn the legislative findings and the

1    information in the article we provided to you.

2         THE COURT:  They say -- they argue in their papers

3    that the State has no legitimate interest in violating the

4    federal constitution which acknowledges that a woman's right

5    trumps a nonviable fetus' right.  In those cases -- the U.S.

6    Supreme Court cases has said viability equals approximately 23,

7    24 weeks.

8         MR. BARNES:  Your Honor, those cases depend on the

9    medical record at that time, and the line has changed even

10   since *Carhart*.  And *Carhart* specifically said that some

11   previability abortions -- at least some can be restricted.  And

12   if we're talking about the undue burden test in general, we're

13   talking about previability abortions because the law is clear

14   that when viability is the issue, the State's interest trumps

15   the woman's interest.

16        So again, in *Roe*, viability was 28 weeks.  *Casey*,

17   sometime around 24 weeks.  In *Carhart*, again they're talking

18   about, you know 23, 24 weeks.  In the North Carolina case,

19   which the Center for Reproductive Rights is -- cocounsel here

20   is cocounsel there -- their expert said 24 weeks.

21   Dr. Carr-Ellis says 23 weeks.  So that line is constantly

22   moving down, and it's never -- it's always moving in favor of

23   the State's authority.  It's never moving the other direction.

24        So, again, that is an issue that we're going to have

25   to explore at length.  But, again, we believe that for today

1   the issue is have the plaintiffs met their burden of proof?

2   And we do not believe they have and, therefore, respectfully

3   request that the court deny their motion.

4        THE COURT:  What other evidence do you contend that

5   the plaintiffs need for evidence to meet their burden of proof?

6        MR. BARNES:  I think they should have offered

7   specifics about increased risk.  They should have produced

8   evidence that says that the risk does not go up with

9   gestational age, that evidence is lacking.  That specifically

10  is what comes to mind right now, Your Honor.

11       THE COURT:  Okay.  Thank you, Mr. Barnes.

12       MR. BARNES:  Thank you.

13       MR. MCDUFF:  May I respond briefly, Your Honor?

14       THE COURT:  Yes, Mr. McDuff.  Yes, you may proceed.

15       MR. MCDUFF:  Thank you.  The irreparable harm exists

16  not only this afternoon but it exists in the coming weeks.  As

17  is indicated by the papers, there are -- there will be

18  procedures performed next Wednesday and Thursday.  And although

19  we don't know yet whether a person beyond the 15th week of

20  pregnancy is going to be scheduled then, it is quite possible.

21       Last year, there were 78 procedures for women beyond

22  15 weeks.  That's an average of two every three weeks.  So I

23  think there's a significant possibility that there will be at

24  least one patient, maybe more, who will be scheduled next week.

25       So the temporary restraining order is not just for

1   today, but for the -- yeah, for the near future and until such

2   time as a preliminary injunction hearing can be scheduled.

3            The -- Mr. Barnes talked about the absence of proof.

4   Actually we've more than carried the burden.  With respect to

5   the key issue of viability, of course, again, Dr. Carr-Ellis

6   states that viability does not occur until well after 15 weeks,

7   and she says that in the normally developing pregnancy, it's

8   around 23 weeks.

9            Mr. Barnes spoke of some evidence -- it's not in the

10  record here, but he said something about viability being at two

11  weeks and maybe in some cases at 20 weeks.  And even -- even if

12  there were evidence to that effect, that's far beyond the 15

13  weeks here.

14           With respect to the issue of safety, Dr. Carr-Ellis

15  states in paragraph 12 of her report, "Abortion is one of the

16  safest medical procedures in the United States.  Complication

17  rate for abortion, including after 15 weeks, are similar to or

18  lower than for other outpatient procedures."

19           In the first sentence in paragraph 13, she said,

20  "Thirdly, the risk of death associated with childbirth is

21  approximately 14 times higher than that associated with

22  abortion, and every pregnancy-related complication is more

23  common among women having live births than among those having

24  abortions."

25           Now, we don't have the legislature outlawing other

 1   outpatient procedures because there is some risk.  But they're

 2   outlawing this one, despite the fact that it's one of the

 3   safest medical procedures that exist.  And the reason they are

 4   outlawing it here as happened in other states which tried to

 5   restrict a woman's right to choose, is to prevent women who

 6   become pregnant, particularly those who accidentally become

 7   pregnant, to prevent them from making their own choices and

 8   then to force them to bear children against their will.

 9          And the Supreme Court has said since 1972 that that is

10   unconstitutional, and it's happening here.  It is happening --

11   it happens time and time again in Mississippi.  We see laws

12   passed to ban or restrict the rights of women to choose, and

13   quite often they are struck down by the federal courts, and

14   this one is going to have to be struck down again.

15          Mr. Barnes talked about an undue burden, the undue

16   burden test.  This is beyond an undue burden.  It's a ban.

17   It's a ban for every woman who has reached the 15th week of

18   pregnancy.

19          Mr. Barnes said something about the *Carhart* case.

20   Now, the *Carhart* case was not -- was not a ban on abortions

21   previability.  It was a regulation that considered the validity

22   of a prohibition of a single method of abortion that is used in

23   a specific and very rare procedure.  Here we have a ban on all

24   abortions after the 15th week, even though it's clear that

25   viability has not been reached.

1          And I just want to make two other points.  First, with

2     respect to Mr. Barnes' statement that the medical risks

3     increase with each week that passes, even if that is true -- or

4     if that is true and if that argument is accepted as somehow

5     being legitimate, the State could continue to dial back the

6     right to choose until its eviscerated.  If it increases after

7     the 15th week, it -- they can say it increases after the

8     12th week.  It increases after the sixth week.  It increases in

9     the first week.

10         And through this whole argument and this whole sort of

11    lashing out that they are using, they could abolish the right

12    to choose.  Fortunately, their reasoning and that argument and

13    these repeated tactics we see out of legislatures in

14    Mississippi and some of the other places are -- go directly

15    against the constitutional guarantees in the Fourteenth

16    Amendment that have been enshrined in the case law since 1972.

17         Finally, Mr. Barnes spoke about saving one unborn life

18    if the temporary restraining order is denied.  But the proper

19    way to look at it, as is recognized by medical science and is

20    recognized by the Supreme Court under our constitution, is that

21    it would be forcing one woman to bear a child against her will

22    simply because she is in the 15th week of pregnancy.  And

23    they -- and if this statute is upheld, women will -- repeatedly

24    across the state will be denied the right to choose, will be

25    denied their rights under the constitution.  This is a law that

1  is clearly unconstitutional.  And for that reason, the

2  temporary retraining order should be granted.

3       THE COURT:  Thank you, Mr. McDuff.  Because of the

4  enormity of the issue before the court, Mr. Barnes, if you

5  would like to respond in any way -- I understand we've already

6  gone through the motion, response, rebuttal, but if there's

7  any -- because of the enormity of this case and because of what

8  the plaintiffs are requesting, I will give you an opportunity

9  to have a word.  But the plaintiff again, though, will get the

10 last word.

11      MR. BARNES:  Nothing further, Your Honor.

12      THE COURT:  Okay.  All right.  Thank you all for

13 making yourselves available for this hearing.  The court will

14 take this matter under advisement.  The court understands what

15 the plaintiffs are requesting and the time frame at which they

16 are requesting so the court -- so thank you all for your

17 arguments.  This matter is now under advisement, and the court

18 will have a ruling as soon as possible.  This concludes the

19 matter.  Court is in recess.

20      (Recess)

21

22

23

24

25

CERTIFICATE OF REPORTER

 

     I, CHERIE GALLASPY BOND, Official Court Reporter, United

States District Court, Southern District of Mississippi, do

hereby certify that the above and foregoing pages contain a

full, true and correct transcript of the proceedings had in the

aforenamed case at the time and place indicated, which

proceedings were recorded by me to the best of my skill and

ability.

     I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial Conference of

the United States.

 

     This the 6th day of June, 2018.

 

                s/ *Cherie G. Bond*
                Cherie G. Bond
                Court Reporter