1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                         NORTHERN DIVISION

3

4    JACKSON WOMEN'S HEALTH ORGANIZATION, ET AL.        PLAINTIFFS

5    VERSUS                        CAUSE NO. 3:18-cv-00171-CWR-FKB

6    THOMAS E. DOBBS, M.D., ET AL.                       DEFENDANTS

7

8                     MOTION HEARING PROCEEDINGS
9            BEFORE THE HONORABLE CARLTON W. REEVES,
              UNITED STATES DISTRICT COURT JUDGE,
10                       MAY 21, 2019,
                       JACKSON, MISSISSIPPI
11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:     CAITLIN GRUSAUSKAS, ESQ.
                             HILLARY SCHNELLER, ESQ.
15                           AARON S. DELANEY, ESQ.
                             ROBERT B. MCDUFF, ESQ. (TELEPHONIC)
16
     FOR THE DEFENDANTS:     PAUL E. BARNES, ESQ.
17                           WILSON D. MINOR, ESQ.
                             ROBERT E. SANDERS, ESQ.
18                           PIETER TEEUWISSEN, ESQ.

19

20

21

22   REPORTED BY:

23       CANDICE S. CRANE, CCR #1781
         OFFICIAL COURT REPORTER
24       501 E. Court Street, Suite 2500
         Jackson, Mississippi  39201
25       Telephone:  (601)608-4187
         E-mail:  Candice_Crane@mssd.uscourts.gov

1                        TABLE OF CONTENTS

2  Argument on Plaintiffs' Motion to Amend:

3        By Ms. Grusauskas.....................................   4

4        By Mr. Minor.........................................  14

5        By Ms. Grusauskas....................................  27

6  Argument on Plaintiffs' Motion for Preliminary Injunction:

7        By Ms. Schneller....................................  28

8        By Mr. Barnes.......................................  38

9        By Ms. Schneller....................................  57

10 Certificate of Court Reporter............................  66

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **IN OPEN COURT, MAY 21, 2019**

2

3          MS. SUMMERS:  All rise.  Hear ye, hear ye, hear ye, the

4   United States District Court for the Southern District of

5   Mississippi, Northern Division, is now in session.  The Honorable

6   Carlton Reeves presiding.  May God save the United States and this

7   Honorable Court.

8          THE COURT:  You may be seated.  You may call the case.

9          MS. SUMMERS:  The Court calls *Jackson Women's Health*

10  *Organization, et al., versus Dobbs, et al., Civil Action*

11  *No. 3:18-cv-171-CWR-FKB.*

12         THE COURT:  We're here today on the parties' motion for

13  leave, the plaintiffs' motion to leave -- for leave, excuse me --

14  to file supplemental amended complaint and the plaintiffs' motion

15  for preliminary injunction.

16         Is the plaintiff ready?

17         I understand Mr. McDuff is on by telephone; is that

18  correct?

19         MR. MCDUFF:  Yes, Your Honor.

20         THE COURT:  All right.  Can you hear us fine?

21         MR. MCDUFF:  I can.  Thank you.

22         THE COURT:  All right.  Is counsel for the plaintiff

23  ready?

24         MS. GRUSAUSKAS:  Yes, Your Honor.

25         THE COURT:  All right.  Counsel for defendant ready?

```
1              MR. MINOR:  Yes, Your Honor.  We do have one housekeeping
2     matter when you're ready to hear it.
3              THE COURT:  Okay.
4              MR. MINOR:  I don't know if there's anyone else --
5              THE COURT:  Make sure you're speaking into the microphone.
6              MR. MINOR:  I apologize.  I'm not sure whether there's
7     anybody in the overflow room or if there's an audio feed.  I just
8     wanted to make sure that my understanding is correct that the
9     overflow room will be treated like an extension of this courtroom,
10    and that no audio or visual recordings can be made in the overflow
11    room; is that correct?
12             THE COURT:  No one other than the press has audio-visual
13    capacity.  The attorneys know if they have it, they are bound by
14    the local rules, so they know that the press -- there was an order
15    that the Court sent yesterday, and the press members are bound by
16    that order.  So I am under the presumption that people will obey
17    my rule.
18             MR. BARNES:  Thank you, Your Honor.
19             THE COURT:  All right.  Or any court order for that
20    matter.  We'll hear the motion to amend first, and then we'll
21    proceed from there.
22             MS. GRUSAUSKAS:  Good morning, Your Honor.
23             THE COURT:  Good morning.
24             MS. GRUSAUSKAS:  I'm Caitlin Grusauskas from the law firm
25    Paul Weiss on behalf of the plaintiffs, Jackson Women's Health
```

1    Organization and Dr. Sacheen Carr-Ellis.

2        Your Honor, six months ago in your order striking down the

3    State's ban on abortion after 15 weeks, you asked the question,

4    why are we here?  Today the question is, why are we here again?

5        Your Honor, we're here again today to challenge yet

6    another unconstitutional law passed by the State of Mississippi

7    aimed at closing out -- closing Mississippi's last remaining

8    abortion clinic and denying thousands of Mississippi women their

9    constitutional rights.  So I'll be arguing plaintiffs' motion

10   seeking the Court's permission to add our challenges to this

11   latest law to our current lawsuit, and my colleague, Ms.

12   Schneller, will be arguing the motion for a preliminary

13   injunction.

14       THE COURT:  Okay.  I'll just ask you to slow down just a

15   little bit.

16       MS. GRUSAUSKAS:  So as the Court knows, plaintiffs'

17   current lawsuit is a broad, comprehensive challenge to various

18   laws that Mississippi has passed in its decades-long campaign to

19   eliminate women's right to abortion.  Most recently that campaign

20   has transitioned from laws that restrict abortion access in

21   various unconstitutional ways to outright bans, like the 15-week

22   ban that this Court struck down just six months ago.

23       And now in open defiance of settled Supreme Court

24   precedent, and indeed in open defiance of this Court's ruling on

25   the 15-week ban, the Mississippi legislature passed an even more

 1   restrictive law, the six-week ban, which is what brings us here

 2   today.  The six-week ban is just a new legislative means of

 3   achieving the same unconstitutional end, namely, the elimination

 4   of a woman's right to abortion in Mississippi.  The plaintiffs,

 5   therefore, seek leave to supplement their existing complaint to

 6   add challenges to the six-week ban.

 7        Rule 15D of the Federal Rules of Civil Procedure permits a

 8   party to supplement a complaint to add, as is the case here,

 9   events or occurrences taking place after the original complaint is

10   filed.  As the text of the notes to the rules states expressly,

11   the Court has "broad discretion to permit supplementation."

12   Indeed, as the case is recognized, the aim of supplementation is

13   to promote a complete adjudication of the parties dispute, and

14   supplementation is appropriate when it serves the interests of

15   judicial economy.

16        Supplementation here would achieve that result permitting

17   a complete adjudication of the parties' dispute which arises from

18   Mississippi's ongoing purposeful campaign to eliminate abortions

19   in this state through a series of unconstitutional restrictions

20   and outright bans.

21        THE COURT:  So far we have sep- -- the case that was filed

22   back last year, the 15-week ban.  The Court has constructed an

23   avenue where that case was -- would be done in two phases; is that

24   correct?

25        MS. GRUSAUSKAS:  You mean the 15-week ban, yes.

1          THE COURT:  The 15-week ban.

2          MS. GRUSAUSKAS:  Correct.

3          THE COURT:  Right.  So if -- or where are we in that

4    process?  The parties, have they engaged in taking the discovery

5    that they thought they needed to take on phase two of that case?

6          MS. GRUSAUSKAS:  So the schedule for phase two is

7    discovery is ongoing.  I believe discovery doesn't close for

8    another year in phase two, so it's certainly ongoing.  And our

9    position is that our challenges to the six-week ban can certainly

10   be addressed concurrently with -- with all of the rest of the

11   discovery as to our other claims.

12         THE COURT:  What other type of discovery do you think one

13   would need that would be different for the six-week ban than the

14   15-week ban?

15         MS. GRUSAUSKAS:  None, Your Honor, frankly.  With respect

16   to the motion for preliminary injunction, you know, all of the

17   necessary discovery and facts are in the court record,

18   Dr. Carr-Ellis' declaration.  The sole question, as the Court

19   noted in its ruling on the 15-week ban, is the point of viability,

20   that's the only factual issue that's really relevant here.  So all

21   the facts that are necessary to resolve the challenge to the

22   six-week ban, because it is also a previability ban on abortion,

23   are in the court record.  And so that challenge can be resolved,

24   you know, without additional discovery.  And I would just note

25   that we do have -- we have added some claims, two other claims

```
 1   with respect to the -- to the six-week ban.  Namely that are not
 2   the subject of our motion for preliminary injunction.
 3         The claim that the six-week ban has the purpose of
 4   imposing a substantial obstacle on women seeking abortion and that
 5   also it is a form of sex discrimination and violation of equal
 6   protection.  But as to those two claims, again, the discovery
 7   would overlap substantially with the discovery for all of our
 8   existing claims.
 9         THE COURT:  Okay.  You may continue.
10         MS. GRUSAUSKAS:  Sure.  So just as an example, the school
11   desegregation cases that were cited in our briefs are illustrative
12   of how supplementation is appropriate in situations like this
13   where states are, to use the language of the Supreme Court in
14   Griffin, engaged in "continued persistent efforts to restrict or
15   deny constitutional rights in defiance of court rulings in
16   furtherance of an unconstitutional scheme."
17         Here we have a very similar situation where the
18   Mississippi legislature enacted the six-week ban with the full
19   knowledge that it is unconstitutional and surely with the full
20   knowledge that it is in contravention of this Court's November
21   ruling on the 15-week ban.  The six-week ban is just the latest of
22   the State's continued persistent efforts to eliminate women's
23   right to abortion.
24         The supplementation here for the reasons we were just
25   discussing would serve the interests of judicial economy.
```

1    Resolution of plaintiffs' challenges to the six-week ban is

2    inextricably intertwined with resolution of plaintiffs' challenges

3    to all the other laws that are in our complaint.

4         Frankly, if the six-week ban were to go into effect, it

5    would exacerbate the already substantial burdens on women that are

6    imposed by the laws that we already are challenging, and because

7    it is a near total ban on abortion, if it goes into effect, it

8    will drastically change the nature of the litigation.  It would

9    drastically cut down on the number of patients that the clinic is

10   able to see which would affect our burden arguments in the scope

11   of fact and expert discovery.

12        THE COURT:  Slow down.  I'm doing that for the court

13   reporter.  I can --

14        MS. GRUSAUSKAS:  I apologize.

15        THE COURT:  I'm following you well but --

16        MS. GRUSAUSKAS:  It's a bad habit.

17        THE COURT:  Yeah.

18        MS. GRUSAUSKAS:  Okay.  Thank you, Your Honor.

19        And, again, as I was saying, the legal and factual issues

20   relevant to our challenges to the six-week ban substantially

21   overlap with the legal and factual issues that are relevant to

22   resolution of our existing claims, and the Court is already

23   familiar with many of those issues.

24        First, we have the 15-week ban that this Court already

25   struck down as an unconstitutional ban on abortion prior to

1    viability.  The six-week ban is unconstitutional for exactly the

2    same reasons.  It's governed by exactly the same legal standard

3    and the exact same key facts, namely the point of viability.

4         Second, as I was saying, we also claim that the six-week

5    ban has the purpose of imposing a substantial obstacle on women

6    seeking abortions.  We have the same claim as to the other laws in

7    the complaint, all governed by the same legal standard, and we're

8    also challenging the six-week ban as a form of sex discrimination

9    which overlaps with our substantive due process challenges to the

10   other laws in terms of the impact on women and their ability to

11   participate equally.

12        THE COURT:  Is the sex discrimination claim a part of the

13   15-week ban claim?

14        MS. GRUSAUSKAS:  It was not, no, Your Honor.

15        THE COURT:  Okay.  So now you're raising a whole new area,

16   a claim of sex discrimination?

17        MS. GRUSAUSKAS:  Yeah, I wouldn't -- I wouldn't

18   necessarily characterize it as a whole new area, but it's

19   technically a new legal claim.  But it's the --

20        THE COURT:  What, if any, discovery does the plaintiff

21   believe would need to be made to litigate that particular claim?

22        MS. GRUSAUSKAS:  I think we're at -- it's a little early

23   to say, but I think we would be interested in, you know,

24   propounding discovery on the ways in which this law impacts women

25   and impacts their ability to participate equally in the economic

```
 1   and social life of this nation.  It's basically born out of a
 2   stereotype that women are -- you know, the proper role for women
 3   is to bear children, and so we would seek facts and expert
 4   discovery related to that.
 5        THE COURT:  Would the sex discrimination discovery also
 6   deal with whether or not procedures that the general population
 7   undergo for various medical conditions, males, for example, if
 8   they have to be subjected to different requirements or stages,
 9   24-hour waiting periods, and, you know, for a vasectomy or
10   something like that.  Would that be part of the sex -- would that
11   help inform your sex discrimination claim?
12        MS. GRUSAUSKAS:  I certainly think it's possible, Your
13   Honor, yes.
14        THE COURT:  Okay.
15        MS. GRUSAUSKAS:  If I may continue?
16        THE COURT:  You may.
17        MS. GRUSAUSKAS:  Thank you.  So therefore, we think it's
18   very appropriate for all of these similar interrelated challenges
19   to be heard and resolved in a single proceeding before a single
20   judge who's already familiar with the issues.
21        I just note for the Court's awareness, there's a recent
22   case from Alabama that actually followed this exact same
23   reasoning.  The case is *West Alabama Women's Center v. Miller*.  It
24   was decided in 2016 by Judge Thompson.  It's not cited in our
25   briefs, but I have copies with me.  And it's -- I can give -- the
```

1   citation is *318 F.R.D. 143*, and there, Judge Thompson permitted

2   plaintiffs to supplement their complaint in a similar abortion

3   lawsuit that challenged Alabama's admitting privileges law to add

4   challenges to two totally new abortion laws that had passed

5   concerning proximity to a school and the dilation and evacuation

6   procedure.  And his reasoning was, you know, essentially what our

7   argument is that the claims involved the same or similar factual

8   and legal issues, and the Court was already familiar with those

9   legal and factual issues.  And, thus, as a matter of judicial

10  economy, it made sense to litigate those in a single proceeding,

11  and so that same reasoning applies here.

12        Now, as I had also stated at the outset, the question of

13  whether supplementation is to be permitted is left to the Court's

14  sound discretion, and that is to be guided by three factors.

15  First, whether there's been undue delay or bad faith.  Second,

16  whether defendants will suffer undue prejudice, and third, whether

17  the new claims would be futile.

18        Now, defendants concede in the very first footnote of

19  their brief that all of these discretionary factors actually weigh

20  in favor of supplementation, which pretty much ends the analysis,

21  but just to quickly recap, you know, there's been no undue delay

22  here.  We brought our motion just a week after Governor Bryant

23  signed the six-week ban into law.  For all the reasons we were

24  discussing before, defendants will suffer no undue prejudice as

25  they concede, you know, all of the litigation can proceed, you

1    know, as it currently is in connection with phase two.  No

2    additional discovery is needed for our motion for a preliminary

3    injunction and --

4         THE COURT:  Slow down -- slow down.

5         MS. GRUSAUSKAS:  Sorry, I can't help it.

6         THE COURT:  You're below the Mason-Dixon line now.

7         MS. GRUSAUSKAS:  Yes.  I know, it's a problem.  I was

8    practicing, but anyways, not so well.

9         And then finally, the third factor of futility, again, as

10   defendants concede, our claims are -- with respect to the six-week

11   ban are not futile as shown in our motion for preliminary

12   injunction, which my colleague will argue shortly.  We're

13   reasonably certain to succeed in showing that this is an

14   unconstitutional restriction on abortion, ban on abortion.

15        And so all of these discretionary factors show that

16   there's really no compelling reason not to permit supplementation

17   here, and frankly the alternative would be to force us to file a

18   new, completely separate lawsuit, which would be inefficient and a

19   waste of the parties and the Court's resources.  It would require

20   coordination between this Court and the other Court.

21        THE COURT:  I assume you'll file a motion to consolidate

22   after that, right?

23        MS. GRUSAUSKAS:  Exactly, yes.  But we'd hope to avoid

24   having to do that unnecessary work.  So for all these reasons and

25   because all the discretionary factors weigh in favor of

1    supplementation, we respectfully submit that our motion should be

2    granted.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. MINOR:  Morning.

5          THE COURT:  Good morning.

6          MR. MINOR:  Wilson Minor from the Attorney General's

7    Office on behalf of Dr. Dobbs and Dr. Cleveland.  May it please

8    the Court?

9          THE COURT:  You may proceed.  Well, let me ask you this.

10   You said on behalf of Dr. Dobbs and Dr. --

11         MR. MINOR:  Dr. Cleveland.

12         THE COURT:  -- and Dr. Cleveland?

13         MR. BARNES:  Your Honor, the Attorney General's Office

14   represents Dr. Dobbs, the state medical officer, and Dr. Cleveland

15   the head of the state medical board.  The local defendants in this

16   action have their own counsel who are here.  I can let them

17   introduce themselves.

18         THE COURT:  Okay.  Thank you.  Thank you.  Because I was

19   going to ask, are we going to hear from the local defendants?

20         MR. SANDERS:  Your Honor, I'm Bob Sanders.  I represent

21   the District Attorney, Robert Shuler Smith.  I have filed a

22   joinder on behalf of Mr. Smith with the State's motion, but we

23   will not argue separately.

24         THE COURT:  Okay.  So the District Attorney agrees with

25   the State's brief?

1           MR. SANDERS:  That's correct, Your Honor.

2           THE COURT:  All right.

3           MR. TEEUWISSEN:  Good morning, Pieter Teeuwissen on behalf

4      of Gerald Mumford, who is the County prosecuting attorney and may

5      have enforcement powers.  He's sued in his official capacity,

6      which is tantamount to suing Hinds County.  I represent him in his

7      official capacity as well as Hinds County.

8           We take no position in this matter.  Mr. Mumford will

9      enforce the law.  If an order comes down saying Mr. Mumford

10     shouldn't enforce the law, he will obey this Court's order.  As

11     this Court particularly knows, the audience may not know, Hinds

12     County has a lot of other lives and a lot of other issues that we

13     need to focus on.  We are here purely in a neutral fashion.

14          THE COURT:  Okay.  Thank you, Mr. Teeuwissen.

15          MS. JACKSON WINTERS:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MS. JACKSON WINTERS:  I'm Lashundra Jackson Winters on

18     behalf of Wendy Wilson, the chief prosecutor for the City of

19     Jackson, which is tantamount to suing the City, itself.

20          THE COURT:  Okay.

21          MS. JACKSON WINTERS:  And we take no -- we're not going to

22     be doing an argument today either, Your Honor.

23          THE COURT:  Okay.  You take -- but do you join in what the

24     State's argument is?

25          MS. JACKSON WINTERS:  Yes, Your Honor.

1    THE COURT:  You do join in it?  Okay.  Thank you.

2    Mr. Minor, you may proceed.

3    MR. MINOR:  Thank you, Your Honor.

4    We're here today to -- for the Court to determine whether

5    the plaintiff should be given leave to supplement their complaint

6    with a constitutional challenge against the fetal heartbeat law,

7    which is Senate Bill 2116.  The plaintiffs have argued that this

8    claim is interrelated or overlaps with their other claims, but

9    that's simply not the case.

10    The core of this case is the -- or the remaining part of

11    this case, the core of that part of the case, is the cumulative

12    effects part of the case.  Their claim that five different

13    abortion statutes violate the right to abortion and those statutes

14    are the State's licensing scheme for abortion clinics, the 24-hour

15    waiting period, the informed consent requirement, the physicians

16    only requirement, and the -- the law that prohibits abortion

17    clinics from using telemedicine.

18    But their proposed claim against the fetal heartbeat law

19    is not a part of the cumulative effects -- their cumulative

20    effects claim.  It's a freestanding claim.  It's separate and

21    distinct, both factually and legally, so --

22    THE COURT:  They contend, I believe, that the 15-week ban

23    prohibits abortions after 15 weeks, and the Court has already

24    ruled that that's unconstitutional.  Now, there's a statute that

25    says, hold on, we're going to do less than 15 weeks.  We're going

1   to do six weeks.

2       MR. MINOR:  We disagree that it's a six-week ban; that's

3   their characterization.  It's a -- the law prohibits abortions

4   after a fetal heartbeat is detected.

5       THE COURT:  And a fetal heartbeat can be detected when?

6       MR. MINOR:  Mr. Barnes is going to address the -- he'll

7   address that issue in our -- in opposition to the motion for

8   preliminary injunction.  I'm just going to argue on the motion to

9   supplement.

10      Yes, it -- the law which -- which the fetal heartbeat law

11  is most similar to is the 15-week law, but that -- that law is no

12  longer -- or the claim against that law is no longer before the

13  Court.  It's before the Fifth Circuit, and the plaintiffs have not

14  asked the Court to reopen phase one or part one of the case which

15  relates to the 15-week law.  And they haven't asked the Court to

16  modify its injunction so the --

17      THE COURT:  Well, let me ask you this.  Has the plaintiff

18  articulated the correct standard for -- to amend the complaint to

19  add this particular claim?

20      MR. MINOR:  I don't think so.  In the Fifth Circuit -- the

21  Fifth Circuit hasn't exactly articulated a standard for this.

22  There's district courts throughout the Fifth Circuit, though, that

23  have said that -- that the purpose of supplementation is to allow

24  a party to set forth new facts that have occurred since the filing

25  of the original pleading and that affect the controversy and the

1    relief sought.  So the purpose of the supplemental pleading is to

2    bring the action up to date.

3         Now, you can add claims.  I'm not disputing that.  You can

4    add claims.  But the claims that you could be permitted to add

5    must stem from one of the original causes of action, and this

6    claim against the fetal heartbeat law is -- does not stem from any

7    of the other claims.  It's a separate and distinct law passed by a

8    different legislature in a different year.  And it doesn't -- it

9    doesn't stem from the 15-week law or any of the other claims

10   against the other laws.  That's the standard that I've seen stated

11   in --

12        THE COURT:  You contend there's a different legislature?

13        MR. MINOR:  It was a different year.

14        THE COURT:  Just a different year.

15        I mean, I imagine the legislature may have changed because

16   somebody --

17        MR. MINOR:  I mean, sorry, the same legislature.  But it

18   was a different year, so the composition may have changed.

19        THE COURT:  But how do you explain your footnote one of

20   your -- of your brief to determine whether to grant leave to file

21   a supplemental pleading under Rule 15D, a district court must also

22   weigh several factors, and then it says, one, two, and three.  I

23   mean, this is your brief.

24        MR. MINOR:  I agree those are factors the Court must

25   weigh, but those are not the end of the discussion.  You have to

```
1    also satisfy the standard that the new claims you're asserting
2    grew out of the original dispute between the parties, and they do
3    not satisfy those standards.  So even if they meet those factors,
4    I don't think that's sufficient to -- to permit supplementation.
5         THE COURT:  I mean, it -- doesn't it boil down to whether
6    six is less than 15?  And if 15 -- and I know we're going to get
7    into that preliminary injunction part of the thing.  But the new
8    claim they're bringing -- I guess the real new claim that they
9    bring is one that they say is sex discrimination, or -- or I think
10   the plaintiff has admitted that, that this is a new claim, that
11   that claim was not brought in that form in the earlier lawsuit or
12   in the -- or in the original lawsuit.
13        So is it that claim that the Court should not allow to go
14   forward?
15        MR. MINOR:  No.  They assert two constitutional challenges
16   to the fetal heartbeat law, substantive due process based on *Casey*
17   and all the abortion case law, and then the second one is the
18   equal protection one.  Our argument is you shouldn't allow either
19   claim to be supplemented.
20        THE COURT:  I mean, the substantive due process claim goes
21   toward the 15-week too, right, because --
22        MR. MINOR:  No.  They assert it -- they assert it as a
23   freestanding claim.  It's Count 7 and Count 8 in their proposed
24   supplemental amended complaint.  It's not -- the 15-week claim is
25   separate.
```

1      THE COURT:  How would the State be prejudiced if the Court

2  allowed them to amend the complaint to add -- to amend the

3  complaint and add it to the existing complaint?  How would the

4  State be prejudiced?

5      MR. MINOR:  The State's position is that it just doesn't

6  make any sense to jam all these claims together in one huge

7  lawsuit.  Effectively what the Court did before was separate the

8  cumulative effects part of the case with the 15-week law, and we

9  basically litigated it as two separate cases.  Now, you're going

10  to --

11      THE COURT:  Can we -- go ahead.

12      MR. MINOR:  Sorry.  If we're going to add a third claim,

13  which is in effect a third lawsuit, we're going to be basically

14  litigating three lawsuits in one.  It just makes -- it makes more

15  sense to separate that one out and have a separate lawsuit.

16  That's all I'm saying.

17      THE COURT:  And then consolidate it or separate -- or a

18  freestanding lawsuit that might go before a different judge, huh?

19      MR. MINOR:  Or it might be assigned to Your Honor.

20      THE COURT:  All right.

21      MR. MINOR:  So, I mean, the plaintiffs rely on these

22  school desegregation cases, which, I think, are clearly

23  distinguishable.  In those cases, you know, the federal courts

24  ordered the schools to be desegregated, and then after the courts

25  ordered that then the legislature and the city councils in those

1    states basically in one of the cases they shutdown the public

2    schools and they used the money for the public schools for

3    vouchers for white children to go to private schools.  In the

4    Louisiana case they cite, the State of Louisiana also paid for

5    private tuition for white children who didn't want to attend the

6    public schools.  So it was clear that the State was trying to

7    circumvent or get around the Court's rulings, and that's not the

8    case here.

9         As I stated earlier, the plaintiffs do not claim that

10   we're, you know, interfering with the Court's injunction against

11   the 15-week law, and they don't seek to reopen part one of the

12   case.

13        THE COURT:  Would it have appeared it was getting around

14   it if the State had enacted a 16-week ban after the Court had

15   struck down a 15-week ban?

16        MR. MINOR:  I don't think so.

17        THE COURT:  What about if the State had done a 14-week ban

18   immediately after the Court did the 15-week ban?

19        MR. MINOR:  That would be a closer question but --

20        THE COURT:  So a six-week ban is not close at all?

21        MR. MINOR:  No.  No.  The law that we're here on today

22   is -- is -- no, I'm saying -- if they amended the 15-week law to

23   make it 14 weeks.  Is that what you were saying?

24        THE COURT:  Well, I'm just saying.  I mean, you're talking

25   about the school desegregation cases.  If the State went and did

1    X, Y, and Z after the Court had ruled, you said that would be in

2    clear defiance.  Maybe you didn't use the word "defiance," but you

3    know.  But what I'm asking is the fact the Court said that the

4    15-week ban is unconstitutional, if the legislature had come

5    forward -- because the Court found that at 15 weeks a fetus is not

6    viable, that it did not meet the viability threshold.

7         So immediately after the Court issued that ruling, if the

8    legislature had enacted a statute that said any abortion after

9    16 weeks, would that appear to be in specific defiance of the

10   Court?

11        And then the second question was, what if they had done

12   14 weeks?

13        MR. MINOR:  No.  If they had enacted a new law, it would

14   be a new, separate, distinct cause of action which would require a

15   new lawsuit.  I misunderstood Your Honor's question.  I thought

16   you meant that if they amended the 15-week law itself and made it

17   14 weeks, that would be a closer question, because you would be

18   amending the statute that's being challenged in the lawsuit.  That

19   would be a closer question.

20        But when the legislature enacts a new law, hey, that's a

21   new, clearly distinct cause of action to challenge that law, and

22   that belongs in a separate lawsuit no matter what -- no matter

23   what the lawsuit is that exists at the time.  If it's a new law,

24   it's a new cause of action.

25        THE COURT:  Okay.  So --

1          MR. MINOR:  That's our position, and it's not in defiance

2    of the Court's ruling.  The Fifth Circuit hasn't ruled on the

3    constitutionality of the 15-week law.

4          THE COURT:  But I have.

5          MR. MINOR:  I understand that.

6          THE COURT:  And the U.S. Supreme Court.

7          MR. MINOR:  We disagree with that -- with that position.

8    But the Fifth Circuit hasn't ruled on it.  I don't think -- I

9    don't think the legislature is thumbing its nose at this Court's

10   orders, and plaintiffs agree because they haven't asked the Court

11   to enforce its injunction so --

12         THE COURT:  So if they did ask the Court to enforce the

13   injunction, what type of relief should they seek?  Should the

14   Court -- should they ask the Court to hold the legislature in

15   contempt?

16         MR. MINOR:  No.  The legislature's passage of law doesn't

17   interfere with the Court's injunctions.  It's a new, separate law

18   that requires a new, separate cause of action to challenge it,

19   which belongs in a separate suit; that's our position.

20         THE COURT:  Turning to the 15D argument, though, that's

21   the -- that's the plaintiffs' threshold for trying to get

22   relief -- trying to add this claim in.  The statute was passed.

23   It was signed by the governor.  They didn't sit on their hands.

24   They -- they waited a few days, I guess.  I don't know how many.

25   And they at least moved to amend after that point, so there was no

1   delay at least in bringing it to the Court's attention.

2          The State agrees, right?

3          MR. MINOR:  We agree with that.  Our point is that as the

4   case sits before the Court today, it's all about the cumulative

5   effects claim against these five -- five general abortion

6   regulations, which are based on different legal principals and

7   factual issues than the fetal heartbeat law.  They're completely

8   unrelated.  They, I mean --

9          THE COURT:  But wouldn't it help judicial economy if all

10  these things are brought genally at the same time in the same

11  proceeding?

12         MR. MINOR:  No.

13         THE COURT:  It would not?

14         MR. MINOR:  No.

15         THE COURT:  Okay.

16         MR. MINOR:  I mean, Your Honor split the case in two to

17  begin with and the -- the fetal heartbeat law would be more -- the

18  discovery about that would be more analogous to the 15-week law,

19  but they're not seeking to reopen that part of the case.  So I

20  think it should be -- we think it should be brought as a separate

21  suit.

22         THE COURT:  Are the parties still engaged in discovery on

23  some of the claims?

24         MR. MINOR:  We're currently in discovery on part two,

25  which is the cumulative effects part of the case about the general

1    abortion regulations that have been in existence for some -- some

2    for almost 30 years.  And so this fetal heartbeat law doesn't

3    belong in that -- in that part of the case.  That's our point.

4         THE COURT:  Could it be brought in this case and just

5    stayed while the 15-week thing is dealt with?

6         MR. MINOR:  I'm sorry.  I don't understand your question,

7    Your Honor.

8         THE COURT:  I mean, you said it can't be brought in this

9    case, because it has nothing to do with the five areas --

10        MR. MINOR:  Right.  The part two, yeah.

11        THE COURT:  -- the part two where you all are engaged in

12   discovery.

13        MR. MINOR:  Right.

14        THE COURT:  Could it be brought here and stayed and the

15   parties deal with the substantive due process claim that is in the

16   amended portion of the complaint and deal with the equal

17   protection issue that is raised in the second part?

18        I'm just -- it just seems to me that if all of these

19   things are wrapped up in one case that just feeds to judicial

20   economy, right?

21        MR. MINOR:  I don't think so.  I think they're -- they're

22   conceptually, legally, factually they're distinct from part two of

23   the case, this law is, and it should be litigated separately.

24   That's our -- that's our position.

25        THE COURT:  Okay.

1          MR. MINOR:  And it just doesn't make much sense to jam all

2     these different claims together.

3          THE COURT:  Okay.

4          MR. MINOR:  And as far as the discovery we would need --

5     we don't think there should be -- I mean, if the Court allows

6     supplementation -- the plaintiffs to supplement, we don't think

7     there should be any limit on discovery with respect to the fetal

8     heartbeat claim.  We're not sure exactly what discovery we would

9     need, but we don't want to limit ourselves right now.  We think

10    the discovery should be unlimited if the Court proceeds with the

11    fetal heartbeat law as part of this case.

12         THE COURT:  Okay.

13         MR. MINOR:  Thank you, Your Honor.

14         THE COURT:  All right.  You -- I think the parties both

15    cite cases which suggest that it's within the Court's sound

16    discretion; is that correct?

17         MR. MINOR:  It is discretionary.

18         THE COURT:  Okay.

19         MR. MINOR:  But unlike a motion to amend your complaint,

20    it's not freely given.  It's not a matter of right almost.

21    It's -- the standard is a little bit more stringent than the one

22    that applies for a motion to amend a complaint.

23         THE COURT:  But the umbrella that encapsulates all that is

24    its discretion on the Court's part.

25         MR. MINOR:  Yeah, it's reviewed under an abuse of

```
 1    discretion standard by the Fifth Circuit.

 2           THE COURT:  All right.  Thank you.

 3           MR. MINOR:  The defendants would respectfully request that

 4    the Court deny the motion for leave.

 5           THE COURT:  Okay.  Thank you.

 6           MR. MINOR:  Thank you.

 7           THE COURT:  All right, Mr. Minor.

 8           Any rebuttal?

 9           MS. GRUSAUSKAS:  Just really quickly, Your Honor.

10           Just two points of clarification with respect to our sex

11    discrimination claim, I just want to explain that the discovery

12    that we would be seeking on that claim with respect to the

13    six-week ban is really the same discovery that we would be seeking

14    with respect to our substantive due process challenges as to the

15    existing claim, so the ways in which women are impacted.  So we

16    don't really -- it may be a new legal theory, but it's

17    substantively going to involve the same facts and issues.

18           And then just with respect to Mr. Minor's last point about

19    discovery, we would reserve the right to seek -- to limit

20    discovery, if necessary, you know, within the bounds of what's

21    relevant to the particular claim being litigated.

22           THE COURT:  So if you bring your six-week claim, you're

23    saying that you would not -- you would resist any discovery on

24    that, because it would be treated in your mind like the 15-week

25    claim has been treated?
```

1          MS. GRUSAUSKAS:  So with respect to the claim that is the

2    subject of our motion for preliminary injunction, which is

3    basically the same as what we argued as to the 15-week ban, is

4    it's an unconstitutional previability ban.  We don't think that

5    discovery is -- any further discovery is needed beyond what, you

6    know, we already have in the record with respect to the point of

7    viability and the fact that the six-week ban, you know, is a ban

8    prior to viability.

9          THE COURT:  Okay.  Thank you.  I understand that the

10   District Attorney and the City of Jackson have joined in that

11   portion of the argument, that Hinds County has taken a neutral

12   position.

13         All right.  Now, we're ready to turn to the -- the Court

14   will reserve ruling on the motion to amend, and now I'll turn to

15   the motion for preliminary injunction.

16         MS. SCHNELLER:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MS. SCHNELLER:  Hillary Schneller for the plaintiffs, and

19   I will try to avoid being repetitive given that we -- you know,

20   the Court is familiar with the 15-week ban and my colleague, of

21   course, has discussed the six-week ban already a bit.

22         As has been discussed, this year the State of Mississippi

23   in defiance of decades of Supreme Court precedent and this Court's

24   ruling just a few months ago passed Senate Bill 2116, which is a

25   criminal ban on abortion after embryonic cardiac activity can be

1    detected.  Meaning it bans abortion at approximately six weeks of

2    pregnancy.

3           We are asking the Court to enter a preliminary injunction

4    before the Act takes effect on July 1st, because it has the effect

5    of unconstitutionally depriving women of the right to decide

6    whether to continue a previability pregnancy.  By banning abortion

7    at six weeks, the act would essentially eliminate access to legal

8    abortion in this state and, therefore, irreparably harm

9    plaintiff's patients.

10          The U.S. Supreme Court and this Court, like every federal

11   court before it, has declared that no state may ban abortion

12   before viability.  No effort to ban abortion like the act has

13   survived a federal court challenge, and there is no reason for

14   this Court to come to a different result.

15          So just to explain some of the facts a bit, using standard

16   medical practice, including the practice of Jackson Women's Health

17   Organization, the only licensed abortion facility in this state,

18   cardiac activity can be detected as early as six weeks of

19   pregnancy using a transvaginal ultrasound, and the State agrees

20   with this fact.

21          And therefore, by banning abortion after embryonic cardiac

22   activity has been detected, the act bans abortion at six weeks,

23   which is before many people can even confirm they're pregnant.

24          As Dr. Carr-Ellis, the clinic's medical director, explains

25   in her declaration for a person with a regular menstrual cycle six

1   weeks is just two weeks after a missed period, which is the first

2   sign many people may know they're pregnant.  And many women do not

3   make their first State-required visit to the clinic at that point,

4   let alone the second in-person visit where they can actually

5   obtain an abortion procedure.

6          For other women missing a period when they're already six

7   weeks pregnant may not be unusual.  For them, the act could

8   completely eliminate the chance to make the decision whether to

9   continue or terminate a previability pregnancy.

10          Nearly all of the clinic's patients obtain abortion after

11   six weeks, so in practice the act is a near total ban on abortion.

12   If permitted to take effect, it will deny nearly all of pregnant

13   Mississippians the right to decide whether to continue a

14   previability pregnancy.  Women will be forced to leave the state

15   to obtain legal abortion care or be forced to remain pregnant

16   against their will.

17          And in permanently enjoining the 15-week ban just a few

18   months ago this Court made three points that apply with equal

19   force to this latest attempt to ban abortion before viability.

20   First, in *Casey,* the Supreme Court upheld *Roe's* essential holding

21   that no state may deprive any woman of the decision whether to

22   continue a pregnancy before viability, and this Court is bound to

23   follow that precedent, which applies regardless of the point

24   before viability that the ban begins to operate, regardless of the

25   reasons the State may assert in support of the ban, regardless of

1    what exceptions it may have, and the total number of women the ban

2    may affect.

3         Second, viability means a reasonable likelihood of

4    sustained survival outside the womb, which, as this Court has

5    recognized, in striking down the 15-week ban occurs at

6    approximately 23 to 24 weeks.

7         And, third, when evaluating a ban on abortion the only

8    factual question is whether it operates before or after viability.

9         Here the State agrees that cardiac activity is detectable

10   as early as six weeks.  The State also concedes, as it did with

11   the 15-week ban, that it has no evidence that viability is

12   possible at six weeks, and the State concedes that the act will

13   prohibit abortion for at least some women.  In other words, those

14   women who seek abortion after embryonic cardiac activity is

15   detected, and those women who do not fall within the act's

16   extremely limited exception.  In short, the act bans abortion

17   before viability and is clearly unconstitutional.

18        THE COURT:  Is that framework still -- you talk about --

19   you mentioned that the Court is bound by the precedent going back

20   as far as *Roe*, *Casey*, and the rest of them.  Last week the Supreme

21   Court issued a decision in *Franchise Tax Board of California*

22   *versus Hyatt*.

23        Has that in any way changed how this Court ought to view

24   Supreme Court precedent?  Has the analysis changed?

25        Because I think in that case, the Court stepped away from

 1   a decision -- from a line of decisions that were -- were ingrained

 2   at least for 40 years.  So how does that impact on how the Court

 3   should view the precedent that undergirds a woman's right to have

 4   an abortion?

 5        MS. SCHNELLER:  So it does not change the analysis at all.

 6   *Roe* and *Casey* remain good law and clear Supreme Court precedent

 7   that was reaffirmed as early as -- you know, as recently as 2016

 8   in *Whole Women's Health*.  And I would just make, I think, two

 9   points, you know, in the -- in that case that you just mentioned

10   the Supreme Court itself overturned precedent.  It is only for the

11   Supreme Court to overturn their precedent, and they have clearly

12   not done so with respect to the fundamental right to decide

13   whether to continue a pregnancy before viability.

14        And, second, even if there was some indication the Court

15   is stepping away from precedent, which it has not done in this

16   area, it is for the court, the Supreme Court, to, you know, give

17   that final ruling.  It's not for the District Court to sort of

18   anticipate what the Supreme Court may do in the future.

19        THE COURT:  I mean, but when I decided the 15-week ban, I

20   was rather firm and sure that what the Supreme Court had said in

21   *Casey* and *Hellerstedt* and all because it -- *Casey*, for example,

22   devotes a whole section to how you would view precedent.  So how

23   does -- does that at all now conflict or is that -- is that

24   section of *Casey*, for example, that discusses being wed and being

25   bound by precedent, I mean, because the court could -- this Court

1    could say I'm bound by precedent, period.  Precedent says this;

2    I'm bound by it, period.

3         But it seems as if possibly this *Hyatt* case sort of

4    shakens that foundation to some degree.

5         MS. SCHNELLER:  So, again, I don't think it shakes any

6    foundation with respect to *Roe*, *Casey*, or *Whole Woman's Health*.

7    The section of *Casey* that discusses stare decisis and precedent is

8    really a discussion of the Supreme Court's own analysis as to

9    whether it will reaffirm or overturn a decision.  It is not an

10   analysis that courts other than the Supreme Court are to engage

11   in.  It is only for the Supreme Court to decide whether it will

12   step away from earlier precedent, which, again, it has indicated

13   it is not doing in the abortion context at all.

14        THE COURT:  Okay.  You may proceed.

15        MS. SCHNELLER:  Somewhat along those lines, I wanted just

16   to note that no ban on abortion before viability has ever survived

17   a federal court challenge.  In addition to the 15-week ban this

18   Court struck down, bans on abortion at 12 and 20 weeks have been

19   declared unconstitutional in the last few years, and bans based on

20   the detection of cardiac activity, bans at six weeks have likewise

21   been ruled unconstitutional.

22        A federal court struck down North Dakota's similar

23   six-week ban in 2013.  The Eighth Circuit affirmed and the Supreme

24   Court declined to review that decision in 2016.  And last year a

25   State Court in Iowa struck down that state's similar six-week ban

1  under the State constitution, and the State did not appeal that

2  decision.

3         And then of the recent spate of similar laws that have

4  been passed in legislatures this year, none have taken effect.  A

5  federal court entered a temporary restraining order against

6  Kentucky's similar six-week ban, and the State has agreed not to

7  enforce that law pending final resolution of that case.

8         Ohio's six-week ban, which like Mississippi's ban takes

9  effect in July, was challenged last week and a preliminary

10  injunction motion is pending.  And then similar laws passed in

11  Georgia and Alabama have not yet been challenged, but various

12  organizations have -- have vowed to challenge those soon.  And

13  there is no reason for this Court to come to a different result

14  than it did on the 15-week ban or that any of these other courts

15  have come to.

16         The State also provides no basis on which the Court should

17  come to a different conclusion.  In defense of the six-week ban,

18  the State recycles essentially three arguments it made just months

19  ago in defense of the 15-week ban, all of which this Court

20  rejected.

21         First, the State asks the Court to essentially abandon

22  decades of precedent on the viability rule, which is nothing more

23  than a disagreement with the Supreme Court precedent, which has

24  held that viability is the earliest point at which the State can

25  constitutionally prohibit abortion.  And as we just discussed,

1    this Court is bound to follow those precedents.

2        Second, the State argues that it has interests that can

3    override a woman's decision whether to obtain an abortion before

4    viability, and as this Court has recognized when striking down the

5    15-week ban, while the Court may -- or while the State may have

6    legitimate interests in regulating abortion, none of those

7    interests are strong enough to support a ban.

8        And, third, the State argues that the act is actually not

9    a ban, and it does not prohibit abortion for every woman.

10   Instead, in the State's view, the act regulates the time during

11   which a woman can make the decision to seek an abortion before

12   viability and requires her simply to make that decision earlier.

13       But this is precisely what the constitution forbids, the

14   State preventing a woman from deciding whether or not to continue

15   a pregnancy before viability at any point during that previability

16   period.

17       So in short, this latest attempt to strip women of their

18   right to abortion before viability is unconstitutional for all the

19   reasons this Court said the 15-week ban was unconstitutional.  But

20   this act bans abortion as early as six weeks, simply makes it more

21   extreme, so we, therefore, ask the Court to enter a preliminary

22   injunction to prevent irreparable harm that would befall

23   plaintiffs' patients if the right to abortion was essentially

24   extinguished in this state.

25       THE COURT:  In your briefs you indicated that the State

1   has acted -- I think the words are either defied or in defiance of

2   the Court's earlier order in joining the statute.  I was asking

3   Mr. Minor about the plaintiffs' citation, too.  He argued you

4   cited to the desegregation cases.  But I -- is it defiance if --

5   is it -- I mean, he says it's either different legislature or

6   different law at least, that they did not move to amend the

7   existing law, so how might they meet your definition of defiance

8   or defying the Court's earlier order?

9        And if they have defied the Court's earlier order, what

10  should this Court do?

11       MS. SCHNELLER:  So I -- we're using the word "defiance"

12  maybe slightly differently.  You know, I think that the -- the

13  legislature has passed a six-week ban in the face of clear Supreme

14  Court precedent and this Court's ruling just a few months ago

15  declaring those bans on abortion before viability clearly

16  unconstitutional.  So given the fact the Court was clear and the

17  Supreme Court has been clear, the legislature acted contrary to

18  that knowing this law was unconstitutional.

19       THE COURT:  I mean, the Court in its earlier order said

20  that viability begins sometime after 23 or 24 weeks.

21       MS. SCHNELLER:  Correct.

22       THE COURT:  And we said that the State has no interest in

23  banning or seeking to obliterate a woman's decision prior to

24  viability, so anything before 20 weeks, 23 weeks, or anything

25  before viability, if they had gone off and done a statute that

1    says any abortions after 15 weeks and a day or 16 weeks -- let's

2    say 16 weeks.  Could that be viewed as defiant?

3          MS. SCHNELLER:  I think it still would be in defiance of

4    the Court's ruling that a 15-week ban is a previability ban on

5    abortion in part because viability occurs at the earliest at 23 to

6    24 weeks.  So given the legislature is clearly aware of this

7    Court's ruling, they discussed it in the legislative debates on

8    Senate Bill 2116, and yet still decided to pass a law that they

9    know is unconstitutional.

10          THE COURT:  What stops them from -- if the Court enjoins

11   this six-week ban, what stops the State, the Governor, from

12   calling a special session for the purpose of enacting a four-week

13   ban or a two-week ban?  What stops them?

14          MS. SCHNELLER:  I don't think anything stops them from

15   taking that action, but, of course, we would certainly be back in

16   court here asking the Court to block that law before it took

17   effect.  Because the legislature as a separate branch of

18   government can, of course, pass laws that are unconstitutional,

19   even knowingly, and we will be back in court asking those laws to

20   be blocked.

21          THE COURT:  And the executive can enforce laws that are

22   unconstitutional?

23          MS. SCHNELLER:  Well, so that right if the -- I think if

24   the executive tried to enforce the 15-week ban that this Court

25   enjoined, then we would be back asking the Court to enforce its

1   injunction against the 15-week ban.  That would be clear defiance

2   of that specific order.

3          THE COURT:  That would be clear defiance.  Okay.  All

4   right.  Thank you, Michelle.

5          MS. SCHNELLER:  Thank you, Your Honor.

6          MR. BARNES:  May it please the Court?

7          THE COURT:  You may proceed.

8          MR. BARNES:  Your Honor, no, passing a new law would not

9   violate the Court's injunction.  As Ms. Schneller said, if the

10  executive branch attempted to enforce the 15-week law in direct

11  violation of this Court's injunction, this Court could, you know,

12  bring the State back into court, whatever person was responsible

13  for trying to enforce it.  That is clearly within the scope of the

14  Court's injunction.

15         A legislature with a different composition passing a

16  similar, or what the Court believes to be a related law, does not

17  violate the injunction.  And, of course, due process says if that

18  happens, the Court strikes down the law if it finds it

19  unconstitutional.  But it's not a violation of the injunction.

20         Second, before I get into my planned argument, I wanted to

21  address the stare decisis argument that the Court raised.  The

22  Court's reversal of *Nevada v. Hall* certainly gives pause to those

23  who thought that case was firmly entrenched on the basis of it was

24  40 years old.  Stare decisis required the Court to continue that

25  line of cases, and they said, no, we're not.

1          However, I do agree with Ms. Schneller that that does not

2     mean that the lower courts are any less bound by Supreme Court

3     precedent.  That it is the Supreme Court that may decide we're no

4     longer going to give the same stare decisis effect to our earlier

5     decisions.  However, it certainly -- as an analytical matter, it

6     certainly raised questions in everyone's mind as to exactly how

7     strong the current composition of the Supreme Court will view

8     stare decisis.

9          And, yes, that at least conceivably could have some impact

10    on the future at the Supreme Court level, because as the Court is

11    well aware, *Casey* reaffirmed the central holding of *Roe* based

12    largely on the stare decisis.  And you've mentioned the entire

13    section on the -- on the value of precedent, so that certainly is

14    a point to consider.  But it does not change the validity or the

15    binding effect of the Supreme Court decisions on the lower courts

16    today.  It's just something that everyone needs to think about and

17    certainly keep in mind.

18         THE COURT:  Should the Court, then, think about what the

19    Supreme Court has done in the last five or six years with a number

20    of cases *Shelby County versus Holder*, the *Janice* case, *Citizens

21    United*, all those are -- were long-standing precedents that this

22    court, the Supreme Court, has now determined that they were no

23    longer to at least be bound to that understanding -- those

24    understandings of those principals in those cases.

25         MR. BARNES:  I think it does to the extent that if there's

1    any room to distinguish a current case, a new case from an

2    existing Supreme Court case that is considered to be just

3    absolutely clear and unequivocal that perhaps there is a room --

4    the Supreme Court is finding room to look and find other reasons.

5    Perhaps there are reasons for the lower courts to at least

6    consider whether or not the case is as broad as it was earlier

7    perceived.  I think that's, of course, something the Court needs

8    to do, in my opinion, with any case.

9          But, again, I think it's primarily just -- maybe it's a

10   signal.  Maybe it's a warning sign, but until the Court says we're

11   overruling or changing this case, it does not.  It does not have

12   any impact on the Court's ruling on this law today, because it is

13   our position that this law is constitutional under existing

14   Supreme Court precedent.

15         THE COURT:  How?  That gets us to the central focus of *Roe*

16   and *Casey,* I think.  I'm looking at *Casey*, and -- and, you know,

17   I'm going to adopt the textualism sort of argument and apply it to

18   a Supreme Court opinion, itself.  It opens up with the very first

19   paragraph or the headnote, it must be stated at the outset and

20   with clarity that *Roe's* essential holding, the holding we

21   reaffirm, has three parts.

22         First, it is a recognition of the right of a woman to

23   choose to have an abortion before viability and to obtain it

24   without undue interference from the State.  Before viability, the

25   State's interests are not strong enough to support a prohibition

1    of abortion or the imposition of a substantial obstacle to the

2    woman's effective right to elect the procedure.  That's what they

3    open up with in *Casey*, boom, that's what they say.  Previability

4    State has zero interest, so how does that -- this law not collide

5    with that fundamental principal?

6        MR. BARNES:  I think actually, Your Honor, as I interpret

7    the case it says the State has legitimate interest in protecting

8    unborn life, protecting maternal health, and in protecting the

9    ethics and integrity of the medical provision from the outset,

10   from conception.  However, the State's interests are not strong

11   enough to support a previability ban, because that is the point at

12   which the State's interests become compelling.

13       I think it's important to note even though *Casey* expressly

14   rejected *Roe's* language, which appeared to make that case -- make

15   abortion a fundamental right, which would make the law subject to

16   strict scrutiny, *Casey* said, no, we reject that interpretation of

17   *Roe*, because it undervalues the State's interest in life.

18       And I think it's important to think about how the Court,

19   itself, has interpreted *Casey* in later cases.  As you know, we

20   cite *Gonzales*.  We cite the majority opinion in *Gonzales*

21   extensively by Justice Kennedy, and note that that's an extension

22   of his dissent in *Carhart*, you know, the Nebraska state partial

23   abortion case.  Justice Kennedy dissented, and says the way the

24   standard is being interpreted by the lower courts, the way the

25   courts are interpreting the undue burden standard is wrong.  It's

1    too strict.  It's like they're still applying strict scrutiny.

2    They didn't notice that we said no, and it still undervalues the

3    State's interest.

4         In *Gonzales versus Carhart*, of course, Justice Kennedy

5    wrote the majority.  But the most telling statements in *Gonzales*

6    we think are in Justice Ginsburg's dissent.  I mean, certainly

7    Justice Ginsburg is, you know, a staunch proponent of women's

8    rights, including the right to abortion and a woman's right to

9    autonomy.  No one is a stronger supporter of those rights on the

10   court.

11        Justice Ginsburg said *Casey's* principals concerning --

12   confirming the continuing viability of the essential holding of

13   *Roe* are merely assumed for the moment, rather than retained to

14   reaffirm.  She goes on to say, today the court blurs the line

15   maintaining that the act legitimately -- legitimately -- I

16   apologize, I'm having trouble with my speech this morning, Your

17   Honor -- legitimately applies both previability and post-viability

18   because a fetus is a living organism while within the womb whether

19   or not it is viable outside the womb.

20        Last, Justice Ginsburg said in cases of a woman's liberty

21   to determine whether to continue her pregnancy, this Court has

22   identified viability as a critical consideration.  We agree.  I

23   think we use the term "central."  Justice Ginsburg says "a

24   critical consideration."  Viability is a "critical consideration."

25        THE COURT:  Has the Supreme Court ever sustained a

1    previability ban on abortion?

2         MR. BARNES:  Your Honor, I think we first have to explore

3    what the word "ban" really means.  As I understand the term "ban,"

4    that means you can't do it.  You can't have it ever.  When you

5    start adding terms like saying, "a near complete ban," then you're

6    not really talking about a ban.  You're talking about something

7    else.

8         THE COURT:  Has the Supreme Court ever sustained an

9    abortion -- or the State's interest in denying a woman's right to

10   self-autonomy, an abortion, prior to the time that the fetus is

11   viable?  Before viability, has the court ever done that?

12        MR. BARNES:  I'm sorry.  Could you repeat the question,

13   Your Honor?

14        THE COURT:  Has the court ever sustained a procedure that

15   interfered with the woman's right to have that procedure prior to

16   the fetus being viable or having reached viability?

17        MR. BARNES:  Well, certainly the court has authorized

18   restrictions on abortion previability as long as they do not

19   constitute a substantial obstacle.  I think something that appears

20   to be lost in this debate a lot is that when we're talking *Casey*,

21   if we're talking the undue burden standard, we're talking about

22   previability restrictions, because post-viability it is clear the

23   State has a compelling interest in protecting unborn life and may

24   ban abortion, as long as there's an exception for the health of

25   the mother.

1          THE COURT:  Post-viability.

2          MR. BARNES:  Post-viability, yes.

3          But previability, that means if you're applying the undue

4     burden test, you're trying to decide, and the Supreme Court is

5     trying to decide, whether or not a particular previability

6     restriction is, in fact, constitutional.  So *Casey* applies

7     previability, that's the core of the -- of the decision, and

8     that's the way the Court applied it in *Gonzales versus Carhart*

9     when the Court struck down the partial birth -- well, excuse me,

10    upheld the federal law barring partial-birth abortion, which is

11    why it led Justice Ginsburg to say the Court is blurring the line

12    because at least in -- actually, we think the Court blurred the

13    line a lot in *Casey,* itself.  But she says the Court is blurring

14    the line saying it is constitutional both pre and post-viability.

15    And obviously, that concerned Justice Ginsburg, because she

16    understood that the majority opinion could be read to say there

17    are laws that apply on both sides.  So --

18         THE COURT:  But even since *Gonzales* has the court

19    sustained a procedure that deprives a woman the right to elect to

20    have that procedure prior to the fetus being viable?

21         MR. BARNES:  I don't think the court has been presented

22    with a case that includes multiple state interests, including the

23    right to protect unborn life and the interest to protect the

24    maternal health and the interest to protect the integrity of the

25    medical profession.  *Hellerstedt* --

1          THE COURT:  Let me --

2          MR. BARNES:  I'm sorry, Your Honor.

3          THE COURT:  Let me ask you this.  Has any court, has any

4     federal court or any court sustained -- this is not the first

5     fetal heartbeat, for example.  This is not the first case that was

6     15 weeks.  In fact, I think the other side has cited cases as much

7     as 20 weeks, which from this Court's earlier opinion and from the

8     law that the Court has cited before viability, typically begins at

9     some point later than 22, 23, 24 weeks, has there been a case

10    where the Court has sustained a procedure or deprived the woman

11    the right to elect to have the procedure prior to the fetus being

12    viable?

13         MR. MINOR:  The District Court of Arizona, Your Honor, the

14    Ninth Circuit reversed.  But the District Court there -- I believe

15    it was a 20-week law.  The District Court in Arizona did

16    originally uphold the law.  The Ninth Circuit reversed.  I am not

17    aware of any decisions by courts yet upholding such a law.

18         However, the fact that it has not happened yet doesn't

19    mean that it will not happen, and as I was -- I apologize for

20    interrupting the Court earlier.  I was just trying to say that

21    *Hellerstedt*, the Court's most recent statement on abortion, was

22    based purely on the alleged interest and protection of maternal

23    health.  The State's interest in protecting unborn life was not

24    part of that case.

25         So since *Gonzales versus Carhart* the Court has never

1    considered a law where those multiple state interests, including

2    the State's interest in protecting life from the moment of

3    conception, which has been recognized by the Supreme Court

4    directly, the Court has not considered such a law.  So we do think

5    that there is room for such a law to survive, especially when it

6    is based on an objective medical finding.  This is -- now, you

7    know, the Court discusses the 15-week law or mentions the 15-week

8    law, and it is true that there are some similarities.  Certainly

9    the previability application of those laws is a similarity.

10         However, the fetal heartbeat law is not based on a

11   specific gestational age.  The 15-week law is.  Of course, the

12   15-week law, being based on a specific gestational age, is

13   actually consistent with what the international community has

14   determined the consensus is, that gestational age limitations are,

15   in fact, the norm in countries other than the United States.  The

16   supposedly progressive countries in Europe:  Germany, 14 weeks,

17   France, 14 weeks, Norway, 12 weeks, Portugal, 10 weeks, Italy,

18   90 days.  In the rest of the world, gestational law -- age laws

19   are considered the norm.

20         Now, we know the Supreme Court here has said viability is

21   a crucial concern, but it does not mean that there might not be

22   alternatives to viability at some point.  The Court has not

23   accepted those, has not considered those, and we freely admit

24   that.

25         However, the six-week law, it's not a gestational age ban.

1    The term "six-week law" or "six-week ban" -- of course, we

2    disagree with the word "ban."  But the six-week law is based on a

3    objective medical finding.  It's not merely based on a gestational

4    age.  It's based on -- and plaintiffs have frequently reminded us

5    that every woman is different, that every pregnancy is different,

6    that there has to be individualized medical attention and

7    consideration.  That's true here, too, because this law doesn't

8    say it's unconstitutional.  All abortions are unconstitutional

9    when a fetal heartbeat can be detected in some instances.  It's

10   when a fetal heartbeat is detected of a specific fetus carried by

11   a specific woman.  At that point, the law takes effect.  An

12   abortion cannot be performed legally.

13        Now, that is a distinction, because again it is based on a

14   medical milestone.  And the detection of a fetal heartbeat is

15   important in medicine, because the time we're talking about six,

16   seven, eight, nine weeks, if a fetal heartbeat is not detected

17   within that time, it is a strong indication a fetus is not viable

18   or the fetus has already -- or the embryo at that time it would

19   be, technically, would be the technical term, that the embryo is

20   not viable or that the embryo has, in fact, died.

21        So this law is based on objective medical finding.  It is

22   different from laws that are based purely on gestational age.  It

23   is different from laws that don't include any milestone or any

24   criterion for determining whether an abortion should proceed or

25   could proceed.

1          Yes, Your Honor, we think that the lower courts have

2     misinterpreted, misapplied *Casey,* just as the lower courts

3     misinterpreted and misapplied *Roe*, to the extent that, you know,

4     about 18 years later the Supreme Court said, wait, we've got to

5     back off.  We didn't intend strict scrutiny to be the standard.

6          We think that the courts are applying *Casey* in a way where

7     it almost is a strict scrutiny standard or it's stronger, could be

8     stronger, because the plaintiffs tell us that if any one woman

9     might be denied the right to choose to have an abortion, that law

10    is a ban.  Justice Ginsburg tells us, well, the large fraction

11    test, yes, we included that language in *Casey*, but because it's

12    always one over one, the large fraction test doesn't really mean

13    anything because any law that only has the effect of banning one

14    woman from having an abortion is unconstitutional.  It's totally

15    at odds with the large fraction language in *Casey* itself.

16          THE COURT:  *Casey* also talks in general terms at least or

17    maybe even specific terms about line drawing, and it says that

18    viability is the easiest point at which -- it's the more workable

19    point I think it says in the opinion, viability.  Doesn't say

20    heartbeat, doesn't say anything like that.  It says viability.

21    Viability, itself, has an element of fairness, I think the Court

22    said in *Casey*.  And it goes back and says that a woman's right to

23    terminate before viability is the most central principal of *Roe*,

24    so you have to look at viability.  Shouldn't that be the starting

25    point?  Even though you might be able to detect a heartbeat

1   earlier than when the fetus or the embryo is viable.

2        MR. BARNES:  It's certainly the starting point, Your

3   Honor.  We don't think it's necessarily the ending point, and I

4   think that the Court also went on to say in Casey, when it was

5   discussing the fundamental fairness, went on to say something --

6   and I am paraphrasing.  I apologize.  I don't have it in front of

7   me.  It says something like if a woman doesn't get an abortion

8   until after viability, it's almost like she's waived her right.

9   She basically knows that she has to exercise her right before

10  viability and if she doesn't --

11       THE COURT:  But sometimes women don't know.

12       MR. BARNES:  I agree, Your Honor.  I mean, I don't have

13  any firsthand knowledge.  I freely admit that I don't know myself.

14  Obviously, I'm -- I've known pregnant women in my life.  I have

15  children.  However, personally, no, I can't say.

16       However, it's my understanding from reading and research

17  that some women do know.  Certainly some women know that they're

18  pregnant before six weeks, and so, again, another reason this law

19  is not a ban is that there are women in this state who would not

20  be affected, who would know they're pregnant before six weeks and

21  could obtain an abortion.  What number is that?  I can't say.  You

22  know, I simply do not know.

23       But I think plaintiffs admit, they say most of our

24  abortions performed after six weeks.  Well, that leaves open the

25  question how many of those women could actually obtain abortions

1   before a fetal heartbeat is detected if this law went into effect?

2         And it's important to note a fetal heartbeat has been

3   detected for that fetus, because it's not always six weeks.

4   Again, the six-week term is the most extreme case, and it's a

5   little misleading because even plaintiffs have to admit sometimes

6   you can't detect a fetal heartbeat at six weeks.  You have to use

7   a transvaginal ultrasound, you know, specialized equipment to be

8   able to do that, and it depends on the skill of the operator, the

9   person who's performing that ultrasound.  If you do an abdominal

10  ultrasound, it could be seven, eight, nine weeks before a fetal

11  heartbeat is determined.  So, you know, just for the record --

12        THE COURT:  Is the State -- is the State going to require

13  what type of ultrasound is done to determine exactly when the

14  fetal heartbeat is going to -- does the statute indicate what type

15  of methods that the provider must use to determine when the

16  heartbeat begins or --

17        MR. BARNES:  One second, Your Honor.  Could I look at the

18  law?

19        THE COURT:  Yes.

20        MR. BARNES:  I think I know the answer, but I still would

21  rather look at the law.

22        And my answer is I do not think it does.  No, Your Honor,

23  it says if that person is not violation -- I'm sorry, I'll slow

24  down.  A person is not in violation of Paragraph A of this

25  Subsection 2 if that person has performed an examination for the

1   presence of a fetal heartbeat in the unborn human individual using

2   standard medical practice and that examination does not reveal a

3   fetal heartbeat or the person has been informed by a physician who

4   has performed the examination for a fetal heartbeat that the

5   examination did not reveal a fetal heartbeat.  So, no, it does not

6   require a specific method.  It leaves it to standard medical

7   practice.

8        But I believe even in Dr. Carr-Ellis' supplemental

9   affidavit, they did correct some of the problems of the original

10  declaration, but even the supplemental declaration she says, you

11  know, typically we don't do a transvaginal ultrasound unless we're

12  very early in pregnancy.  The norm is an abdominal ultrasound,

13  because they're trying to ensure it's not an ectopic pregnancy,

14  because that, of course, raises serious issues, dangers, much

15  higher risk of complications, so they have to know where the

16  pregnancy is, make sure it's not in the tubes before they begin

17  performing an abortion.

18        But so, no, the law leaves it up to the medical judgment

19  of the provider, standard medical practice.  And, Your Honor --

20        THE COURT:  And what is the impact of that, the fetal

21  heartbeat law?  I mean, what -- what if -- I mean, what does the

22  fetal heartbeat law -- what's the heart of it?  I mean, what's the

23  purpose of it?  I mean, what happens, for example, if one

24  reaches -- there is a fetal heartbeat.

25        MR. BARNES:  Studies show that there's a 95 percent chance

1    that the fetus is viable.

2         THE COURT:  Okay.  But there is a fetal heartbeat.  A

3    doctor goes off and performs the abortion anyway, then is he

4    subjected to criminal sanctions?  Is that what's in our law?

5         MR. BARNES:  Under our law it would be a misdemeanor.  It

6    could be a misdemeanor charge.  It also could be grounds for

7    professional discipline, suspension of a license or some sort --

8    you know, there's a variety of forms of discipline that the

9    medical board can take from, you know, no action, a letter of

10   reprimand, up to, you know, suspending or taking a person's

11   license permanently.

12        THE COURT:  What happens --

13        MR. BARNES:  So it is a grounds for discipline.

14        THE COURT:  What happens if the patient, if the mother, if

15   the woman goes to an unlicensed professional or some other person,

16   some back-alley person, and gets the abortion procedure done?

17   What does that law do to address that particular individual who

18   performs that particular abortion?

19        MR. BARNES:  It doesn't, and it doesn't have to, because

20   that is prohibited by other laws including the physicians' only

21   requirement and the licensing laws, some of those laws the

22   plaintiffs are challenging the cumulative effects, because other

23   Mississippi laws state that only a physician can perform

24   abortions.  So if there's a nonphysician performing abortions

25   anywhere in the state, that's already prohibited.  If a person --

1    so other Mississippi laws already covered that situation.  This

2    law does not specifically speak to that.  However, they would

3    be performing -- such an -- such a procedure would be illegal

4    regardless of whether it was before or after a fetal heartbeat was

5    detected.

6         Could I have one moment to look at my notes, Your Honor?

7         THE COURT:  Yes, you may.

8         MR. BARNES:  Your Honor, I think I've covered all my notes

9    from opposing counsel's argument.  In conclusion, I would just say

10   that, again, we think this law fits in the cracks.  It fits in an

11   open area that *Gonzales* or *Carhart* did not foreclose.  It's an

12   area the Fifth Circuit has not foreclosed, and as was mentioned

13   earlier in the argument on the previous motion, we are certainly

14   well-aware of the Court's ruling on the 15-week law and respect

15   that, which is why we have, again, with respect -- we -- we

16   disagree with it, and therefore, we have appealed it.

17        However, we certainly recognize that if the Court's

18   analysis does not change, that the Court's ruling on this law, you

19   know, is probably going to be very similar.  But, again, we think

20   that respectfully the Court was wrong in that decision, which is

21   why we have appealed it, and we note this law is separate and

22   distinct.  It is based on an objective medical milestone, and it

23   is our position that this law is constitutional.

24        THE COURT:  Does the State concede or agree that the State

25   cannot impose an undue burden on a woman at previability or

1    even -- and maybe even some instances post-viability?

2        MR. BARNES:  That is my understanding, especially when the

3    law is based purely on maternal health.  I think the question of

4    whether or not the same -- the undue burden, substantial obstacle

5    language, the balancing test that the Court has espoused is

6    directly relevant to a law based on protection of life.  I'm not

7    sure it's quite the same analysis.  I think, again, you have to

8    give the State's interest in protecting life a little more weight.

9        THE COURT:  I mean, part of the undue burden the Court

10   found in *Casey* was that the woman had to notify their husband

11   before they had the procedure, and the Court said that's an undue

12   burden.

13       MR. BARNES:  The Court did, because the Court found there

14   were a certain number of women that would probably be subjected to

15   domestic violence if they had to tell their husbands.  However, in

16   *Casey* the Court upheld parental notification, upheld informed

17   consent, upheld several other abortion restrictions.  So, again,

18   it's not an all or nothing.

19       THE COURT:  Yeah, but this statute is all or nothing.

20   This statute says once the fetal heartbeat is measured, once it's

21   detected, and whenever that occurs, I guess, then there -- that

22   techniques could do it -- right now I believe everybody suggests

23   or concedes in their papers that it's as early as six weeks, but

24   next year it may be as early as five weeks.  I don't know.  I

25   don't know whether a heartbeat begins --

1          MR. BARNES:  In viability maybe 20 weeks next year, just

2     as viability was 27 to 28 weeks at the time of *Roe*.  It was 23 to

3     24 weeks at the time of *Casey*.  It's still approximately in that

4     range today.  Although I think the evidence in this case,

5     Dr. Carr-Ellis' testimony is that it's 23 weeks, so I think we

6     should be precise when we have a witness who has said 23 weeks.

7          I agree with Your Honor; viability is certainly an

8     important consideration here.  But this law -- you asked about the

9     purpose of this law.  This law was passed to protect the sanctity

10    of human life.  Life, the most precious resource, and that's not

11    an improper purpose.  It's not an improper purpose for people --

12    again, we believe this law is constitutional under existing -- the

13    existing framework.

14          However, if there are those who would like to use this as

15    an opportunity to ask the Supreme Court to revisit, you know, it's

16    abortion jurisprudence, that's their right.  It's not necessary

17    based on our argument, but it's not improper to seek a change in

18    law.  So, you know, if there are -- it's claimed that Mississippi

19    does not favor abortion.  That is true; the legislature has said

20    that the policy of the State is to favor life, and so it is.

21          But it's not improper to seek to change the law, but

22    again, not necessary here, because this law is constitutional

23    under existing Supreme Court precedent.

24          THE COURT:  I -- I cannot see how a six-week -- a six -- I

25    cannot see how a six-week limitation on a woman's right to decide

1    what she's going to do with her body, the choices that she can

2    make based on her -- how that survives in the face of this Court

3    having already struck a 15-week.  It -- and I realize the

4    legislature can do what it wants, and they can say what they want

5    to say while doing what they do.  But it sure smacks of defiance

6    to this Court.  I mean, it sounds like it.  You said you can't do

7    15 weeks, so by golly we're going to do -- we're going to do six

8    weeks.  We're going to cut that down to less than half.

9         MR. BARNES:  Your Honor, as I noted earlier, I do -- we

10   certainly understand the ramifications of the Court's 15-week

11   ruling, but, again, we disagree.  And we respectfully disagree.

12   We understand the Court does not agree with us on that point,

13   which is why we have appealed.

14        But, again, it's not -- it's not a law that says at six

15   weeks gestational age abortion is banned.  It's based on the

16   detection of a fetal heartbeat.  That's not always at six weeks.

17   That is a distinction between the 15-week law where the sole

18   criterion is that 15 weeks, 0 days, is the deadline for when women

19   must seek to have an abortion.  But just as the Court said in

20   *Casey*, you know, if women know that an earlier time is their

21   limit, and they do not seek to have an abortion within that limit,

22   it falls on the woman.

23        Now, just as the Court said in *Casey,* if the woman waits

24   until after viability, she's given up that right.  She's basically

25   waived it.  The bottom line is we acknowledge and respect the

1    Court's ruling.  We've taken steps to have it reviewed, and thank

2    you for your consideration.

3          THE COURT:  All right.  Thank you, Mr. Barnes.

4          MS. SCHNELLER:  Your Honor, I just wanted to make about

5    three points.  First, just to clarify, the -- as Mr. Barnes noted

6    the bill requires the clinic to -- prohibits abortion after

7    detection of embryonic cardiac activity based on standard medical

8    practice.  Standard medical practice to detect cardiac activity

9    early in pregnancy would be a transvaginal ultrasound, which is

10   what the clinic would do if this law were to take effect.  And

11   cardiac activity is a sign that pregnancy is developing.  It is

12   not an indication of viability within the meaning of that term as

13   the Supreme Court has used it, which means a reasonable likelihood

14   of sustained survival outside the womb, which as we've discussed,

15   not medically possible until 23 weeks at the earliest.

16         And, again, to clarify on *Gonzales*, I think the Court was

17   clear about *Gonzales* being about a regulation of abortion, not a

18   ban.  In its decision on the 15-week ban, the regulation in

19   *Gonzales* prohibited the use of one rarely-used procedure.  It did

20   not prohibit abortion.  It did not prohibit women from making the

21   ultimate decision whether to terminate a pregnancy at a certain

22   point before viability.

23         And last just because this law does not prohibit abortion

24   for every woman does not mean it's not a ban.  The law prohibits

25   abortion after embryonic cardiac activity has been detected, which

1    means that a woman at that point is unable to make the decision

2    about her body as to whether to terminate a pregnancy.

3         The State attempts to distinguish a six-week ban from a

4    total ban, including the one that was struck down in Louisiana

5    about 20 years ago, which was a total ban on abortion with at

6    least an exception for a woman's life.

7         Similarly, here the six-week ban prohibits abortion after

8    cardiac activity has been detected with some exceptions.  The

9    critical point is that at a certain point a woman is no longer

10   able to make that decision for herself, which the Supreme Court

11   has said is clearly unconstitutional.

12        THE COURT:  That the State robs her of the right to -- or

13   substitutes itself to determine what she does with her body.

14        MS. SCHNELLER:  Exactly.  Before viability it is for the

15   woman to decide yes or no, whether she's going to continue her

16   pregnancy, and the State may regulate that right, but it cannot

17   prohibit her from making those fundamental decisions.

18        THE COURT:  Okay.  Thank you.

19        MS. SCHNELLER:  Thank you, Your Honor.

20        THE COURT:  All right.  The Court is going to take a brief

21   recess.  I'll be back.  I might have some more questions.  I'm

22   going to take a brief recess.  I'm not suggesting I'm going to get

23   you an order right now, but we'll take a brief recess.

24        MS. SUMMERS:  All rise.

25             (A brief recess was taken.)

1          MS. SUMMERS:  All rise.

2          THE COURT:  You may be seated.  I did have a couple more

3    questions for the State because the -- not because of, but the

4    plaintiffs did mention a case that the Court had -- or referenced

5    a matter, a case, didn't give it the name that the Court is aware

6    of --

7          MR. BARNES:  Yes, Your Honor.

8          THE COURT:  -- where I think they mentioned the case

9    20 years ago or so from the Fifth Circuit.  There's a -- and I

10   assume that case was the *Sojourner T.* case.  There, Mr. Barnes,

11   the Fifth Circuit -- Louisiana had enacted a statute, I think,

12   that banned abortions, made it a crime to perform an abortion,

13   except in cases of medical emergency, rape, or incest, and the

14   Court there ruled it unconstitutional.  The Fifth Circuit

15   affirmed, based primarily on *Casey,* saying, again, you cannot ban

16   -- and I think the State is saying that the fetal heartbeat,

17   itself, is not a ban, but if you discover a fetal heartbeat, you

18   cannot have an abortion, that's my reading of the statute.

19         MR. BARNES:  Just like if a doctor determines that it's

20   not viable, you can't have an abortion.  But I agree with Your

21   Honor, I believe that *Sojourner*, again, with those limited

22   exceptions was -- did say abortions could not be performed.  I may

23   be wrong, but I think that was the same year as *Casey*.  Was it not

24   1992 in *Sojourner*?

25         THE COURT:  1992.

1       MR. BARNES:  And so *Casey* was fresh off the -- or hot off

2   the presses when *Sojourner* was decided by the Fifth Circuit.

3       THE COURT:  And was denied by the Supreme Court the

4   following year, though, 1993.

5       MR. BARNES:  It was.  It was.  But again, it was fresh.

6   *Casey* was fresh; *Casey* hadn't been interpreted.  *Gonzales* didn't

7   exist yet.  You know, Justice Ginsburg had not sent up the warning

8   flags that perhaps the Court was moving in a different direction.

9   But, yes, *Sojourner* does say that, but *Sojourner* is not based on

10  the detection of a fetal heartbeat.

11      Our position here today, I'm not talking about any laws

12  that act before the detection of a fetal heartbeat.  I offer no

13  opinion on those, Your Honor, on the constitutionality or

14  unconstitutionality of such laws.  But when a fetal heartbeat is

15  detected, it is our position that law is constitutional.

16      THE COURT:  Right.  And it becomes -- it, therefore, is a

17  ban.  After a fetal heartbeat is detected, you cannot have an

18  abortion no matter the consequences, the scope, no matter what --

19  where you are in your life -- this is to the woman, where you are

20  in your life, no matter what.  Once the fetal heartbeat is

21  detected in Mississippi, she cannot have an abortion under any

22  circumstances whatsoever.

23      MR. BARNES:  There are some --

24      THE COURT:  Except for a medical emergency.

25      MR. BARNES:  Yes, I was going to say, Your Honor, there is

1    a health exception.  Again, we respectfully disagree with the

2    Court's interpretation of the term "ban," but we recognize that we

3    are in respectful disagreement.

4         THE COURT:  Which leads me to the next question.  The only

5    exception to the heartbeat is if the woman's life becomes -- she

6    meets a medical emergency as defined in that statute.  I think

7    it's a definition that's given for medical emergency that's set

8    forth in that statute, I think.  It's described at least.  So in

9    this case, under this statute, there is no rape or incest

10   exception, is there?

11        MR. BARNES:  Your Honor, it's my understanding there's not

12   a rape or incest exception.

13        THE COURT:  So a --

14        MR. BARNES:  And all I can say on that is I don't believe

15   the Supreme Court has ever required rape or incest exceptions.  It

16   has required an exception for the health of the mother, and the

17   Supreme Court has said that exception is required post-viability

18   as well as previability.

19        THE COURT:  So a child who is raped at 10 or 11 years old

20   who does not reveal to her parents that the rape has occurred,

21   because she's scared.  She knows the rapist.  The rapist may be in

22   her home.  She does not open her mouth about it.  Nobody discovers

23   it until it's too late, that is until the fetal heartbeat is

24   detectable.  That child must then bear this -- must bring this

25   fetus to term under this statute, because that fetus cannot be

1    aborted if the fetal heartbeat can be detected.

2          Have I -- I mean, have I described the statute in a way

3    that it cannot be fulfilled?

4          MR. BARNES:  I agree that there is no rape or incest

5    exception explicitly in the statutory language.  I would say the

6    situation the Court has described would be capital rape, and at

7    least that's my understanding.  And that performing an abortion on

8    a child that age, a minor, would require either parental consent

9    or judicial bypass, which Mississippi law does provide.

10         THE COURT:  But the Judge could not allow her to have an

11   abortion through judicial bypass or otherwise, according to the

12   way the statute reads, because I -- I couldn't allow a child to

13   have an abortion if the fetal -- and it wouldn't be me.  It would

14   be the Chancery Court, I think, or it would be some state court

15   judge in most instances.

16         MR. BARNES:  Your Honor, I -- we -- I agree with you what

17   the statute says, and there's no exception for rape or incest.

18   However, I hesitate to opine on what a family court judge might or

19   might not have authority to do.  Certainly, it would appear to

20   violate this law, that hypothetical that you've raised.  However,

21   those courts do have special powers, and I am not prepared to

22   speak about that today.

23         THE COURT:  Not special powers to violate state law,

24   right?

25         MR. BARNES:  No, Your Honor.  But special -- I understand

1    that their decisions are based primarily on the best interest of

2    the child.  And, again, no, this law is explicit, but I am not

3    going to opine on whether or not a family law court would have no

4    other recourse.  I simply don't know, and I'm not prepared to

5    argue that point.

6         THE COURT:  But a child, you're saying, might have

7    recourse there through the family court.  But an adult would not.

8         MR. BARNES:  No, Your Honor.

9         THE COURT:  Because an adult who is raped doesn't have to

10   get parental notification.  And if she does not become aware that

11   she is pregnant because of the rape until after the fetal

12   heartbeat is detected, she would have absolutely no recourse then,

13   correct?

14        MR. BARNES:  Your Honor, to clarify, I'm saying that I do

15   not know whether there might be any recourse for a child.  I'm not

16   saying there is or is not.  I simply do not know.

17            As for an adult, again, the law -- the statutory language

18   is clear after the detection of a fetal heartbeat, then only the

19   medical exception contained in the statute would permit a legal

20   abortion.

21        THE COURT:  Obviously, the legislature was fully aware

22   that it did not create a rape exception, incest exception, or any

23   kind of exception other than the fetal heartbeat.

24        MR. BARNES:  Your Honor, I cannot speak to what the

25   legislature did or did not know.  The legislature is not just, you

1   know, one body and there are many legislators.  So, no, Your

2   Honor, I can't say one way or the other.

3          THE COURT:  Well, they speak through their statute, and

4   they did not do it there in the statute.

5          MR. BARNES:  They do speak through their statutes, Your

6   Honor.

7          THE COURT:  All right.  Thank you, Mr. Barnes.

8          Any follow-up based on the question I've asked the State

9   with respect to that?

10         MS. SCHNELLER:  No, Your Honor.

11         THE COURT:  All right.  Thank you all for -- Mr. McDuff, I

12  didn't ask if you were still on the phone.  I assume you are.

13         MR. MCDUFF:  I am on the phone, Your Honor.  Thank you.

14         THE COURT:  Thank you all for making yourselves available

15  for this argument.  The Court believes it's important these types

16  of cases that affect us all to make sure there's a public airing

17  of the case.  I think the public has a right to know.  The public,

18  obviously, is interested.

19         And the Court is going to take the arguments into

20  consideration with the briefing that's already been done, and the

21  Court will seek to make a ruling as soon as possible so that the

22  parties can figure out what might be their next steps.  I realize

23  that the statute, if the Court does not enjoin the statute, it

24  becomes the law of the state on July 1st.  The Court is fully

25  aware of that, and the Court intends to have a ruling so that

```
 1    persons will know how to proceed after July 1 or be ready to
 2    proceed in a way July 1 going forward.
 3            Is there anything else from the plaintiff?
 4            MS. SCHNELLER:  No, Your Honor.
 5            THE COURT:  Is there anything else from the State?
 6            MR. BARNES:  No, Your Honor.
 7            THE COURT:  All right.  Thank you, Counsel.  I appreciate
 8    you.  Court is adjourned.
 9            MS. SUMMERS:  All rise.
10    ********************************************************************
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and for

4   the State of Mississippi, Official Court Reporter for the United

5   States District Court, Southern District of Mississippi, do hereby

6   certify that the above and foregoing pages contain a full, true,

7   and correct transcript of the proceedings had in the aforenamed

8   case at the time and place indicated, which proceedings were

9   recorded by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial Conference

12  of the United States.

13         THIS the 23rd day of May, 2019.

14

15                        /s/ Candice S. Crane, CCR

16                        Candice S. Crane, CCR #1781
                          Official Court Reporter
17                        United States District Court
                          Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25