**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

JACKSON WOMEN'S HEALTH
ORGANIZATION, on behalf of itself and its
patients,

and

SACHEEN CARR-ELLIS, M.D., M.P.H., on
behalf of herself and her patients,

     Plaintiffs,

v.                                                                Case No. 3:18cv171-CWR-FKB

THOMAS E. DOBBS, M.D., M.P.H., in his
official capacity as State Health Officer of
the Mississippi Department of Health, et al.

     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Jackson Women's Health Organization, the only remaining licensed abortion facility in the state, and its medical director, Dr. Sacheen Carr-Ellis (collectively, "JWHO"), brought this challenge to the State's repeated efforts to control Mississippians' reproductive health and lives by restricting and prohibiting abortion. This case began with Mississippi's attempt to ban abortion after 15 weeks of pregnancy—state action that prompted a flood of states across the South and Midwest to do the same. The Court found that ban unconstitutional, and permanently enjoined its enforcement. The State responded the next year by passing a law that prohibits abortion *even earlier*—as early as just 6 weeks of pregnancy. And unsurprisingly, this Court also preliminarily enjoined that ban. Yet, in the face of multiple, unambiguous rulings from the Supreme Court, the Fifth Circuit, and this Court, the State continues to defend its near-total ban on abortion.

Discovery is now complete in this case. Because no genuine dispute of material fact exists regarding the constitutionality of the State's ban on abortion at 6 weeks, Plaintiffs are entitled to summary judgment. The Court should declare the Ban unconstitutional as violative of either, or both, due process and equal protection, and permanently enjoin its enforcement.

## PROCEDURAL BACKGROUND

On March 19, 2018, the day the Governor signed into law a bill banning abortion after 15 weeks of pregnancy (the "15-Week Ban"),[1] JWHO sought a temporary restraining order against its enforcement, (ECF Nos. 1, 5), which this Court granted, and which was extended on consent. (ECF Nos. 9, 25, 80, 84, 87). This Court ultimately granted a permanent injunction against the 15-Week Ban, and the Fifth Circuit affirmed. *JWHO v. Currier*, 349 F. Supp. 3d 536 (S.D. Miss. 2018), *aff'd* 945 F.3d 265 (5th Cir. 2019) ("*JWHO I*"). The State has sought review from the U.S. Supreme Court. Pet. for Writ. of Certiorari, *Dobbs v. JWHO*, No. 19-1392 (U.S. June 15, 2020).

---

[1] Pregnancy is commonly measured by the number of days that have passed since the first day of a patient's last menstrual period ("LMP"). Ex. 3, Decl. of Sacheen Carr-Ellis, M.D., M.P.H. ¶ 7 n.1.

On April 9, 2018, JWHO amended its complaint, adding challenges to several Mississippi abortion restrictions: the abortion-specific facility licensing scheme, mandatory delay and two-trip requirement, biased counseling requirements, telemedicine ban, and requirements that only physicians provide abortion care (together, the "Challenged Laws"). *See* Suppl. Amend. Compl. (ECF No. 119). JWHO alleges that the Challenged Laws, individually and together, impose on their patients an undue burden in violation of the due process guarantee of the Fourteenth Amendment, deny their patients' and their own rights to equal protection under the Fourteenth Amendment, and violate Dr. Carr-Ellis's First Amendment rights to free speech. *See id*.

On April 11, 2018, this Court ordered that this case proceed in two parts for discovery and trial purposes: Part I, which is JWHO's challenge to the 15-Week Ban; and Part II, which encompasses the Challenged Laws. (ECF No. 25).

Then, in March 2019, the State passed another abortion ban—prohibiting abortion once fetal cardiac activity can be detected, as early as 6 weeks LMP. *See* S.B. 2116 § 1(3)(a) (the "6-Week Ban" or the "Ban"). This Court granted JWHO's motion to supplement its complaint to challenge the Ban on due process and equal protection grounds. When it added the Ban to this case, the Court ordered that the challenge to it would "move forward on the same timeline as Part II" and be "adjudicated simultaneously," noting the ample time left for discovery. (ECF No. 118, at 4, 5). The Court also preliminarily enjoined the Ban's enforcement, finding JWHO likely to succeed on its due process claim, and the Fifth Circuit affirmed. *JWHO. v. Dobbs*, 379 F. Supp. 3d 549 (S.D. Miss. 2019), *aff'd*, 951 F.3d 246 (5th Cir. 2020) ("*JWHO II*").

Approximately two years after the Ban was added to this case, discovery closed on March 17, 2021. The parties disclosed 18 experts and took approximately 30 depositions. Summary judgment and *Daubert* motions are now due. *See* Nov. 13, 2020 Order Granting Unopposed Mot. to Amend/Correct Case Mgmt. Order. A two-week trial is set to begin on December 6, 2021. *Id*.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     The Challenged Ban.

On March 21, 2019, a year after the 15 Week-Ban was signed into law, and four months after this Court permanently enjoined it as unconstitutional, Governor Phil Bryant signed S.B. 2116 into law. *See JWHO II*, 379 F. Supp. 3d at 551. That law, which is titled "An Act . . . To Prohibit An Abortion Of An Unborn Human Individual With A Detectable Fetal Heartbeat," prohibits the performance of "an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn human individual that the pregnant woman is carrying and whose fetal heartbeat has been detected." Ex. 1, S.B. 2116 § 1(2)(a), 2019 Leg., Reg. Sess. (Miss. 2019). The Ban's only exceptions are to "prevent the death of a pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman." S.B. 2116 § 1(2)(b)(i).

Violation of the Ban subjects providers to severe criminal penalties and professional sanctions, including monetary penalties, imprisonment, and denial or suspension of their medical license. *See* S.B. 2116 §§ 1(2)(e), 2(16); Miss. Code Ann. § 41-41-39.

The Ban was set to take effect on July 1, 2019. *See* S.B. 2116 § 3. This Court preliminarily enjoined its enforcement on May 24, 2019, and the Fifth Circuit affirmed. *JWHO II*, 379 F. Supp. 3d at 552–53, *aff'd*, 951 F.3d 246.

### II.     The Ban Is a Near-Total Abortion Ban.

On its face, the Ban prohibits the termination of a pregnancy where "fetal heartbeat has been detected[.]" S.B. 2116 § 1(2)(a). There is no dispute that the Ban bars the provision of nearly all abortions in Mississippi upon detection of a "fetal heartbeat," which can occur as early as 6 weeks, 0 days LMP. *See* Carr-Ellis Decl. ¶¶ 8, 13. It is also uncontested that viability is medically impossible as early as 6 weeks LMP. *Id.* ¶ 15; *see also e.g.*, *JWHO II*, 951 F.3d at 248 ("all [parties]

agree that cardiac activity can be detected well before the fetus is viable"). As a matter of well-established medical fact, a fetus is not viable until many months after the Ban begins to operate. Carr-Ellis Decl. ¶ 15. Indeed, for more than twenty years, the State held the position that between 14 to 16 weeks LMP, a fetus has "no chance of survival outside the womb." Ex. 2, Dr. Mary Currier's Resps. to Pls.' First Set Reqs. Admis. to Defs., No. 2 (admitting that every version of the State Department of Health's Informed Consent Information booklet on abortion available between 1996 and prior to March 2018 included such a statement).

It is uncontested that some people do not know they are pregnant at the point in pregnancy when the Ban would prohibit them from deciding whether to have an abortion. Carr-Ellis Decl. ¶¶ 16–20. Upon learning of their pregnancy, people take some period of time to decide whether to continue it. *Id*. ¶ 24. That time differs for each person. *Id*. Pregnancy itself has significant impacts on the body and carries risk, as does childbirth. *Id*. ¶¶ 28–32. In making the decision whether to continue a pregnancy, people may consider many factors, including, but by no means limited to, the potential health risks of pregnancy and carrying to term, as well as the impact of childbearing and rearing on their lives and futures, including on their education, work, and family. *Id*. ¶¶ 23–27.

There is also no dispute that that, if the Ban takes effect, nearly all abortions will be illegal in Mississippi. *Id*. ¶ 16, 21-22. By banning abortion before viability, the Ban prohibits nearly every pregnant person in the state from making the decision whether to continue or terminate a pre-viability pregnancy. *Id*. ¶¶ 16, 21-22, 33. Instead, it compels nearly every pregnant person to accept continued pregnancy and ultimately, childbearing, or to leave the state to access abortion. *Id*. ¶¶ 22, 32. The State does not prohibit other people—i.e., those who are not pregnant—from making reproductive decisions. *See, e.g.*, Ex. 7, Mar. 8, 2021 Tr. of Dep. of Kenneth Cleveland, M.D. ("Mar. Cleveland Dep.") 55:24–56:4 (no other Mississippi law prohibits clinicians from providing reproductive health care); *see also id.* 56:5–8 (no Mississippi law prohibits clinicians from

providing health care "that is specific to men").

There is no stated purpose for the Ban in the legislation itself and the legislation enacting it has no legislative findings. *See generally* S.B. 2116. In response to this litigation, the State has submitted that "[s]ome or all of the laws and/or regulations" challenged in this case are "justified based on one or more of the following: the State's compelling interests in protecting the life of the unborn, promoting respect for human life at all stages of pregnancy, protecting maternal health and safety, and safeguarding the ethics and integrity of the medical profession." Answer, Twelfth Defense, 21 (ECF No. 121). The State has offered no evidence that would indicate whether or how the Ban relates to these purported purposes.

## LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute of material fact and judgment is appropriate as a matter of law. *See* Fed. R. Civ. P. 56(a). Once a movant introduces evidence of the absence of genuine factual issues, it is the nonmovant's burden to persuade the court that there is a genuine dispute. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The nonmovant cannot satisfy its burden with "metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations omitted).

## ARGUMENT

Because no genuine dispute of material fact exists as to JWHO's claims that the Ban is unconstitutional, JWHO is entitled to summary judgment on either, or both, its due process and equal protection claims.

### I. The Ban Is an Unconstitutional Pre-Viability Abortion Ban.

There can be no dispute that the Ban is a pre-viability abortion ban. This is the only fact the Court needs in order to conclude that the Ban deprives individuals of the liberty and autonomy to

decide whether to continue a pregnancy as guaranteed by the Due Process Clause of the Fourteenth Amendment. The Ban robs people in Mississippi of their opportunity to make this most personal decision. Indeed, "[t]his case does not present a close call." *Planned Parenthood S. Atl. v. Wilson*, 2021 WL 1060123, at *11 (D.S.C. Mar. 19, 2021) ("easily reject[ing]" a state's theory that the "probability" of succeeding in banning previability abortion has anything to do with the change of "the composition of the [Supreme] Court . . . in recent years.").

Prior to viability, the Constitution guarantees every person the liberty to weigh a multitude of interests and decide for themselves whether to carry a pregnancy to term. *See JWHO I*, 945 F.3d at 274 (finding, when it comes to pre-viability abortion bans, that the Supreme Court "has already balanced the State's asserted interests and found them wanting"). To support the Ban, the State has proffered interests in potential life and protecting patient health. *See, e.g.*, Mem. in Opp. to Pls.' Mot. for Prelim. Inj., 6 (ECF No. 107). But the Supreme Court has made clear that the state's interests "are not strong enough to support a prohibition of abortion" before viability. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). Nor can the Ban's narrow exceptions save it. *Id.* at 879 ("Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."). Indeed, "law libraries are chock-full of judicial opinions affirming a woman's right to abort a pregnancy before viability." *Wilson*, 2021 WL 1060123, at *11.

This Court has already ruled three times that Mississippi's efforts to ban abortion before viability are unconstitutional and the Fifth Circuit has affirmed each time that the State appealed. *See JWHO v. Currier*, 2018 WL 1567867 (S.D. Miss. Mar. 20, 2018) (entering TRO against 15-Week Ban); *JWHO I*, 349 F. Supp. 3d 536, *aff'd* 945 F.3d 265 (affirming permanent injunction of 15-Week Ban), *pet. for cert filed* No. 19-1392 (U.S. June 15, 2020); *JWHO II*, 379 F. Supp. 3d 549, *aff'd*, 951 F.3d 246 (affirming preliminary injunction of 6-Week Ban). As the Fifth Circuit

explained in affirming this Court's preliminary injunction, "[i]f a ban on abortion after 15 weeks is unconstitutional, then it follows that a ban on abortion at an earlier stage of pregnancy is also unconstitutional." *JWHO II*, 951 F.3d at 248. Because the Ban prohibits abortion well before viability, and no state interest is constitutionally adequate to override a person's autonomy to decide whether to continue a pre-viability pregnancy, this Court should rule, once again, that the Ban is unconstitutional under the Due Process Clause.

## II.     The Ban Violates the Equal Protection Clause.

The Ban is unconstitutional for another reason: it violates the Equal Protection Clause of the Fourteenth Amendment. By depriving only pregnant people of the power to make informed, autonomous decisions about their reproductive health and lives, the Ban, on its face, classifies based on sex and thus warrants heightened scrutiny. *See Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728–34 (2003). The burden is on the State to defend the Ban. To survive this constitutional challenge, the State "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*"VMI"*). It fails on both counts. The State cannot show that the Ban serves important governmental objectives today, nor can it demonstrate the required "close means-end fit." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1696 (2017); *VMI*, 518 U.S. at 531–34. Far from serving the State's purported interests in protecting the health and well-being of Mississippians and their families, the Ban instead deprives individuals of the ability to make autonomous decisions about their reproductive and family lives based on impermissible stereotypes that exacerbate existing inequalities. As the Supreme Court has explained, only an "exceedingly persuasive justification" can sustain a sex-based classification— and here, the State does not come close to meeting this "demanding" burden. *See VMI*, 518 U.S. at 533. The Ban should be declared unconstitutional as violative of equal protection.

A.  The Ban Classifies Based on Sex.

The Ban creates a sex classification on its face by prohibiting only pregnant people from making informed, autonomous decisions about their reproductive health and lives. The State does not prohibit others from making their own reproductive decisions. For example, people who are not pregnant may decide to use contraception or to have a vasectomy to prevent pregnancy, or to use assisted reproductive technologies to become pregnant. *See, e.g.*, Mar. 8, 2021 Tr. of Dep. of Kenneth Cleveland, M.D. ("Mar. Cleveland Dep.") 55:24–56:4 (no other Mississippi law prohibits clinicians from providing reproductive health care); *see also id.* 56:5-8 (no Mississippi law prohibits clinicians from providing health care "that is specific to men").[2] In other words, the Ban only limits the reproductive autonomy of pregnant people, and thus classifies based on sex.

Sex-based classifications are suspect, because, reviewing "our Nation['s] . . . long and unfortunate history of sex discrimination," the Supreme Court concluded that they are often grounded in "gross, stereotyped distinctions between the sexes." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). At the root of these "stereotyped distinctions," *id.* at 685, are beliefs about "inherent differences" between the sexes, *VMI*, 518 U.S. at 533, that are, in large part, based on assumptions and expectations about an individuals' capacity for childbearing. *See, e.g.*, *Muller v. Oregon*, 208 U.S. 412, 422 (1908) (a woman is "[d]ifferentiated by" "her physical structure and a proper discharge of her maternal functions," which "having in view not merely her own health, but the well-being of the race—justify legislation to protect her"); *id.* at 421 ("as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public

---

[2]  *See also* Ex. 6, Jan. 15, 2021 Tr. of Dep. of Kenneth Cleveland, M.D. 228:7–25, 245:3–10 (discussing that physician assistants can perform vasectomies in the state and that he is not aware of any specific law restricting advanced practice registered nurses performing vasectomies); Mar. Cleveland Dep. 51:20–52:12 (stating that state law does not require a person seeking a vasectomy to meet twice with a clinician, nor to delay the procedure by at least 24 hours after meeting first with a clinician).

interest and care in order to preserve the strength and vigor of the race"); *Bradwell v. Illinois*, 83 U.S. 130, 141–42 (1872) ("The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother"); *see also Hoyt v. Florida*, 368 U.S. 57, 62 (1961) (a woman is, and should remain, "the center of home and family life").

Classifications based on a person's capacity for pregnancy and childbearing are thus a core feature of the "long and extensive history of sex discrimination" that is the very reason sex classifications are suspect. *See Hibbs*, 538 U.S. at 730, 736 (citing congressional findings that "[h]istorically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first"). Accordingly, the Supreme Court's equal protection jurisprudence recognizes that regulations of pregnancy and childbearing, like the Ban, are laws that classify based on sex. *See id.* at 728–36; *VMI*, 518 U.S. at 531–34.[3]

In *Hibbs*, for example, the Court treated laws that classify based on pregnancy and childbearing as impermissible sex-based classifications. There, the Court held that the family leave provisions of the Family Medical Leave Act were an appropriate exercise of Congress's power to remedy sex discrimination under the Fourteenth Amendment. *Hibbs*, 538 U.S. at 735–37. It observed that workplace policies offering "'maternity' leave that far exceeded the typical 4- to 8-week period of physical disability due to pregnancy and childbirth" but no parallel "paternity" leave benefit constituted unlawful sex discrimination. *Id.* at 731. The policies "were not attributable to

---

[3]  Neither *Hibbs* nor *VMI* cites *Geduldig v. Aiello*, 417 U.S. 484 (1974). While *Geduldig* has been cited as support for the argument that pregnancy regulations do not classify based on sex, it stated only that "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.* at 496 n.20 (rejecting equal protection challenge to disability insurance program that excluded pregnancy coverage). In any event, *VMI* and *Hibbs*, which recognize that pregnancy regulations can classify based on sex, indicate that *Geduldig* has little continued relevance. In fact, in contrast to many of the Court's early sex discrimination cases, *Geduldig* has not been cited in a Supreme Court majority opinion in an equal protection case in over 40 years. *See generally* Reva Siegel, *The Pregnant Citizen, from Suffrage to the Present*, 19TH AM. SPECIAL ED. GEO. L.J. 167 (2020); *see also id.* at 208, n.229.

any differential physical needs of men and women, but rather to the pervasive sex-role stereotype that caring for family members is women's work." *Id.* They classified based on whether workers were "mothers and mothers to-be,"—that is, a person's capacity for childbearing—which the Court recognized as impermissible sex classifications. *See id.* at 736.

Additionally in *VMI*, the Court applied the standard for assessing the constitutionality of sex classifications to VMI's exclusion of women. 518 U.S. at 531–34. In doing so, it explained that "[s]ex classifications may be used . . . 'to promot[e] equal employment opportunity,'" and cited its prior decision upholding a state law that required employers to provide leave and reinstatement to pregnant workers. *Id.* at 533 (citing *Calif. Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 289 (1987) (upholding the law against a challenge that it was preempted by Title VII and the Pregnancy Discrimination Act)). The *VMI* Court thus also characterized laws that classify based on pregnancy as examples of laws that classify based on sex. 518 U.S. at 533.

Similarly, here, the Ban classifies based on a whether a person is pregnant: it prohibits only pregnant people from making autonomous reproductive decisions, while permitting others to make those decisions. By singling out pregnant people, the Ban creates a sex classification that is subject to heightened scrutiny—which it cannot survive.

B.  The State Has Failed to Meet its Burden Under Heightened Scrutiny.

"For close to half a century," the Supreme Court has "viewed with suspicion" laws that classify based on sex. *Morales-Santana*, 137 S. Ct. at 1692. The burden to "defend gender-based government action," therefore, is "demanding" and "rests entirely on the State." *VMI*, 518 U.S. at 531; *see also Morales-Santana*, 137 S. Ct. at 1690. To survive an equal protection challenge under heightened scrutiny, the State must demonstrate that the classification serves "important governmental objectives" and that the discriminatory means employed are "substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533. The State's justification "must be

genuine, not hypothesized or invented *post hoc* in response to litigation." *Id*. It must also "not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* (citations omitted). In other words, the State must demonstrate "an 'exceedingly persuasive justification'" for its discriminatory action for the law to survive. *Id*. at 534. The State has not even attempted to introduce evidence that the Ban serves its purported justifications, let alone that the Ban is substantially related to those interests.

Sex classifications "often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members." *Frontiero*, 411 U.S. at 686–87. Thus, "if a 'statutory objective is to exclude or 'protect' members of one gender' in reliance on 'fixed notions concerning [that gender's] roles and abilities,' the 'objective itself is illegitimate.'" *Morales-Santana*, 137 S. Ct. at 1692 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)); *see also Frontiero*, 411 U.S. at 684 (historically, sex discrimination "was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal but in a cage"). Further, the State's objectives must be important and legitimate *today*, as "we have recognized new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Morales-Santana*, 137 S. Ct. at 1690 (cleaned up) (quoting *Obergefell v. Hodges,* 135 S. Ct. 2584, 2603 (2015)).

Even if a state carries its burden to prove that the Ban genuinely pursues an "important governmental objective," it must still show that the sex-based classification is "substantially related." *VMI*, 518 U.S. at 524. The required "close means-ends fit" between the purpose of the law and what it actually accomplishes, *Morales-Santana*, 137 S. Ct. at 1696, is necessary to ensure that sex classifications are not based on "simplistic outdated assumption[s]" about gender, *see Hogan*, 458 U.S. at 725–26. This link between the means and ends warrants an especially close review where the classification further subordinates historically disadvantaged people. *See, e.g.*, *VMI*, 518

U.S. at 534 (sex "classifications cannot be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women"); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("closely and contextually" examining law intruding into family relationships of poor people).

Here, the State fails to meet its burden on all counts. First, the Ban has no stated purpose or legislative findings, and the only objectives the State has asserted are in its Answer to the Complaint in this litigation, which is the exact sort of "post hoc" reasoning in response to litigation disfavored by the Supreme Court. *See VMI*, 518 U.S. at 533. Further, the State has provided no evidence whatsoever linking the Ban to its post-hoc objectives of maternal health and safety, potential life, and the ethics and integrity of the medical profession. The sincerity of the State's position is also undercut by its failure to pursue these objectives in other arenas with the same vigor as it does the passage of abortion restrictions. Second, the Ban is constitutional only if the State's justification for it is "exceedingly persuasive"—it must not rely on or reinforce sex stereotypes and must serve current, important, and legitimate government interests. But the Ban rests on and reinforces harmful sex stereotypes about people who may become pregnant: namely, that they are incapable of making informed, autonomous decisions about their bodies, lives, families, and futures, and that their proper role in society is to bear and raise children. Third, even assuming the State has met its demanding burden to show that the Ban's purposes are genuine, the Ban is utterly divorced from, and certainly not "substantially related," to any legitimate purpose. Not only does continued pregnancy and childbirth compelled by the Ban increase risk to maternal health and safety, for example, but it also perpetuates the unequal status of people who may become pregnant—in particular, those who have been subject to persistent discrimination based on sex, race, and socio-economic status.[4]

---

[4] Because the State has a constitutional obligation to ensure each person's rights within its borders, it is irrelevant whether Mississippians can be forced to travel to another state to vindicate their equal protection rights. Continued pregnancy and childbirth are thus the only material effects of the Ban. *See*

In short, the State has fallen far short of meeting its burden of proof.

       *i.   The State Advances Only Unsupported, Post-Hoc Rationalizations for the Ban.*

No stated purpose or legislative findings justified the Ban when it passed. *See generally* S.B. 2116. Now the State claims, in its Answer, and without elaboration, that "[s]ome or all of the laws and/or regulations" challenged in this case are "justified based on one or more of the following: the State's compelling interests in protecting the life of the unborn, promoting respect for human life at all stages of pregnancy, protecting maternal health and safety, and safeguarding the ethics and integrity of the medical profession." [5] Answer, Twelfth Defense, 21 (ECF No. 121). But the State has put forth no evidence in the record to support these purported goals. In fact, the same stated purposes can be found in nearly identical, boilerplate form in responses by other states defending abortion bans in litigation throughout the country. [6] Each of the State's responses appears to be

---

    *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938) (holding state's obligation "to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction" and it "cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do"); *see also JWHO v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014) (applying *Gaines* to hold that availability of abortion in nearby states is irrelevant to analysis of restriction under due process, because "a state cannot lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights").

[5]   The State expresses its interest in "protecting the integrity and ethics of the medical profession" through the Ban only in terms that are bound up with its interest in "promot[ing] respect for life, including life of the unborn." Br. of Defs-Applts, 26, *JWHO II*, No. 19-60455 (5th Cir. Aug. 28, 2019) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 157–58 (2007)); *see also id.* ("As a law intended to promote respect for life S.B. 2116 also furthers the State's interest in protecting the ethics of the medical profession."). Accordingly, JWHO treats these interests as coextensive here.

[6]   *See, e.g.*, Defs.' Answer, 12, *Sistersong Women of Color Reprod. Justice Coll. v. Kemp*, No. 1:19-cv-2973 (ECF No. 73) (N.D. Ga. Aug. 19, 2019) (asserting Georgia's 6-week ban is based on "interests in protecting the life of the unborn; promoting respect for life at all stages of pregnancy; protecting maternal health and safety; and safeguarding the ethics and integrity of the medical profession"); Prop. Interv. Gov. McMaster's Mem. of Law in Supp. of Mot. to Dissolve TRO & in Opp. to Pls.' Mot. for Prelim. Inj., 27–29, *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-cv-508 (ECF No. 48-1) (D.S.C. Mar. 2, 2021) (asserting South Carolina's interests in 6-week ban are "protecting the life of the unborn child," "maternal health," and "safeguard[ing] the medical profession"); Defs.' Answer, 4, *Edwards v. Beck*, No. 4:13-cv-00224 (ECF No. 37) (E.D. Ark. May 24, 2013) (asserting Arkansas's 12-week ban furthers interests in "protecting the life of the fetus that may become a child," "protecting the health and life of the pregnant woman," and "protecting the integrity and ethics of the medical profession").

"invented *post hoc* in response to litigation," and without more, cannot rise to the necessary "exceedingly persuasive justification" for the Ban. *See VMI*, 518 U.S. at 533.

Further, this Court need not uncritically accept the State's purported purposes. *See id*. at 535 (the State's "benign justifications" in defense of sex-classifications "will not be accepted automatically"); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("[M]ere recitation of a benign or compensatory purpose" does not replace "inquiry into the actual purposes" of sex classification.). The State must demonstrate a "tenable justification" that "describes *actual* state purposes," not "rationalizations for actions in fact differently grounded." *VMI*, 518 U.S. at 535–36 (emphasis added). Here, the State's scarce measures to advance its purported interests other than through the habitual passage of abortion restrictions make its burden a particularly challenging one. *Cf. id.* at 536 (considering with skepticism claim that VMI excluded women in pursuit of diversity as "[n]either recent nor distant history bears [this] out"); *id.* at 538 (observing in response to VMI's claim that absence of public single-sex higher education for women is an "historical anomaly" that the "historical record indicates action more deliberate than anomalous: [f]irst, protection of women against higher education; next, schools for women far from equal in resources and stature to schools for men; finally, conversion of the separate schools to coeducation").

This Court has already "conclude[d] that the Mississippi Legislature's professed interest in 'women's health' is pure gaslighting," as State "leaders are proud to challenge *Roe* but choose not to lift a finger to address the tragedies lurking on the other side of the delivery room: our alarming infant and maternal mortality rates." *JWHO I*, 349 F. Supp. 3d at 540 n.22.  he same is true of the State's other claimed interests. *See id*. Indeed, despite professing interests in "maternal health and safety," "protecting the life of the unborn" and "promoting respect for human life at all stages pregnancy," Mississippi legislators ignore recommendations made by their *own* experts to address the State's maternal and infant mortality crises. As the State acknowledges, it "has persistently had

one of the highest infant mortality rates in the nation," and maternal mortality remains a significant concern. Ex. 5-A, Miss. State Dep't of Health, Infant Mortality Rep. 2019, 1; Ex. 5-B, Miss. State Dep't of Health, Miss. Maternal Mortality Rep. 2013–2016 (Apr. 2019), 25. Racial disparities in infant mortality are "stark" (Black babies are nearly twice as likely to die as white babies) and in maternal mortality are "dramatic" (Black women are nearly three times as likely to die as white women).[7] Infant Mortality Rep., 8; Maternal Mortality Rep., 25. Reports issued by the Defendant Mississippi State Department of Health share a common recommendation to help address these tragedies: extending postpartum Medicaid eligibility from 60 days to one year after childbirth. *See* Infant Mortality Rep., 8; Maternal Mortality Rep., 5, 23. The State has never implemented this recommendation and has taken active steps to frustrate it. In fact, less than a month ago, the Legislature killed a bill that would have extended postpartum Medicaid to thousands of birthing people.[8] At the same time, the State has had no difficulty passing the Ban and other abortion restrictions in purported response to these ongoing crises.

These are just two examples of the well-documented threats to Mississippians' health, lives, and well-being. In the absence of supportive policies for pregnant people, families, and children, such as those recommended by the Defendant Department of Health, this Court's previously stated skepticism of the State's claim that it passed the Ban out of concern for the lives and health of

---

[7]   The State's Infant Mortality Report stresses: "There are no biological reasons for these stark disparities. Efforts to reduce Mississippi's overall infant mortality rate must address critical social determinants of health including poverty, education and the effects of historical, structural and interpersonal racism and bias on maternal and infant health." *Id.* at 8. Likewise, racial disparities in maternal mortality "demand[] urgent attention and acknowledgment of how factors like social determinants of health and implicit bias can affect women's health and health care." Maternal Morality Rep. 25.

[8]   *See* Erica Hensley & Nick Judin, *Disrupted Care: Mississippi Legislature Kills Postpartum Medicaid Extension, Affecting 25,000 Mothers Yearly*, Mississippi Free Press (Apr. 2, 2021), https://www.mississippifreepress.org/10868/disrupted-care/; Emily Wagster Pettus & Leah Willingham, *Mississippi: No extension of postpartum Medicaid coverage*, Clarion Ledger (Mar. 30, 2021), https://www.clarionledger.com/story/news/politics/2021/03/30/no-extension-postpartum-medicaid-coverage-in-mississippi/4815069001/.

pregnant people and their children is warranted.

    *ii. The State's Purported Objectives Rely on and Reinforce Harmful Sex Stereotypes.*

The State's purported concerns are also "illegitimate" here because they seek to "'"protect" members of one gender' in reliance on 'fixed notions concerning [that gender's] roles and abilities.'" *See Morales-Santana*, 137 S. Ct. at 1692 (quoting *Hogan*, 458 U.S. at 725). The State's apparent concerns reflect and reinforce at least two harmful sex stereotypes: (1) that pregnant people lack the capacity to make decisions about their reproductive lives, or are incapable of competently considering the interests put forward by the State; and (2) that pregnancy and childbearing capacity determines one's role in society. *See J.E.B. v. Alabama*, 511 U.S. 127, 132 (1994) (supporters of sex discriminatory laws "tended to couch their objections in terms of the ostensible need to protect women"); *Orr v. Orr*, 440 U.S. 268, 283 (1979) (sex classifications are impermissible when they "risk . . . reinforcing the stereotypes about the 'proper place' of women and their need for special protection").

The Ban denies pregnant people their autonomy to weigh the risks of pregnancy, childbirth, and abortion, among other considerations, and instead substitutes the State's judgment that pregnant people must accept the risks of pregnancy and childbirth over abortion. *See* Carr-Ellis Decl. ¶¶ 23–33. A pregnant person faces risks to their health whether they terminate the pregnancy or carry to term. *See, e.g.*, *id.* ¶ 28–32; *see also generally* Maternal Mortality Rep. And pregnant people, just like any person who is not pregnant, are just as capable of and entitled to weigh risks and benefits when making decisions about their health, lives, and futures. *See* Carr-Ellis Decl. ¶¶ 23–33; *see also Isaacson v. Horne*, 716 F.3d 1213, 1235 (9th Cir. 2013) (Kleinfeld, J., concurring) (reasoning in abortion ban case that "people are free to do many things risky to their health" and finding "no authority for making an exception to this general liberty regarding one's own health for abortion").

Taking away a person's ability to act autonomously in making important, personal decisions reflects the belief "that certain individuals, for no reason other than gender, are presumed unqualified by state actors to decide important questions." *See J.E.B.*, 511 U.S. at 141–42 (holding unconstitutional exclusion of women from juries that was rooted in stereotypes about women's decision-making ability and role in society). Classifications that rely on such "outmoded notions of the relative capabilities" of people based on their sex are impermissible. *Id.* at 139 n.11 (citation omitted).

Similarly, the State's purported interests in "protecting the life of the unborn" and "promoting respect for human life at all stages of pregnancy" are inextricably intertwined with the assumption that pregnant people are either incapable of considering these interests, or cannot be trusted to do so competently. Indeed, "[c]oncern for a woman's existing or potential offspring historically has been the excuse" for sex discrimination. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls,* 499 U.S. 187, 211 (1991) (citing *Muller*, 208 U.S. at 422 (upholding protective labor legislation based on the need to protect women and the "future well-being of the race")). Yet, ideas about how and when to promote and realize new life are "intimate views with infinite variations," of "deep, personal character," and may have "profound moral and spiritual implications." *Casey*, 505 U.S. at 850, 853. Some may believe that "any pregnancy ought to be welcomed and carried to full term no matter how difficult it will be to provide for the child and ensure its well-being." *Id.* at 853. Others may believe "that the inability to provide for the nurture and care of the infant is a cruelty to the child and an anguish to the parent." *Id.* Pregnant people are perfectly capable of weighing their moral and religious beliefs, economic means, the needs of their children and other dependents, among other considerations, in determining whether to continue a pregnancy to term. *See* Carr-Ellis Decl. ¶¶ 23–33. Through the Ban, however, the State "resolve[s] the[] philosophic questions in such a definitive way that the woman lacks all choice in the matter," *Casey*, 505 U.S. at 850, which reflects outdated "defin[itions about] the

capacity of women to act in society, and to make reproductive decisions." *Id.* at 860.

Additionally, forcing nearly every person who does not end a pregnancy within its very earliest weeks to accept pregnancy and childbirth reflects outdated stereotypes about the proper roles of men and women in society. Namely, the Ban reinforces the view that people who may become pregnant are instantly transformed from independent, autonomous actors into nothing more than "mothers-to-be," and must therefore forgo other aspects of their lives in service of this state-mandated role. *See Hibbs*, 538 U.S. at 736 (discussing historic "denial or curtailment of women's employment opportunities . . . traceable directly to the pervasive presumption that women are mothers first, and workers second"); *VMI*, 518 U.S. at 536 & n.9 (noting historic exclusion of women from higher education based on views that "[i]t is not that girls have not ambition, nor that they fail generally to run the intellectual race [in coeducational settings], but . . . that they do it at a cost to their strength and health which entails life-long suffering, and even incapacitates them for the adequate performance of the natural functions of their sex").[9] Rather than trusting a person's "own conception of her spiritual imperatives and her place in society" to guide her reproductive decision-making, the Ban relies on the State's outdated assumptions and expectations about their proper role. *Casey*, 505 U.S. at 852; *see also, e.g.*, *Gonzales*, 550 U.S. at 184–85 (Ginsburg, J., dissenting) ("[D]epriv[ing] women of the right to make an autonomous choice, even at the expense of their safety . . . reflects ancient notions about women's place in the family and under the Constitution—ideas that have long since been discredited.").

Other outdated laws that rest on the same problematic stereotypes have been struck down because a state may no longer "insist, without more, upon its own vision of the woman's role,

---

[9]     *See also id.* at 536 n.9 (citing views that "physiological effects of hard study and academic competition with boys would interfere with the development of girls' reproductive organs" and that "after five or six weeks of 'mental and educational discipline,' a healthy woman would 'lose . . . the habit of menstruation' and suffer numerous ills as a result of depriving her body for the sake of her mind").

however dominant that vision has been in the course of our history and our culture." *Casey*, 505 U.S. at 852, 897 (striking down spousal-notification requirement for abortion because it reflected views that are "no longer consistent with our understanding of the family, the individual, or the Constitution," including that a woman had "no legal existence separate from her husband" and that her role "as the center of home and family life" precluded her "full and independent legal status"); *Johnson Controls*, 499 U.S. at 211 (striking down employer's "fetal-protection policy" which barred women from certain jobs, noting that it was not for "employers to decide whether a woman's reproductive role is more important to herself and her family than her economic role"); *Orr*, 440 U.S. at 279 (striking down law imposing alimony obligation on husbands but not wives because it was rooted state's preferred "allocation of family responsibilities under which the wife plays a dependent role"); *Wiesenfeld*, 420 U.S. at 645 (invalidating law granting widows but not widowers benefits to care for minor children, which was based on assumption that "men are more likely than women to be the primary supporters of their spouses and children").

The "overbroad generalizations about the different talents, capacities, or preferences of males and females" on which the State's defense relies have been repeatedly rejected as insufficient to meet its burden that the law has an "exceedingly persuasive justification." *VMI*, 518 U.S. at 533. Because the Ban is grounded in the same, outdated stereotypes, it cannot survive the demands of heightened equal protection scrutiny.

iii. *The Ban is Not "Substantially Related" to Any Important State Interest and Thus Lacks the Close Means-Ends Fit Heightened Scrutiny Requires.*

The State cannot show that the Ban is "substantially related" to any important and legitimate governmental objectives. *See VMI*, 518 U.S. at 533. Not only has the State provided no evidence to support the Ban's "close relationship" to its objectives, *Hogan*, 485 U.S. at 725, but the evidence that *does* exist indicates that the Ban would work contrary to these interests. In other words, the

Ban's means and ends are not just unrelated, but diametrically opposed and would "create or perpetuate [] legal, social, and economic inferiority"—results that are squarely incompatible with equal protection's mandate. *See VMI*, 518 U.S. at 533 (sex classifications cannot be used "for denigration of the members of either sex or for artificial constraints on an individual's opportunity").

The means the State deploys here would force people to remain pregnant and give birth. The Ban's imposition of compulsory pregnancy and forced childbearing perpetuates the unequal status of people who may become pregnant rather than promoting their equal participation in all aspects of life. *See id.* at 534; *Casey*, 505 U.S. at 856. Accordingly, even assuming that the Ban's genuine purpose is to protect the health of pregnant people and promote life, depriving pregnant people of the ability to make autonomous decisions about their reproductive and family lives serves precisely the opposite goal. The Ban forces people to carry pregnancies to term even when to do so risks significant harm to their physical, emotional, familial, and material well-being. *See* Carr-Ellis Decl. ¶¶ 23–33; *see also* Ex. 4, Decl. of Serena Mayeri, J.D., Ph.D. ¶¶ 47–48. Further, the Ban imposes those harms on individuals and families who, historically and in the present day, suffer disproportionately from inequities and injustices based on sex, race, and socio-economic status. *See* Carr-Ellis Decl. ¶¶ 23, 26, 32; Maternal Mortality Rep. 5, 15, 25; Infant Mortality Rep. 1, 8; *see also VMI*, 518 U.S. at 541–42 (courts must take a "hard look" at "generalizations" and "judgments" that are "likely to perpetuate historical patterns of discrimination").

Far from protecting the health and welfare of pregnant people, measures controlling reproduction have long been a means by which the State robs individuals of their ability to shape their families and futures. As the Supreme Court has recognized: "The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Casey*, 505 U.S. at 856. Indeed, for "decades of economic and social developments, people have organized intimate relationships and made choices that define

their views of themselves and their places in society, in reliance on the availability of abortion." *Id.*; *see also Gonzales*, 550 U.S. at 172 (Ginsburg, J., dissenting) (decisions about childbearing involve a person's "autonomy to determine her life's course, and thus to enjoy equal citizenship stature"). Childbearing also subjects people "to anxieties, to physical constraints, to pain," and to "suffering [] too intimate and personal for the State to insist" they endure. *Casey*, 505 U.S. at 852; *see also id.* at 928 (Blackmun, J., concurring) ("By restricting the right to terminate pregnancies, the State conscripts women's bodies into its service, forcing women to continue their pregnancies, suffer the pains of childbirth, and in most instances, provide years of maternal care"); *Gonzales*, 550 U.S. at 184 n.9 (Ginsburg, J., dissenting) ("Eliminating or reducing women's reproductive choices is manifestly *not* a means of protecting them.").

Accordingly, reproductive control measures that, like the Ban, "turn the capacity to bear children . . . into a source of social disadvantage" have been struck down because of their detrimental effect, notwithstanding any purportedly benign justifications. *See N.M Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 855 (N.M. 1998) (striking down abortion restriction under state Equal Rights Amendment where discriminatory means was a poor fit for advancing any legitimate goals). For example, in *Cleveland Board of Education v. LaFleur*, the Supreme Court invalidated a policy that required pregnant teachers to quit their jobs several months before they gave birth and prohibited them from returning until three months after, which was "said to protect the health of the teacher and her unborn child." 414 U.S. 632, 641–46 (1974) (holding policy unconstitutional on due process grounds). "[P]enaliz[ing] the pregnant teacher for deciding to bear a child," the Court held, was an impermissible means of furthering the employer's alleged goals. *Id.* at 648; *see also e.g.*, *Turner v. Dep't of Empl. Sec & Bd. of Rev. of Ind. Comm. of Utah*, 423 U.S. 44, 45 (1975) (invalidating similar law because state "must achieve legitimate state ends through more individualized means"). For similar reasons, the Fifth Circuit struck down a Mississippi public

school policy that denied jobs to unmarried parents. *See Andrews v. Drew Mun. Separate Sch. Dist.*, 507 F.2d 611, 614 (5th Cir. 1975), *cert. dismissed as improvidently granted*, 427 U.S. 559 (1976). Rejecting the argument that the policy was necessary to protect children from bad "role models," the Fifth Circuit held that the school failed to "advance [its] objectives in a manner consistent with the Equal Protection Clause." *Id.* (crediting district court's conclusion that policy was "not only patently absurd," but also "mischievous and prejudicial" and would stigmatize unmarried parents and their children). Instead, the policy forced unmarried parents to abandon them or forgo their career aspirations and a living wage. Mayeri Decl. ¶ 41.

Further, "close consideration" of the fit between means and ends should be undertaken where people who face structural barriers, including racism and economic hardship, suffer the brunt of state-sanctioned discrimination. *See, e.g.*, *M.L.B.*, 519 U.S. at 116–17 (1996) (demanding "close consideration" of "state controls or intrusions on family relationships" that burden the poor, and invalidating Mississippi law denying parents' ability to appeal orders permanently severing parent-child relationship based on their ability to pay). Doing so guards against classifications that further subordinate people who have been historically disadvantaged. *See id.*; *Plyer v. Doe*, 457 U.S. 202, 226, 230 (1982) (in case of "special constitutional sensitivity," invalidating Texas law that denied public education to undocumented immigrant children, because the law furthered no "substantial state interest"); *Gaston Cty. v. United States*, 395 U.S. 285, 296–97 (1969) (acknowledging enduring effects of segregated school system, which "systemically deprived its [B]lack citizens of the educational opportunities it granted to its white citizens," in evaluating literacy test for voting).[10]

---

[10]  *See also Beal v. Doe*, 432 U.S. 454, 459–60 (Marshall, J., dissenting) (observing that "[e]ven if [a] strongly disparate racial impact does not alone violate the Equal Protection Clause . . . at some point a showing that state action has a devastating impact on the lives of minority racial groups must be relevant" and that poverty "is surely a relevant factor in the present inquiry" about restriction on Medicaid coverage for abortion); *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994) (noting that "attempt to bisect

Courts should be particularly wary of laws that effectuate the State's interests through reproductive controls as these laws have often perpetuated existing legal, social, and economic inferiority. *Cf. J.E.B.*, 511 U.S. at 142 n.14 (noting that race and sex stereotypes about "competence or predispositions [] have been used to prevent [people] from voting, participating on juries, pursuing their chosen professions, or otherwise contributing to civic life"). And regardless of whether such measures take the form of compulsory pregnancy and childbearing or coercive action to restrict reproduction, their effects have fallen most heavily on Black women, people of color, and people with limited financial means. *See* Mayeri Decl. ¶ 13. Historically, these practices and related measures have sustained discrimination, including by denying individuals the autonomy to make important decisions about their bodies and their lives and enforcing sex- and race- based stereotypes. *Id.* ¶¶ 6–7, 13–44.

This record of state-sanctioned reproductive control reaches back to slavery, when Black women endured brutal sexual violence at the hands of their enslavers and were coerced to bear and rear children under bondage. *Id.* ¶ 15. The law protected and facilitated white slaveholders' treatment of enslaved people as property, afforded white slaveholders an economic interest in enslaved persons' procreation, and denied enslaved people rights to maintain family bonds. *Id.*

Later in the nineteenth century, nativists pursued policies, including abortion restrictions, designed to encourage reproduction among middle- and upper-class white, native-born Americans and to discourage or prevent people considered "unfit" from reproducing. *Id.* ¶ 16. And in the early twentieth century, eugenicists pushed for laws and policies that mandated or coerced the sterilization of "feeble-minded" people—defining "feeble-mindedness" to include conditions such

---

a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences"); *Jefferies v. Harris Cty., Cmty. Action Ass'n,* 615 F.2d 1025, 1030 (5th Cir. 1980) (holding that Black woman plaintff could bring Title VII claims "on the basis of both race and sex").

as chronic poverty, sexual "deviance," and "illegitimacy"—which targeted poor people, immigrants, and people of color. *Id.*; *see also Buck v. Bell*, 274 U.S. 200, 205 (1927) (permitting coercive sterilization to promote the "health . . . and welfare of society").

After World War II, resistance to racial justice and to providing public assistance to families of color underwrote a new wave of reproductive controls. Mayeri Decl. ¶ 18. State legislators proposed, and some enacted, brutal laws mandating sterilization, incarceration, fines, or the removal of children from the custody of women (and occasionally men) who became parents outside of marriage. *Id.* ¶ 18. Proponents' justifications included protecting the public fisc from welfare expenditures, stemming sexual immorality and, in some instances, overt racial hostility. *Id.* ¶¶ 18–21, 33–37. Although some of the harshest coercive sterilization legislation failed to pass, physicians routinely coercively sterilized poor Black women and other women of color. *Id.* ¶¶ 22, 38, 40; *see, e.g.*, *Relf v. Weinberger*, 372 F. Supp. 1196, 1199 (D.D.C. 1974) (case brought by two poor, Black sisters who were forcibly sterilized in Alabama), *vacated*, 565 F.2d 722 (D.C. Cir. 1977). The experience of women who entered the hospital for surgery or to give birth but who left with a forced tubal ligation or unconsented hysterectomy was common enough in the South to be called "Mississippi appendectomy." Mayeri Decl. ¶ 38.

Mississippi also punished those who had children—selectively supporting families and erecting barriers to parents' employment. *See id.* ¶¶ 41–44. The impact again fell most heavily on Black women and families. *See id.* For example, the challenge to the local Mississippi school district policy excluding unmarried parents from jobs was brought by two Black mothers pursuing employment as teachers' aides. *Andrews v. Drew Mun. Separate Sch. Dist.*, 371 F. Supp. 27 (N.D. Miss. 1973), *aff'd* 507 F.2d 611. All of the candidates denied employment under the challenged policy were Black women. *Id.* at 35–36 (observing that "[t]he essentially discriminatory effect of the Drew policy upon unmarried women is inescapable," as "only unmarried females [had] been

prohibited from employment"); *id.* at 30 (evidence demonstrated that "[n]o white person had been . . . denied employment" under the policy). Although the Fifth Circuit did not directly address the race- and sex-discrimination at work, the challenged policy was connected to efforts to resist school desegregation as well as "a long history of discrimination against females on matters of sex and sexual behavior . . . designed to subordinate females to an essentially inferior role, which the power of our society is mobilized to reinforce." Mayeri Decl. ¶¶ 42–43 (quoting testimony of plaintiffs' expert in the case, social psychologist Dr. Kenneth Clark).

By forcing people to remain pregnant and bear children against their will, the Ban prevents each pregnant person's full and equal participation in social, political, economic, and family life.[11] And as history demonstrates, reproductive control efforts routinely harm people who already face systematic disadvantage—in particular Black women, people of color, and people with limited financial means. As a result, the Ban fails to satisfy heightened scrutiny because its means are not substantially related to its ends. *See Morales-Santana,* 137 S. Ct. at 1690.

**CONCLUSION**

Because the Ban prohibits abortion before viability, it violates the due process rights of JWHO's patients, and because it impermissibly discriminates based on sex, it also violates their rights to equal protection. Summary judgment and permanent injunctive relief is warranted where, as here, (1) Plaintiffs have established success on the merits; (2) the loss of constitutional freedoms unquestionably constitutes irreparable injury to Plaintiffs' patients; (3) the State cannot be harmed by the issuance of an injunction that prevents the State from enforcing an unconstitutional law, and (4) upholding constitutional rights serves the public interest. *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).

---

[11]   *See also* Br. of Amici Curiae Reproductive Justice Scholars Supp. Pets.-Cross-Respts., 2019 WL 6609232, **17–31 *June Medical Servs. v. Russo*, 140 S. Ct. 2103 (2020).

For the above reasons, JWHO respectfully requests that the Court declare the Ban unconstitutional on either, or both, due process and equal protection grounds, and permanently enjoin its enforcement as applied to pre-viability abortions.

Respectfully submitted this 29th day of April, 2021.

/s/ Hillary Schneller_____

Hillary Schneller,* NY Bar # 5151154
Julie Rikelman,* NY Bar # 3011426
Michelle Moriarty,* NY Bar # 5055363
Jenny Ma,* NY Bar # 5012422
Alexandra S. Thompson,* NY Bar # 5241989
Shayna Medley,* NY Bar # 5558382
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3777 (phone)
(917) 637-3666 (fax)
hschneller@reprorights.org
jrikelman@reprorights.org
mmoriarty@reprorights.org
jma@reprorights.org
athompson@reprorights.org
smedley@reprorights.org
*Pro Hac Vice

Claudia Hammerman,* NY Bar # 2574333
Alexia D. Korberg,* NY Bar # 5094222
Aaron S. Delaney,* NY Bar # 4321642
Caitlin Grusauskas,* NY Bar # 4846788
Paul, Weiss, Rifkind, Wharton
 & Garrison, LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000 (phone)
(212) 492-0364 (fax)
chammerman@paulweiss.com
adelaney@paulweiss.com
cgrusauskas@paulweiss.com
akorberg@paulweiss.com
*Pro Hac Vice

Robert B. McDuff, MS Bar, # 2532
Mississippi Center for Justice
767 North Congress Street
Jackson, MS 39202
(601) 969-0802 (phone)
(601) 969-0804 (fax)
rbm@mcdufflaw.com
Attorneys for Plaintiffs

Beth L. Orlansky, MS Bar # 3938
Mississippi Center for Justice
P.O. Box 1023
Jackson, MS 39205
(601) 352-2269 (phone)
borlansky@mscenterforjustice.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of April, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Hillary Schneller