**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**JACKSON WOMEN'S HEALTH**
**ORGANIZATION, on behalf of itself and its**
**patients, et al.**                                                                 **PLAINTIFFS**

**VS.**                                                   **Civil Action No.  3:18-CV-171–CWR-FKB**

**THOMAS E. DOBBS, M.D., M.P.H., in his**
**official capacity as State Health Officer**
**of the Mississippi Department of Health, et al.**                    **DEFENDANTS**

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES

The State Defendants, Dr. Thomas Dobbs, in his official capacity as the State Health

Officer of the Mississippi State Department of Health, and Dr. Kenneth Cleveland, in his official

capacity as the Executive Director of the Mississippi Board of Medical Licensure, submit the

following arguments and authorities in support of their Motion to Exclude Certain Opinions and

Testimony of Plaintiffs' Expert Witnesses:

## INTRODUCTION

Certain opinions and testimony of Plaintiffs' designated expert economist, Jason Lindo,

Ph.D; and the entire report and opinions of Plaintiffs' designated historian, Johanna Schoen,

Ph.D, fail to meet the reliability requirements of Fed. R. Evid. 702 and should be excluded by

this Court pursuant to its gatekeeping function in accordance with *Daubert v. Merrell Dow*

*Pharma, Inc.*, 509 U.S. 579 (1993).

Dr. Lindo's opinions concerning the effect of certain of the challenged laws on abortion

rates and travel distance are not based on a sound methodology reliably applied to the facts of

this case.  Dr. Lindo's opinions are correlational only, not causative, and fail to take into account

the effect of abortions obtained by Mississippi women out of state (approximately 57.7% of the abortions obtained by Mississippi women), rendering those opinions unreliable.

Dr. Schoen is a historian who has offered a biased report describing her subjective interpretation of historical events, court decisions, and public statements to opine that all of Mississippi's laws concerning abortion, not merely the challenged laws, are the result of an improper, anti-abortion legislative purpose. Dr. Schoen's report concerning legislative purpose lacks objectivity and also appears intended to act as a conduit to introduce numerous otherwise inadmissible documents and circumvent the Rules of Evidence governing hearsay. Dr. Schoen's report would not help the Court, as the trier of fact, to understand the evidence or determine any fact in issue. Furthermore, Dr. Schoen's opinions are, by their nature, inherently subjective and unreliable.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 requires all expert testimony to meet certain minimum requirements. Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Although these requirements have been included in Rule 702 since the year 2000, the requirements must still be interpreted by the courts in light of *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See* Fed. R. Evid. 702 cmt. (2000).

Pursuant to Daubert, district courts must act as gatekeepers to exclude unreliable expert

testimony. The gatekeeping function "imposes a special obligation upon a trial judge to 'ensure

that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

"A party seeking to introduce expert testimony must show '(1) the testimony is based

upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case.'"

*Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid.

702(b)-(d)). The proponent must also establish that "the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue[.]" Fed. R. Evid. 702(a). The burden of proving that an expert's findings and

conclusions meet the standards for admissibility set forth in Rule 702 falls on the proponent of

the testimony. *E.g.*, *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002).

The Fifth Circuit has instructed that :

> Many factors bear on the inquiry into the reliability of scientific and other expert
> testimony.  In *Daubert*, the Supreme Court offered an illustrative, but not an
> exhaustive, list of factors that district courts may use in evaluating the reliability
> of expert testimony.  These factors include whether the expert's theory or
> technique: (1) can be or has been tested; (2) has been subjected to peer review and
> publication; (3) has a known or potential rate of error or standards controlling its
> operation; and (4) is generally accepted in the relevant scientific community.  In
> the later case of *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized
> that the *Daubert* analysis is a "flexible" one, and that "the factors identified in
> *Daubert* may or may not be pertinent in assessing reliability, depending on the
> nature of the issue, the expert's particular expertise, and the subject of his
> testimony." The district court's responsibility is "to make certain that an expert,
> whether basing testimony upon professional studies or personal experience,
> employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field."

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

A district court has broad discretion in determining whether particular subject matters or specific opinions are a proper subject for expert testimony, or whether those opinions are instead matters which can be "competently deal[t] with based upon . . . common sense and . . . knowledge of the world." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449-50 (5th Cir. 1990). As a general rule, an expert opinion based on "common sense" does not meet the helpfulness requirement of Rule 702. *See, e.g.*, *Lott v. Rental Serv. Corp.*, 2006 WL 839558 at *4-5 (S.D. Miss. Mar. 30, 2006) ("Simply because they are offered by an 'expert,' observations . . . which fall within the realm of 'open and obvious' and 'common sense' do not become opinions based on reliable principles and methods. As the testimony of the plaintiff's offered expert is neither reliable nor helpful, the court is compelled by *Daubert* and its progeny to find that it is also not admissible.").

Further, in order to be reliable under Rule 702, the expert opinion must "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (citations omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). The district court must ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. While it is true that "experts commonly extrapolate from existing data," Federal Rule of

Evidence 702 does not "require[] a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Because this suit involves a request for injunctive relief, the Court will sit as the trier-of-fact.  The Fifth Circuit has observed that "the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).

However, expert testimony "must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted); *see Matthews v. Crosby Tugs, LLC*, 2016 WL 6821956, at *2 (E.D. La. Nov. 18, 2016) ("Nevertheless, *Daubert* still applies in bench trials, and this Court must still ensure that the proffered testimony is reliable.") (citation omitted). This is especially true when the plaintiff moves for summary judgment and relies on expert testimony, as Defendants reasonably anticipate JWHO will do in this case on at least some of their claims.  *See, e.g.*, *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 78 (3d Cir. 2017) ("District courts should, as in any other case, ensure that plaintiffs' evidence is reliable under *Daubert* and provides more than the mere scintilla of evidence needed to survive summary judgment.") (internal quotation marks omitted) *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must . . . set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

**ARGUMENT**

I.    **Dr. Lindo's Opinions Concerning the Effects of the Challenged Laws on Abortion Rates and Travel Distance Are Unreliable Because They Ignore the Impact of Out-of-state Abortions Obtained by Mississippi Women.**

Dr. Lindo, who describes himself as an expert in the field of economics and policy evaluation,  performed statistical analysis for Plaintiffs.  Dr. Lindo's two reports are attached to Defendants' motion as Exhibit A ("Lindo Report") and Exhibit B ("Lindo Rebuttal") respectively.   Dr. Lindo's deposition is attached as Exhibit E.  Dr. Lindo's empirical analyses concerning abortion rates and travel distance are unreliable because they do not take into account the confounding effect of out-of-state abortions obtained by Mississippi women.

Defendants' own statistical expert, Dr. Tumalesh Solanky, professor and chair of the mathematics department at the University of New Orleans ("UNO") describes in detail in his report attached as Exhibit C ("Solanky Report") and his deposition attached as Exhibit D ("Solanky Depo.") the methodological flaws in Dr. Lindo's analysis that skews his conclusions and results.  Dr. Lindo sharply disagrees in his Rebuttal (Ex. B) and deposition, attached as Exhibit E.

Dr. Lindo's reports include both a review of existing research studies, and an original empirical analysis prepared by Dr. Lindo specifically for use in this case. As an initial matter, Dr. Lindo admits that both his empirical analysis and that of Dr. Solanky are "supplemental [to existing research] because they are the results of correlational rather than causal analyses . . . ." Ex. B at 10.  The significance in this difference is that correlational analyses are inadequate to

statistically prove causation rather than mere association.  Ex. C at 4.  Further, to the extent that the prior studies on which he relies are themselves flawed, Dr. Lindo's opinions and analysis based thereon are similarly flawed and unreliable.

In a related sense, Dr. Lindo utterly abandons the concept of statistical significance which has long been a cornerstone of statistical analysis, and which featured prominently in the earlier research and analysis upon which he relies.  There is apparently a sharp dispute in the community of statisticians as to the helpfulness or lack thereof of the traditional statistical concept of "statistical significance."  As an economist, Dr. Lindo has adopted a newer, holistic approach to statistical analysis that discounts the importance of statistical significance, permitting a statistician to minimize calculations inconsistent with an analysis, while as a mathematician, Dr. Solanky firmly relies on traditional principles of statistical analysis.  *Compare, e.g.,* Ex. B at 3-14 *with* Ex. C. at 4, 7.

In addition, Dr. Lindo almost exclusively devotes the 130 pages of his two reports to the purported effects of what Plaintiffs (and Dr. Lindo) refer to as the "Two-Trip Requirement" and "Mandatory Delay"  and effectively addresses the "Telemedicine Ban" and the "Physician-Only Requirement," in only one paragraph (Ex. A at 62).  Even though he performed no analysis of the impact of those two laws, Dr. Lindo nonetheless opines that "individually, and collectively, the Mandatory Delay and Two-Trip Requirement, the Physician-Only Requirement, and the Telemedicine Ban have the effect of imposing significant additional burdens on women seeking an abortion in Mississippi."  Ex. A at 61.  Dr. Lindo's opinions concerning the Physician-Only Requirement and the Telemedicine Ban are not based on sufficient facts or data, nor are those opinions the results of reliable principles and methods applied to the facts of this case, and

therefore those opinions should be excluded.

## II.   Dr. Lindo's Empirical Analysis is Fundamentally Flawed.

Dr. Lindo relies primarily on three prior studies analyzing the impact of Mississippi's 24-hour waiting period before and after the law became effective in 1992. *See* Ex. A at 10-13.[1]   The first Joyce study compared Mississippi's abortion rate before and after the effective date of the 24-hour delay requirement with data from South Carolina and Georgia because they were "2 southern states with no mandatory delay statute." Ex. F at 654.   The third Joyce study also compared Mississippi with South Carolina because at that time both states had parental consent laws as well as mandatory waiting periods, although South Carolina required only a 1-hour delay.  Ex. H at 264-65.   In his analysis of the effect of distance on abortion rates, Dr. Lindo selected the national average abortion rate as the control for comparison, but asserted that using the national average led to the same conclusions.  Ex. E at 218-219.   However, Dr. Lindo did not explain his selection of the national abortion average as a proper control nor account for differences in the legal restrictions (or lack thereof) both nationally and in other individual states, or explain how he accounted for these potential confounding variables.

Each of these studies concerning the impact of Mississippi's 24-hour waiting period and informed consent requirements has its own flaws in methodology.  As Dr. Lindo performed only

---

[1]The three primary studies are attached hereto as Exhibit F, Theodore Joyce et. al., *The Impact of Mississippi's Mandatory Delay Law on Abortions and Births*, 278 J. AM. MED. ASS'N 653 (1997) (hereinafter Joyce, *Mandatory Delay Law on Abortions and Births*); Exhibit G, Theodore Joyce & Robert Kaestner, *The Impact of Mississippi's Mandatory Delay Law on the Timing of Abortion*, 32 FAMILY PLANNING PERSPECTIVES 4 (2000) (hereinafter Joyce, *Mandatory Delay Law on the Timing of Abortion)*]; and Exhibit H, Theodore Joyce & Robert Kaestner, *The Impact of Mandatory Waiting Periods and Parental Consent Laws on the Timing of Abortion and State of Occurrence among Adolescents in Mississippi and South Carolina*, 20 J. POLICY ANALYSIS MGMT. 263 (2001) (hereinafter Joyce, *Mandatory Waiting Periods and Parental Consent Laws*).

correlational analysis, a brief review of the flaws in the studies on which he relies for causation is necessary.  In the 1997 study Joyce, *Mandatory Delay Law on Abortions and Births*, the authors attempted to correct numerous flaws from an earlier analysis of the same Mississippi data, that was criticized by a district court in Wisconsin, with which the Seventh Circuit agreed in *Karlin v. Foust*, 188 F.3d 446, 487-88 (7th Cir. 1999):

> The district court concluded that the study contained a number of methodological flaws that precluded a finding that the decline in abortions in Mississippi resulted from the difficulties in making two trips to an abortion facility rather than from some other reason. For example, the district court found that the Mississippi Study failed to obtain information regarding the number of Mississippi women having abortions in Louisiana—a shortcoming of significance because the sole abortion facility in southern Mississippi closed in early 1992, the year that Mississippi's new abortion statute took effect. This fact meant that a number of women who would ordinarily obtain abortions in southern Mississippi would likely be forced to seek abortions in a nearby Louisiana facility. Although the Mississippi Study attempted to control for its lack of information on Louisiana abortions by reducing the decline in abortions figure by two percent, the district court found that the closing of the abortion clinic in Mississippi made that arbitrary reduction highly speculative.

> The Mississippi Study's most significant shortcoming, however, is that it failed to adequately control for the persuasive effect of the law. In *Casey*, the Supreme Court recognized that a state has a profound interest in potential life from the outset of a woman's pregnancy. 505 U.S. at 878, 112 S. Ct. 2791. To promote that interest, a "State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion," provided that those measures do not place an undue burden on a woman's abortion right. *Id.* Thus, to prove that an abortion regulation poses an undue burden on a woman under *Casey*, it is not enough for a plaintiff to show that the number of abortions declined after the passage of a state abortion regulation because that result is entirely consistent with a state's legitimate interest in persuading a woman to carry her child to term. The plaintiff must also explain why the law had this effect.

> While the Mississippi Study does show a decline in abortions after the passage of that state's abortion statute, the district court found that it does not adequately explain the reason for the decline—whether the drop in abortions is attributable to the persuasive effects of the law or the difficulties in making two trips to an

abortion facility. Accordingly, the district court concluded that the Mississippi Study failed to establish that the waiting period caused the drop in Mississippi abortions and, thus, the Study bore no legal relevance to the inquiry into whether Wisconsin's waiting period would unduly burden a Wisconsin woman's choice to undergo an abortion.

On appeal, plaintiffs have pointed to no evidence in the record that would convince us to disturb the district court's ruling.

*Karlin*, 188 F.3d at 487-88.

Despite their attempts to correct those flaws in the 1997 study Joyce, *Mandatory Delay Law on Abortions and Births*, they were not totally eliminated.  For example, that study still had no data for abortions Mississippi obtained in Louisiana.  Ex. F at 654. The authors expected an increase in the Mississippi birth rate if the law had caused more unintended pregnancies to be carried to term, but stated "[t]he results were inconclusive with respect to birth rates, although not inconsistent with the hypothesis that the law caused an increase in the number of unintended pregnancies carried to term.  Definitive tests of the hypotheses were impossible because the expected effects on the birth rates of the observed decline in abortion are small and can be masked by unmeasured state-specific factors that also affect the birth rate."  Ex. F at 659. Further, the authors admitted that they "[could] not exclude the possibility" that "other changes [could] have occurred in Mississippi during the study period to precipitate the observed decline in abortion rates."  Ex. F at 659.

In the 2000 study  Joyce, *Mandatory Waiting Periods and Parental Consent Laws*, the authors concluded that Mississippi's 24-hour waiting period "increased the mean gestational age of the fetus at the time of the procedure by approximately four days," but that "*[w]omen who live closest to abortion providers in other states were relatively unaffected by this law*."  Ex. G at 4 (emphasis added).

-10-

In the 2001 study Joyce, *Mandatory Delay Law on the Timing of Abortion*, the authors compared effects in Mississippi with the perceived effects of South Carolina's one-hour waiting period, and concluded that Mississippi's 24-hour waiting period law "was associated with an increase in the proportion of abortions performed out of the state . . . ." Ex. H at 263.[2]  In an attempt to correct the failure in the 1997 study to rule out that abortion rates in Mississippi law declined because the law was persuasive, as permitted by *Casey*, the 2001 study merely stated:

> Since both states give roughly similar information regarding the fetus and alternatives to abortion, the additional costs imposed by the overnight delay and the two-visit requirement in Mississippi is the *most plausible* explanation for the increase in later abortions.  Put differently, the increase in later abortions *appears* unrelated to ambivalence induced by the receipt of state-mandated materials related to the fetus.

Ex. H at 278 (emphasis added).  The 2001 Joyce study also admitted several additional limitations, including that "[d]ata on abortions to residents of Mississippi obtained in Louisiana, an important border state, are lacking," and "[a] second caveat is the effectiveness of the comparison groups."  Ex. H at 279.

In a departure from the three Joyce studies on which he heavily relies, Dr. Lindo considered *only in-state* abortions performed at JWHO in his computation of abortion rates:

> Dr. Lindo's analysis of abortion rates, because it focuses only on abortions performed at JWHO, and thus fails to account for more than half of the abortions Mississippi women obtain.  His data on abortion rates, in other words, are not rates for Mississippi women obtaining abortions, but for Mississippi women obtaining abortions *at JWHO*.

Ex. C at 9.  By comparison, all three of the Joyce studies took into account abortions obtained by

---

[2] In the 2000 study, the authors also analyzed the impact of Mississippi's parental consent law for minors' abortions.  However, Plaintiffs have not challenged that law in this case, and the portion of the study devoted to that law is irrelevant here.

Mississippi residents at out-of-state facilities.  Ex. F at 653-54; Ex. G at 267; Ex. H at 5-6.  This

is important because approximately 57.7% of Mississippi women who have obtained abortions

since 2004 have chosen to have those abortions performed out-of-state, and the "vast majority of

Mississippi counties are closer to one or more abortion facilities located in [the bordering states

of] Louisiana, Arkansas, Tennessee, or Alabama than they are to JWHO."  Ex. C at 2.  This

failure negatively affects Dr. Lindo's analysis in two ways.  First, Dr. Lindo "assumes the travel

distance to JWHO is a proxy for travel distance required to obtain an abortion" which makes his

analysis "misleading."  *Id.*  Second, Dr. Lindo's analysis assumes that "each county's abortion

rate at JWHO approximates the county's abortion rate overall" even though Dr. Lindo ignores

over half the abortions obtained by Mississippi women.  *Id.*

Dr. Lindo asserts that existing research studies have shown a causal link between travel

distance and reduced abortion rates, including the three Joyce studies in the 1997-2000 time

frame, such that he had did not need to perform a causal empirical analysis in his report(s): "I did

not do a difference-in-difference analysis of the effect of Mississippi's two-trip law to evaluate

its causal effects because these analyses have already been done by other researchers and the

results have been published in peer-reviewed journals."  Ex. B at 15.

Dr. Lindo states: "[f]or purposes of this report, I have only considered women's access to

abortion within the state of Mississippi itself. It my understanding that, while some women may

travel out of state to seek and obtain care, the availability of abortion outside of Mississippi's

borders is irrelevant to the State's constitutional obligations to its residents."  Ex. A at 3 n.4.  At

his deposition, Dr. Lindo admitted that his exclusion of abortions obtained by Mississippi

women at out-of-state clinics was based on his "understanding as a lay person who is not a legal

expert." Ex. E at 12. *See generally* Ex. E at 11-19. Thus, Dr. Lindo's exclusion of out-of-state abortions from his analysis was based on the conclusion that out-of-state abortions were not *legally* relevant, not because that data was *statistically* irrelevant. Joyce and others specifically analyzed out-of-state abortion data, and considered it not merely relevant, but "important." Ex. F at 654.

Dr. Lindo's conclusion that out-of-state abortion data is legally irrelevant is apparently based on misreading and taking out of context the Fifth Circuit's statement in *JWHO v. Currier*, 760 F.3d 448, 457-58 (5th Cir. 2014), that: "we hold that the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state—here, Mississippi." In that case, the Court held that enforcement of the Mississippi law requiring hospital admitting privileges for doctors performing abortions would have closed JWHO, the only abortion provider in the state, which would have *forced* women to obtain abortions in other states. In that context, the Court concluded that Mississippi could not "lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights . . . and thus requires us to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders." *Id.* at 457.

But the issue here is not a law that would *force* women to go to other states to obtain abortions because of lack of availability in Mississippi, but the reality that more than half of Mississippi women who have abortions *choose* to go out of state to do so. Ignoring that reality has a real and direct impact on the reliability of any statistical analysis attempting to show a correlation between travel distance and abortion rates such as that Dr. Lindo offers. The issue is the factual relevance of the distances women actually travel to obtain abortions, whether in

-13-

Mississippi or out of state, not the legal relevance of out-of-state access if a state law eliminated all in-state abortion access.  It is an undisputable fact that many women living in Mississippi border counties travel a much shorter distance to obtain abortions at clinics in other states than they would have to travel to obtain an abortion at JWHO.  If one is attempting to quantify through statistical analysis the effect that *actual* travel distance may have on *actual* abortion rates, whether the clinics are inside or outside the state is *factually* irrelevant.  Here the State is challenging the reliability of Dr. Lindo's analysis and whether he has adequately accounted for potential confounding variables, not attempting to rely on the availability of out-of-state abortion clinics to justify a law eliminating abortion access.

In his report, Dr. Solanky summarized the problem:

A complete analysis of the abortion data provided by the Centers for Disease Control & Prevention (CDC) and reported to the state by abortion providers reveals that approximately 57.7% of Mississippi residents who have obtained an abortion since 2004 have utilized an out-of-state facility to do so. This is unsurprising given the fact that the vast majority of Mississippi counties are closer to one or more abortion facilities located in Louisiana, Arkansas, Tennessee, or Alabama than they are to JWHO. As a result, Dr. Lindo's study, which assumes that travel distance to JWHO is a proxy for travel distance required to obtain an abortion, is misleading and has produced statistically irrelevant data.

Likewise, because Dr. Lindo's study assumes that each county's abortion rate at JWHO approximates the county's abortion rate overall, he likely underestimates the true abortion rate for all counties, perhaps especially those closer to out-of-state facilities than to JWHO. This further undermines his study and makes his analysis statistically irrelevant.

Ex. C at 2. At his deposition, Dr. Solanky described the specific mathematical problem:

When Dr. Lindo computes the abortion rate for all the 82 counties, all 82, when he computes the rate, the denominator in that rate is the county population.  In the numerator, he has number of abortions the women of that county obtained.  And he is not counting any abortion which happened to Mississippi women outside of Mississippi.  So that is a misleading number.  All 82 of them is the numerator is

deflated . . . The number is relevant because Dr. Lindo is talking about producing
the abortion rate per county.

Ex. D at 227.  In his report, Dr. Solanky explained:

> 32. Dr. Lindo's analysis of abortion rates, because it focuses only on abortions
> performed at JWHO, thus fails to account for more than half of the abortions
> Mississippi women obtain. His data on abortion rates, in other words, are not rates
> for Mississippi women obtaining abortions, but for Mississippi women obtaining
> abortions at JWHO.
>
> 33. That distinction renders Dr. Lindo's model meaningless. His model assumes
> that travel distance is the only criteria used by Mississippi women to pick an
> abortion facility, and that distance and abortion rates are the sole variables. But in
> counties far away from JWHO but close to another clinic, the presence of a closer
> clinic is likely to be a confounding variable that makes the assumption that a
> county's true abortion rate is equivalent to its abortion rate at JWHO implausible.
> Failure to account for that confounding variable leads Dr. Lindo to underestimate
> abortion rates and exaggerate travel distances needed for an abortion, especially
> as distance from JWHO increases.

Ex. C at 9.

Thus, the opinions of Dr. Lindo regarding abortion rates and travel distance are
unreliable and should be excluded.  Further, Dr. Lindo's opinion regarding the Physicians-only
law and the Telemedicine Law are not based on sufficient facts or data, and should therefore be
excluded as unreliable.

**III.    Dr. Schoen's Opinions Are Not Reliable, Nor Would They Be Helpful in Resolving
Any Material Fact in Dispute**.

Dr. Johanna Schoen is a historian who has offered a report describing her opinions
regarding the legislative purpose for the challenged laws (and many others), attached as Exhibit
I.  This report fails the helpfulness and/or reliability requirements of Fed. R. Evid. 702 and
should be excluded in its entirety.

Dr. Schoen was "retained . . . to offer my opinions concerning the purpose of the laws

challenged in this litigation, with a particular focus on the historical context and political history

of the antiabortion movement." Ex. I at 2. By their very nature, Dr. Schoen's opinions are

inherently subjective and unreliable. Dr. Schoen's report reflects a pervasive bias, including her

interpretation of historical events and materials concerning abortion, such that her opinions do

not satisfy the helpfulness requirement of Fed. R. Evid. 701(a).

No one would dispute that abortion is a controversial issue, but throughout Dr. Schoen's

report runs the implicit theme that one side of the controversy, the pro-abortion side, is right, and

the other side, the pro-life (or as Dr. Schoen describes it, "antiabortion") side, is wrong. See

generally Ex. I 6-15, 23-27. Dr. Schoen is obviously entitled to her opinion, but her report does

not reflect a sufficient level of academic or scientific objectivity to be reliable. For example,

simply reviewing the titles of Dr. Schoen's publications and presentations demonstrates the one-

sided nature of her scholarship and areas of academic interest. Ex. I at Internal Ex. A 2-7.

Much of Dr. Schoen's report is devoted to a summary of events, including legal

decisions related to abortion, connected loosely only by the thread of her subjective

characterization and interpretation of events, and reflects biases, prejudices, and misconceptions

that render such a one-sided view unhelpful and unreliably subjective. Dr. Schoen's

interpretation of events is based on nothing more than her own *ipse dixit*. Dr. Schoen does not

address, analyze, or explain sources, materials, or events that might tend to undercut her

opinions.

Dr. Schoen's report casts the pro-life movement in a purely negative light, without any

acknowledgment that many Americans hold the same pro-life views that are valid and proper,

and that they have every right to do so. Dr. Schoen paints those holding pro-life beliefs with a

broad negative brush.  For example, her report includes a section on abortion violence by radical anti-abortion activists that has no connection with this case and is a blatant attempt to inject an irrelevant, inflammatory issue that would serve no valid purpose.  *See* Ex. I at 9-11 ("Shifting Antiabortion Tactics from the 1980s to Early 1990s: Escalating Violence and Terror").  The reprehensible acts of violent extremists decades ago have no connection with JWHO, the State Defendants, or the challenged laws.

Dr. Schoen's report suggests that the participation of persons holding pro-life views in the political process is suspect and renders any laws supported by such persons the product of an improper purpose, regardless of whether legitimate state interests recognized by the Supreme Court are advanced by those laws.  *See generally* Ex. I at 23-48.   Dr. Schoen's report further suggests that for the State of Mississippi to adopt laws consistent with pro-life views, or to pass laws to conform to evolving standards in the Supreme Court's abortion precedents is improper. *See, e.g.*, Ex. I at 39.

Dr. Schoen bases her opinion(s) on review of various types of materials including multiple levels of hearsay, such as, *inter alia*, newspaper articles.  The manner in which Dr. Schoen's report references (and often quotes) numerous materials, including newspaper articles and the like, that standing on their own are inadmissible hearsay (often including multiple levels of hearsay, such as when Dr. Schoen quotes a statement by a public official quoted in a newspaper article) shows that Plaintiffs are attempting to circumvent the restrictions on the use of hearsay by having Dr. Schoen reference those otherwise inadmissible materials.  For example, Dr. Schoen cites seventy-seven "news articles."  Ex. I at App. I, 5-8.

Rule 702 requires an expert to "reliably "appl[y]" their chosen and reliable "principles

and methods to the facts of the case."   But Dr. Schoen's report is not limited to analysis or

opinions of *the facts of this case*, such as testimony and the documents produced in discovery,

but instead attempts to manufacture additional "facts" and documentary evidence through the

vehicle of an "expert" report.  Also, Dr. Schoen's report is not limited to the challenged laws, but

instead discusses numerous unchallenged Mississippi laws, some of which were enacted, and

some of which were not.

Dr. Schoen is not a lawyer or legal expert, yet she offers analysis and interpretation of

numerous court decisions, statutory provisions, and her contentions as to the purpose of those

decisions and laws.  However, this Court is obviously capable of interpreting the Supreme

Court's abortion decisions without the help of a non-lawyer like Dr. Schoen. Appendix I to

Exhibit I reflects that Dr. Schoen cites twenty-seven court opinions, sixteen statutes, six sets of

regulations, and twenty-eight different legislative materials.  Ex. I at App. I.  Moreover, the

problems associated with allowing expert witnesses to testify concerning their interpretation of

legal issues has long been recognized:

> As a result, [the expert witness's] testimony as to the applicable legal standard
> was plainly erroneous, thus demonstrating the danger in allowing experts to
> testify as to their understanding of the law.  Each courtroom comes equipped with
> a "legal expert," called a judge, and it is his or her province alone to instruct the
> jury on the relevant legal standards.

*Burkhart v. Washington Metro. Area Transit Auth*., 112 F.3d 1207, 1213 (D.C. Cir. 1997).  Even

though this would be a bench trial, such that confusing the jury would not be an issue, this Court

needs no assistance from an expert witness to interpret the law.  Therefore, Dr. Schoen's

opinions concerning legal issues and interpretation do not satisfy the helpfulness requirement of

Fed. R. Evid. 702(a).

Dr. Schoen is not a medical doctor or expert of any kind, yet she offers opinions concerning the safety of abortion. *See, e.g.*, Ex. I at 6, 15.  Similarly, Dr. Schoen offers causation opinions concerning the effects of various laws, but has not established any qualifications to do so. *See, e.g.*, Ex. I at 53.  Although Dr. Schoen does not discuss many materials that would conflict with her opinion, she did choose to include all manner of unfairly inflammatory and prejudicial extraneous materials not relevant to any issue before the Court. *See, e.g.*, Ex. I at 29 n.28 (relative political power of poor women and women of color); Ex. I at 35 (regulation of "black hospitals" in the 1960s); Ex. I at 39 n.159 (challenges to Mississippi's dual voting registration system).

Addressing Dr. Schoen's opinions seriatim reflects further deficiencies that render those opinions unreliable. Fox example, Dr. Schoen offers speculative and conjectural opinions that the purposes stated by lawmakers for passing certain laws are false:

> 133. Mississippi legislators have sometimes justified the Challenged Laws and subsequent regulations by claiming to have enacted them for the purpose of promoting the health and safety of women. However, a review of the available evidence of the context in which these laws were passed suggests that this stated purpose is inconsistent with the historical record.
>
> 134. To the contrary, the historical circumstances under which the Challenged Laws were enacted are more consistent with a decades-long effort by national antiabortion groups to create a barrier to abortion access: the Challenged Laws followed substantial lobbying by national antiabortion groups and coincided with the adoption of similar laws in other states advocated by those groups. Additionally, the laws were enacted despite the fact that similar laws in other states had been declared unconstitutional by federal courts, including the Supreme Court.

Ex. I at 52.  In reaching this opinion, Dr. Schoen effectively assumes that any statement that would show that a law had a proper purpose (such as protecting maternal health), is suspect, but any statement that suggests an improper purpose (which to Dr. Schoen apparently includes any

comment reflecting pro-life beliefs) is absolutely accurate and reliable.  Dr. Schoen did not discuss or analyze all of the circumstances related to the passage of the laws at issue or the context in which various comments were made, but instead relied on fifty years of hand picked sources and comments about abortion to reach this highly subjective opinion.  An objective analyst could (and probably would) easily reach conclusions at odds with Dr. Schoen's opinion(s).  Additionally, Dr. Schoen's opinions which cannot be replicated, cannot be tested, and are subject to no known error rate.  Moreover, the quoted opinions are indefinite and couched in the ambiguous terms:  "suggests," "inconsistent," and "more consistent with."  Dr. Schoen offers nothing but her own *ipse dixit* that her subjective interpretation and conclusions are correct or accurate.

> Dr. Schoen next opines that:
>
> 135. The Challenged Laws were enacted following periods of increased access to abortion for women in Mississippi and, once enforced, were followed by reduced access to abortion for those women. This result was not unexpected, and evidence suggests that a lower rate of abortion was, in fact, the Challenged Laws' intended result. The effect of these laws has  been to erect barriers to accessing abortion for women. Those who are most profoundly affected by these barriers are those with minimal political power to protect their interests: lower-income women and women of color.

Ex. I at 53.  Once again, this statement of the "intended result" of the challenged laws is a purely subjective opinion supported only by Dr. Schoen's *ipse dixit*.  Dr. Schoen fails to take into account that many of the laws she takes issue with were, in fact, types of laws specifically upheld by the Supreme Court, and such laws certainly do not reflect an improper purpose.  That Dr. Schoen disagrees with all Supreme Court cases that might tend to restrict abortion in any way, beginning with *Casey*, is irrelevant and immaterial.  The Supreme Court decides what the law is, and while her analysis might have academic interest, it does not matter for purposes of

this case whether Dr. Schoen agrees with Supreme Court decisions or not.

Further, Dr. Schoen's opinion concerning abortion access relies on a fallacious *post hoc ergo propter hoc* analysis, i.e., that because a second event followed the first event, the first event caused the second.  Specifically, Dr. Schoen opines that because abortion rates decreased after certain laws went into effect, the laws caused the reduction.  Dr. Schoen did not make any attempt to account for confounding variables, such as the closure of abortion clinics (which may have reduced abortion rates) after the doctors at those clinics lost their licenses to practice medicine because of egregious instances of medical malpractice.

For example, Dr. Malachy DeHenre, who performed abortions at clinics in Alabama and Mississippi, was prohibited from practicing medicine in Mississippi in August 2004 because of medical malpractice that resulted in the death of an abortion patient in Alabama, and seriously injured two abortion patients in Mississippi.  Ex. J at Cleveland-000196-000199.  Also relevant is Dr. Thomas Tucker, who at one time owned and performed abortions at clinics in Jackson and Desoto County.  Dr. Tucker ultimately lost his license to practice medicine because of, among other things, medical malpractice in the treatment of abortion patients in Alabama that led to the death of at least one abortion patient.  Ex. K at Cleveland-000319-000329.

Dr. Schoen also offers an opinion concerning the importance of public pro-life statements made by individual legislators:

> 136. Contemporaneous public statements made by legislators who drafted and advocated for the laws, as well as statements by other key decisionmakers, are inconsistent with the purpose of protecting women's health. Furthermore the evidence does not support the idea that these laws were passed in response to any increasing abortion-related complications or other health issues; rather, abortion was already one of the safest health procedures in the United States. Each new wave of laws and regulations were passed after the previous wave had failed to make Mississippi an "abortion free" state.

Ex. I at 53.  It is not disputed that certain Mississippi lawmakers hold pro-life views and have

expressed pro-life views on many occasions.  But it is their right to hold and express such views.

There is no litmus test for holding public office that lawmakers must be pro-abortion and express

only pro-abortion views.

The State of Mississippi has a right to define its interests in the national abortion debate,

just like every other State.  *Stenberg v. Carhart*, 530 U.S. 914, 961 (2000) (Kennedy, J.,

dissenting) ("*Casey* is premised on the States having an important constitutional role in defining

their interests in the abortion debate").  The State is not required to remain neutral, and may take

sides, promoting a preference for protecting life and its potential, and showing profound respect

for the life within the woman.  *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).  Thus, states are

not foreclosed from enacting laws to further their interests in the life of the unborn, as well as

ensuring respect for all human life.

Similarly, legislators who hold pro-life views are not prohibited from passing laws that

both promote maternal health while also advancing the State's interest in protecting unborn life.

For example, pro-life advocates might favor passage of an abortion law because they because

they believe the law might reduce the abortion rate.  However, that does not mean that every

legislator that votes for an abortion bill does so based on an improper purpose, nor does it mean

that the purpose of a legislative body as a whole is based on an improper purpose.  A pro-life

legislator could believe that an abortion law might serve pro-life goals while at the same time

genuinely and truthfully believe that the law also protects maternal health.  In fact, many

abortion laws do just that.  Mississippi's informed consent law is one example of such a law.

Dr. Schoen's opinions concerning improper purpose are inconsistent with the law

governing Plaintiffs' burden of proof on this issue.  To establish an improper purpose, Plaintiffs

must prove that each challenged law "serve[s] no purpose other than to make abortions more

difficult." *Whole Woman's Health v. Cole*, 790 F.3d 563, 586 (5th Cir.), *modified*, 790 F.3d 598

(5th Cir. 2015), *rev'd and remanded on other grounds by, Whole Woman's Health v. Hellerstedt*,

136 S. Ct. 2292 (2016), as revised (June 27, 2016) (quoting *Casey*, 505 U.S. at 901; brackets in

original).

 Further, an inquiry into a statute's purpose must necessarily seek the intent of the

legislative body *as a whole* in passing the statute; the subjective motivations of individual

lawmakers are irrelevant. *See, e.g.*, *Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S.

226, 249 (1990) (explaining "what is relevant is the legislative purpose of the statute," not the

"motives of the legislators who enacted it"); *Croft v. Perry*, 604 F. Supp. 2d 932, 938 (N.D. Tex.

2009) (legislative purpose inquiry "only considers the overall legislative purpose . . . , not a

particular legislator's motive in supporting it"), *aff'd*, 624 F.3d 157 (5th Cir. 2010).

 The subjective motivations of particular legislators in voting for a bill are not a sufficient

basis from which to infer the purpose of the entire legislative body.  *See, e.g.*, *United States v.

O'Brien*, 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to make a speech about a

statute is not necessarily what motivates scores of others to enact it, and the stakes are

sufficiently high for us to eschew guesswork.") (footnote omitted); *Planned Parenthood of

Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 791 (7th Cir. 2013) (refusing to hold abortion law

unconstitutional based on improper legislative purpose because "[s]ome Wisconsin legislators

doubtless voted for the statute in the hope that it would reduce the abortion rate, but others may

have voted for it because they considered it a first step toward making invasive outpatient

procedures in general safer").

Accordingly, the fact that pro-life advocates, and pro-life legislators, supported the challenged laws, and made statements to that effect, does not show that the Mississippi Legislature enacted these laws for the sole purpose of improperly preventing women from obtaining abortions.  Further, the fact that pro-life advocacy groups promoted a law and lobbied a Legislature to pass it does not establish improper purpose.  The Supreme Court held in *Mazurek v. Armstrong*, 520 U.S. 968, 974 (1997), "the fact that an anti-abortion group drafted the . . . law" in question "says nothing significant about the legislature's purpose in passing it." 520 U.S. at 973 (emphasis added).

It is significant that Dr. Schoen does not simply question the motives of the handful of Mississippi legislators that she quotes, but effectively questions the motives and integrity of the entire Mississippi Legislature for roughly four decades.  The Mississippi Legislature is not an unchanging, monolithic entity, but is instead a group of individuals, and the composition of each house of the Legislature changes every four years.  Thus, Dr. Schoen is not merely attacking the integrity of the legislators and former legislators she quotes, but is impugning the purposes and integrity of literally *hundreds* of different, individual legislators regarding the passage of abortion laws over a forty-year span.

Because Dr. Schoen's opinions concerning purported improper purposes for the challenged laws are inconsistent with Supreme Court precedent, they cannot be helpful to determine any fact at issue in this case as required by Rule 702(a).

Last, Dr. Schoen offers the opinion that:

137. Together, the intricate net of antiabortion laws and regulations enacted in Mississippi over the past thirty years have kept countless women from accessing

-24-

safe, legal abortion care.

Ex. I at 53.  Once again, Dr. Schoen has no valid basis for this subjective opinion, and her statement is phrased in a way that is meaningless for purposes of this case.  First, the only laws at issue in this case are the specific laws that Plaintiffs have challenged, not an "intricate net of antiabortion laws and regulations."  Second, even assuming, *arguendo*, that Dr. Schoen's opinion was correct as stated (which it is not), the issue is whether the specific challenged laws have *improperly or unlawfully* prevented women from accessing abortion care in a manner inconsistent with controlling Supreme Court precedent.  Further, Dr. Schoen has not established any credentials that would qualify her to offer an "expert" opinion as to causation.  At most, Dr. Schoen's subjective opinions and analysis describe only an alleged correlation between certain events and access to abortion.  Correlation is not causation, regardless of whether the proposed expert is a statistician or a historian.

Because Dr. Schoen's opinions are inherently subjective and unreliable, they should be excluded in their entirety pursuant to Rule 702(a)-(d).

## CONCLUSION

Based on the foregoing, the Court should enter an order granting the State Defendants' motion and excluding the unreliable opinions of Dr. Lindo and Dr. Schoen as described herein.

Respectfully submitted this the 29th day of April, 2021.

**THOMAS E. DOBBS, M.D., M.P.H., in his official capacity as STATE HEALTH OFFICER OF THE MISSISSIPPI DEPARTMENT OF HEALTH, and KENNETH CLEVELAND, M.D., in his official capacity as EXECUTIVE DIRECTOR OF THE MISSISSIPPI STATE BOARD OF MEDICAL LICENSURE**

By:     *s/Paul Barnes* _____
PAUL E. BARNES, MSB No. 99107
WILSON MINOR, MSB No. 102663
Special Assistant Attorneys General

STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, MS   39205
Telephone No. (601)359-4072
Facsimile: (601)359-2003
pbarn@ago.state.ms.us
wmino@ago.state.ms.us

## CERTIFICATE OF SERVICE

This is to certify that on this day I, Paul E. Barnes, Special Assistant Attorney General for the State of Mississippi, electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notice of such filing to all counsel of record.

THIS, the 29th day of April, 2021.

_s/Paul Barnes_____
PAUL E. BARNES